IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| KAREN BROOKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. B-01-052 |
| | § | |
| UNUMPROVIDENT CORPORATION | § | |
| and UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendants. | § | |

---

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO
COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2)
PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES**

---

Andrew C. Whitaker
State Bar No. 21274600
S.D. No. 14309
Attorney-In-Charge
OF COUNSEL:
Doug K. Butler
State Bar No. 03516050
S.D. No. 9271
FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (telecopy)

ATTORNEYS FOR DEFENDANTS
UNUMPROVIDENT CORPORATION
and UNUM LIFE INSURANCE
COMPANY OF AMERICA

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   INTRODUCTORY OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Defendants Have Responded to the Majority
            of Brooks' Requests for Production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    Documents Supporting Defendants' Allegations and Regarding the
                  Handling of Brooks' Claim (Requests No. 1, 23-31, 36-43, 44.1, 45,
                  and 50-54) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    Expert Witnesses (Request No. 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            3.    UnumProvident's Form 10-Ks (Request No. 9) . . . . . . . . . . . . . . . . . 6

            4.    The Policy (Request No. 10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            5.    Application Questionnaires (Request No. 11) . . . . . . . . . . . . . . . . . . 7

            6.    Brooks' Medical Bills and Records (Request No. 21) . . . . . . . . . . . 7

            7.    Defendants' Investigation (Request No. 22) . . . . . . . . . . . . . . . . . . . 8

            8.    Telephone Memoranda (Requests No. 32-33) . . . . . . . . . . . . . . . . . 8

            9.    Curricula Vitae and Publications (Requests No. 34, 46-49, and 59) . 8

            10.   BMC Surgical Log (Request No. 35) . . . . . . . . . . . . . . . . . . . . . . . . 8

            11.   Documents from the Original Action (Request No. 55) . . . . . . . . . . 9

            12.   Defendants' Investigation (Requests No. 60-74) . . . . . . . . . . . . . . . 9

      B.    Defendants Do Not Have Any Documents
            Responsive to Some of Brooks' Requests for Production . . . . . . . . . . . . . . 10

1.     Blank Policies and Applications (Request No. 12) . . . . . . . . . . . . 10

2.     Premium Payments (Request No. 13) . . . . . . . . . . . . . . . . . . . . . . . 10

3.     Criminal Records of Defendants' Employees (Request No. 14) . . . 10

4.     Brochures and Surveillance (Requests No. 15 and 17) . . . . . . . . . . 11

C.     Defendants Have Answered the Majority of Brooks' Interrogatories . . . . . 11

D.     Brooks Is Not Entitled to Information Regarding Other
Claims, Complaints, and Lawsuits (Requests No. 3, 4, 5, 6, 8,
56, 57, and 58 and Interrogatories No. 15, 16, 19, 21, and 22) . . . . . . . . . . 13

E.     Brooks Is Not Entitled to Information Regarding the TDI's Investigations
(Requests No. 7, 8, and 18 and Interrogatories No. 8, 20, and 22) . . . . . . . 19

F.     Brooks Is Not Entitled to Additional Information Regarding
Sullivan's Activities (Request No. 38 and Interrogatory No. 21) . . . . . . . . 21

G.     Brooks Is Not Entitled to Any of the Other Documents
that She Seeks (Requests No. 16, 19, 20, and 44) . . . . . . . . . . . . . . . . . . . 21

H.     Brooks Is Not Entitled to a Listing of All of
Defendants' Employees (Interrogatory No. 5) . . . . . . . . . . . . . . . . . . . . . . 23

I.     Defendants Are Entitled to Recover
Their Attorney's Fees from Brooks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# INDEX OF AUTHORITIES

## CASES

Page

Amcast Indus. Corp. v. Detrex Corp.,
    138 F.R.D. 115 (N.D. Ind. 1991) ............................................................... 24

Baker v. CNA Ins. Co.,
    123 F.R.D. 322 (D. Mont. 1988) ............................................................... 15

Hofer v. Mack Trucks, Inc.,
    981 F.2d 377 (8th Cir. 1992) ................................................................... 13

In re IBM Peripheral EDP Devices Antitrust Litig.,
    77 F.R.D. 39 (N.D. Cal. 1977) ................................................................. 24

K Mart Corp. v. Sanderson,
    937 S.W.2d 429 (Tex. 1996) .................................................................... 18

Leksi, Inc. v. Federal Ins. Co.,
    129 F.R.D. 99 (D.N.J. 1989) ................................................................... 18

Lyons v. Millers Cas. Ins. Co. of Tex.,
    866 S.W.2d 597 (Tex. 1993) .................................................................... 16

Marker v. Union Fidelity Life Ins. Co.,
    125 F.R.D. 121 (M.D.N.C. 1989) ................................................... 14, 15, 16

Moses v. State Farm Mut. Auto. Ins. Co.,
    104 F.R.D. 55 (N.D. Ga. 1984) ...................................................... 14, 15, 16

National Union Fire Ins. Co. of Pittsburgh, Pa. v. Dominguez,
    873 S.W.2d 373 (Tex. 1994) .................................................................... 16

North River Ins. Co. v. Greater N.Y. Mut. Ins. Co.,
    872 F. Supp. 1411 (E.D. Pa. 1995) .................................................... 14, 15

Texaco, Inc. v. Sanderson,
    898 S.W.2d 813 (Tex. 1994) .................................................................... 18

Transportation Ins. Co. v. Moriel,
    879 S.W.2d 10 (Tex. 1994) ..................................................................... 16

Underwriters Life Ins. Co. v. Cobb,
    746 S.W.2d 810 (Tex. App.--Corpus Christi 1988, no writ) .................................... 17

Universe Life Ins. Co. v. Giles,
    950 S.W.2d 48 (Tex. 1997) ...................................................................................... 16

## STATUTES AND RULES

Fed. R. Civ. P. 33(d) ....................................................................................................... 11

Fed. R. Civ.  P. 37(a)(4)(B) ........................................................................................... 23

S.D. Tex. L.R. 33.1 ..................................................................................................... 5, 13

Tex. Bus. & Com. Code § 17.45 ....................................................................................... 17

Tex. Bus. & Com. Code § 17.46 ....................................................................................... 16

Tex. Bus. & Com. Code § 17.50 ....................................................................................... 16

Tex. Ins. Code art. 1.10D ........................................................................................... 19, 20

Tex. Ins. Code art. 21.21 ................................................................................................. 17

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KAREN BROOKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. B-01-052 |
| | § | |
| UNUMPROVIDENT CORPORATION | § | |
| and UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO
COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2)
PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES**

Defendants UnumProvident Corporation ("UnumProvident") and Unum Life Insurance

Company of America ("Unum Life") (collectively, "Defendants") file this combined response

to Plaintiff's Motion to Compel Responses to Request for Production (Docket No. 32) and

Plaintiff's Motion to Compel Answers to Interrogatories (Docket No. 34) (collectively, the

"Motions to Compel") and state:

## I. <u>NATURE OF THE ACTION</u>

This is a suit for disability benefits under a group policy issued to the American

Podiatric Medical Association. Less than a year after obtaining a Certificate of Insurance (the

"Certificate") under such policy, Plaintiff Karen Brooks ("Brooks") fell in her bathtub and

purportedly sustained injuries preventing her from performing her occupational duties as a

podiatrist. Unum Life began paying $6,000 per month in disability benefits to Brooks while it investigated her claim. During its investigation, Unum Life obtained (among other information) surgical logs from one of the hospitals at which Brooks had privileges indicating that she performed more surgeries in the period after her fall than she had before her fall. Brooks was unable to offer a satisfactory explanation for the information contained in these logs, and Unum Life stopped paying benefits to her. In Plaintiff's Complaint (the "Complaint"), Brooks asserts claims against Defendants for (1) breach of contract, (2) violations of the Texas Insurance Code, (3) violations of the DTPA, (4) bad faith, and (5) fraud. Defendants deny all liability to Brooks and have asserted a counterclaim to recover the $48,000 in benefits that were paid to her.

## II. INTRODUCTORY OVERVIEW[1]

From a review of the Motions to Compel, it would appear that Defendants have produced few (if any) documents to Brooks and have refused to answer most (if not all) of her interrogatories. To the contrary, a review of Defendants' discovery responses confirms that Brooks' assertions that Defendants "did not respond with one document" to her requests for production and "failed to answer [her interrogatories] in near entirety" are simply not true. By now, Defendants have provided to Brooks, at their expense, copies of the following documents:

---

[1]Unless otherwise indicated, all emphases are supplied by counsel.

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2) PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 2**

- Unum Life's claim file pertaining to Brooks (CL001-869), which contains the nonprivileged documents pertaining to the investigation of her claim[2];

- the underwriting file pertaining to Brooks (UW001-141);

- the transition rider and schedule sheet for the APMA 65-65 plan (UNUM 0001-0011), which set forth the applicable terms of Brooks' coverage;

- the curricula vitae of Jon Colson, Nancy Olds, Sheldon White, and Nancy Bogg (UNUM 0012-0016), who were some of the individuals involved in the handling of Brooks' claim;

- the chapter authored by Nancy Bogg in a published book (UNUM 0017-0032);

- Exhibits 2 and 3 to the Appendix in Support of Defendants' Brief Regarding Plaintiff's Continued Performance of Surgeries (UNUM 0033-0048), which contain evidence of Brooks' misrepresentations during the claims process; and

- UnumProvident's Form 10-Ks for 1998 through 2001 (UNUM 0049-1482), which contain financial and other information about Defendants' business.

In addition, Defendants have, on multiple occasions, offered to make available to Brooks their copies of the following documents, all of which were obtained with notice to Brooks, so that she could copy them at her expense:

- the following items from <u>Karen Brooks v. UnumProvident Corporation and Unum Life Insurance Company of America</u>, C.A. No. B-00-029 (the "Original Action"): Deposition on Written Questions of Beatriz Sosa, the Custodian of Records of Dr. Madhavan Pisharodi, M.D.; Deposition on Written Questions of Lori Lopez, the Custodian of Records of Texas Back Institute; Deposition on Written Questions of Diane Clark, the Custodian of Records of Valley Regional Medical Center; Deposition on Written Questions of Esmeralda Saldivar, the Custodian of Records of Valley Pain Center; Deposition on Written Questions of Fernando Terrones, CPA; Deposition on Written Questions of David K. Drefke, CPA; Deposition on Written Questions of David Kaalib, the Custodian of Records of Berkshire Life Insurance Company; Deposition on Written

---

[2]Defendants withheld six documents from this file on privilege grounds and provided Brooks with a log identifying such documents.

Questions of Christina Bohn, the Custodian of Records of Minnesota Mutual Life Insurance Company; Deposition on Written Questions of the Custodian of Records of New Era Life Insurance Company; and documents produced by Brownsville Medical Center (collectively, the "Original Action Documents")[3]; and

- the documents obtained by subpoena in this action from Berkshire Life Insurance Company (BLI 00001-00163), New Era Life Insurance Company (NE 0001-0025), Ambulatory Surgery Center of Brownsville (ASC 00001-00012), Atlas Administrators (AA 00001-00516), Medical Center of Plano (MCP 0001-0025), New York Life Insurance Company (NYL 00001-00089), The Paul Revere Life Insurance Company (PR 0001-0074), PICA Group Services (PG 0001-0002), Robert Swantner (RS 0001-0061), and Valley Pain Center (VPC 0001-0061).

As set forth in Defendants' responses, these documents are, taken together, responsive to 56 of Brooks' 74 requests for production. Moreover, Defendants have been unable to locate any documents responsive to five of Brooks' requests (Request No. 12 regarding a blank policy and application, Request No. 13 regarding premium payments, Request No. 14 regarding the criminal records of its employees, Request No. 15 regarding sales brochures, and Request No. 17 regarding surveillance), thus leaving only 14 requests for production truly in dispute.

Defendants have also answered the majority of Brooks' interrogatories. As set forth more fully in their answers and below, Defendants have fully answered Interrogatory No. 1 regarding persons with knowledge of relevant facts, Interrogatory No. 2 regarding relevant documents, Interrogatory No. 4 regarding the individuals who worked on Brooks' claim, Interrogatory No. 6 regarding the investigation of her claim, Interrogatory No. 7 regarding her

---

[3]As set forth in numerous letters to Brooks' counsel, the Original Action Documents consist of the documents that Defendants obtained through depositions on written questions of third parties in the Original Action, which Brooks dismissed without prejudice on October 3, 2000.

statements and admissions, Interrogatory No. 9 regarding audio or video recordings, Interrogatory No. 11 regarding the enforceability of her coverage, Interrogatory No. 12 regarding liability for her psychiatric or psychological condition, Interrogatory No. 14 regarding the information relied upon by Defendants' experts, Interrogatory No. 18 regarding the licenses of Defendants' employees, and Interrogatories No. 23-25 regarding various contentions in Defendants' Answer and Counterclaim. Defendants also provided Brooks with at least some (if not all) of the information sought in Interrogatory No. 3 regarding their damages, Interrogatory No. 8 regarding the statements of Defendants and their employees, Interrogatory No. 10 regarding the training of Defendants' employees, Interrogatory No. 13 regarding Defendants' experts, and Interrogatory No. 17 regarding the preparation of Defendants' interrogatory answers. All told, Defendants have answered (when sub-parts are included) well over 25 questions from Brooks, and pursuant to S.D. Tex. L.R. 33.1, the Court should quash her remaining questions.

## III. ARGUMENT

### A.    Defendants Have Responded to the Majority of Brooks' Requests for Production.

Initially, the Motions to Compel should be denied because Defendants have already produced documents in response to 56 of Brooks' 74 requests for production:

      1.    <u>Documents Supporting Defendants' Allegations and Regarding the Handling of Brooks' Claim (Requests No. 1, 23-31, 36-43, 44.1, 45, and 50-54)</u>. With respect to Request No. 1 regarding documents that support Defendants' denial of Brooks' claim, Request No. 23

regarding her alleged disability, Request No. 24 regarding the allegations in Defendants'

counterclaim, Request No. 25 regarding Defendants' denial of certain allegations, Requests No.

26-31 regarding Defendants' affirmative defenses, Request No. 36 regarding the reports of

Health Resources and Technology and John Wells, M.D., Request No. 37 regarding Dr.

Cartaya's report, Request No. 38 regarding the individuals interviewed by Sean Sullivan,

Request No. 39 regarding the duties of a podiatrist, Requests No. 40-43 regarding Brooks'

earnings, duties, and capabilities, Request No. 44.1 regarding the reports of Health Resources

and Technology, Request No. 45 regarding Brooks' duties and capabilities, and Requests No.

50-54 regarding various allegations in Defendants' counterclaim, Defendants have, through

their previous production of the claim file (CL001-869) and the underwriting file (UW001-

141) and offer to produce the Original Action Documents, produced all of the nonprivileged

documents of which they are currently aware that are responsive to these requests.

2.    Expert Witnesses (Request No. 2).  To date, Defendants have designated only

their outside counsel in this case as expert witnesses on the issue of attorneys' fees and have

provided Brooks with their biographical information, which may be found as Exhibit C to

Defendants' interrogatory answers.  If and when additional experts are designated, Defendants

will produce copies of their curriculum vitae, if available.

3.    UnumProvident's Form 10-Ks (Request No. 9).  With respect to Request No. 9,

Defendants have now produced copies of UnumProvident's Form 10-Ks for 1998 through 2001

(UNUM 0049-1482).

4.    The Policy (Request No. 10). With respect to Request No. 10 regarding Brooks' policy, Defendants previously produced the transition rider and schedule sheet (UNUM 0001-0011) for the plan issued to the American Podiatric Medical Association (the "APMA"). As also set forth in Defendants' response, insureds such as Brooks received a certificate of insurance, and Unum Life does not have a copy of the Certificate issued to Brooks, which is presumably in her possession. Defendants have thus produced the documents that they have.

5.    Application Questionnaires (Request No. 11). With respect to Request No. 11 regarding "questionnaires or checklists" completed by Brooks during the application process, as set forth in their response, Defendants have previously produced the underwriting file pertaining to her (UW001-141), which contains all of the responsive documents in their possession. Rule 34(b) allows a producing party such as Defendants to produce documents "as they are kept in the usual course of business," which is exactly what Defendants have done here.

6.    Brooks' Medical Bills and Records (Request No. 21). With respect to Request No. 21 regarding Brooks' medical bills and records, as set forth in their response, Defendants have previously produced all such documents as part of the claim file (CL001-869) and the underwriting file (UW001-141). Moreover, Defendants have repeatedly advised Brooks that they are willing to make their copy of the Original Action Documents and the other documents that they have obtained by subpoena from third parties available to her for inspection and copying. These documents constitute all of the medical records that Defendants have at the present time.

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2) PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 7**

7.     Defendants' Investigation (Request No. 22).  With respect to the documents sought in Request No. 22 regarding their investigation of Brooks, Defendants have produced all nonprivileged documents as part of the claim file (CL001-869) and offered to produce the Original Action Documents.  Any additional documents are privileged for the reasons set forth in section III.E. below with respect to the investigation of Brooks by the Texas Department of Insurance.

8.     Telephone Memoranda (Requests No. 32-33).  With respect to the documents sought in Request No. 32 regarding the July 20, 1998 telephone conversation between Brooks and one of their employees, Defendants' response specifically identifies CL084-85, which is a memorandum pertaining to this very conversation.  In turn, Defendants' response to Request No. 33 specifically identifies CL084-85 and CL337 as memoranda or notes pertaining to the referenced communications.

9.     Curricula Vitae and Publications (Requests No. 34, 46-49, and 59).  Defendants have produced copies of the curriculum vitae of Nancy Bogg (UNUM 0013-0016), which is responsive to Requests No. 34 and 47, the curriculum vitae of Jon Colson (UNUM 0012), which is responsive to Request No. 46, the chapter authored by Ms. Bogg (UNUM 0017-0032), which is responsive to Request No. 48, the curriculum vitae of Sheldon White (UNUM 0012B-0012D), which is responsive to Request No. 49, and the curriculum vitae of Nancy Olds (UNUM 0012A), which is responsive to Request No. 59.

10.     BMC Surgical Log (Request No. 35).  With respect to Request No. 35 regarding the surgical log that Defendants obtained from Brownsville Medical Center ("BMC") in the

Original Action, Defendants referred Brooks to CL389-400 (which is a copy of the log that Unum Life obtained during the claims process) from the previously produced claim file and the log obtained from Brownsville Medical Center in the Original Action Documents. Defendants also produced copies (UNUM 0033-0048) of Exhibits 2 and 3 to the Appendix in Support of Defendants' Brief Regarding Plaintiff's Continued Performance of Surgeries, which was filed on September 22, 2000 in the Original Action.

11.    Documents from the Original Action (Request No. 55). With respect to Request No. 55 regarding the relevant documents from the Original Action, as set forth in their response, Defendants have now produced the claim file (CL001-869), the underwriting file (UW001-141), and the transition rider and scheduling sheet for the APMA 65-65 plan (UNUM 0001-0011); agreed to produce their copy of the Original Action Documents; and agreed to produce the pleadings from the Original Action. Brooks should have received copies of all of these documents from her prior counsel; however, Defendants are willing to produce them again (at Brooks' expense) upon request.

12.    Defendants' Investigation (Requests No. 60-74). With respect to Requests No. 60-74 regarding the investigation of Brooks' claim by the listed agents or employees of Unum Life, as set forth in Defendants' responses, Defendants have previously produced all such nonprivileged documents through the claim file (CL001-869). By design, Unum Life maintained a centralized claim file with respect to Brooks, and all of the nonprivileged documents in such file have been produced.

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2) PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 9**

**B.    Defendants Do Not Have Any Documents**
**Responsive to Some of Brooks' Requests for Production.**

In addition, the Motions to Compel should be denied because Defendants simply do not

have copies of some of the documents requested by Brooks.

1.    Blank Policies and Applications (Request No. 12).  With respect to Request No.

12 regarding a "blank" policy and application, the coverage issued by Commercial Life to the

APMA is no longer in force, and the requested documents have nothing whatsoever to do with

this case.  Moreover, Defendants are not sure what a "blank" policy would look like and have

thus far been unable to locate a "blank" application, which is not surprising in light of the fact

that the APMA's coverage is no longer in force.  Defendants have, however, produced copies

of Brooks' application for coverage and the key terms of such coverage.

2.    Premium Payments (Request No. 13).  With respect to Request No. 13 regarding

premium payments, Defendants have (after a diligent search) been unable to locate any

responsive documents.  Defendants are attempting to determine, however, the total amount that

was paid in premiums for Brooks' coverage and, if they can determine that amount, are willing

to so stipulate in lieu of producing such documents.  Moreover, Brooks likely has some of

these documents in her possession.

3.    Criminal Records of Defendants' Employees (Request No. 14).  With respect to

Request No. 14 regarding the criminal records of the employees involved in the handling of

Brooks' claim, Defendants do not have any such documents in their possession, custody, or

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO**
**COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2)**
**PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 10**

control. Moreover, the documents sought in this request have nothing whatsoever to do with this case and (if any exist) invade the privacy of the employees at issue.

    4.    <u>Brochures and Surveillance (Requests No. 15 and 17)</u>.  As set forth in their responses to Request No. 15 regarding brochures and Request No. 17 regarding surveillance, Defendants do not have any responsive items to produce.

## C.    <u>Defendants Have Answered the Majority of Brooks' Interrogatories.</u>

In addition, the Motions to Compel should be denied because Defendants have answered the majority of Brooks' interrogatories:

- in response to Interrogatory No. 1 regarding persons with knowledge of relevant facts, Defendants identified 46 individuals, by name, address, and (if available) telephone number and provided a description of their knowledge;

- in response to Interrogatory No. 2 regarding relevant documents, Defendants identified over 15 categories of documents and provided Brooks with information regarding the location of such documents;

- in response to Interrogatory No. 4 regarding the individuals who worked on her claim, Defendants identified 14 individuals and, with respect to each individual so identified, provided his or her name, address, telephone number, title, supervisor, employer, and (if known) current place of employment;

- in response to Interrogatory No. 6 regarding the investigation of Brooks' claim, Defendants referred her pursuant to Fed. R. Civ. P. 33(d) to its claim file, which sets forth the steps taken during the investigation of her claim and identifies the individuals taking such steps;

- in response to Interrogatory No. 7 regarding statements and admissions of Brooks, Defendants referred her pursuant to Fed. R. Civ. P. 33(d) to the underwriting and claim files pertaining to her and the Original Action Documents, which contain all of the statements and admissions of Brooks of which Defendants are currently aware;

- in response to Interrogatory No. 9 regarding audio or video recordings of Brooks, Defendants stated that they have no such recordings;

- in response to Interrogatory No. 11 regarding the enforceability of Brooks' coverage, Defendants stated that they are not contending that such coverage is unenforceable but are contending that she is not entitled to any additional benefits and must repay the benefits that she received;

- in response to Interrogatory No. 12 regarding liability for Brooks' psychiatric or psychological condition, Defendants explained why they are not so liable;

- in response to Interrogatory No. 14 regarding the information relied upon by their experts, Defendants stated their experts (who are their outside counsel in this case) have reviewed the pleadings and discovery generated in this lawsuit in rendering their opinions;

- in response to Interrogatory No. 18 regarding the professional licenses held by the employees involved in the handling of her claim, Defendants provided Brooks with information regarding the dates such licenses were issued, the entities issuing such licenses, and the suspensions or revocations (if any) of such licenses; and

- in response to Interrogatories No. 23-25 regarding various contentions in Defendants' Answer and Counterclaim, Defendants provided Brooks with a lengthy narrative in support of such allegations.

In their answers to these interrogatories, Defendants provided Brooks with all of the information of which they were aware at the time and will periodically supplement as they learn of additional information.

In addition, Defendants have provided Brooks with at least some information in response to Interrogatory No. 3 regarding their damages, Interrogatory No. 8 regarding the statements of Defendants and their employees, Interrogatory No. 10 regarding the training of Defendants' employees, Interrogatory No. 13 regarding Defendants' experts, and Interrogatory No. 17 regarding the preparation of Defendants' interrogatory answers. By their calculation,

Defendants have answered (when sub-parts are included) at least 30 questions from Brooks, which exceeds the number of questions allotted to her by S.D. Tex. L.R. 33.1. On this ground alone, Brooks' efforts to obtain additional interrogatory answers should be rejected.

### D.     Brooks Is Not Entitled to Information Regarding Other Claims, Complaints, and Lawsuits (Requests No. 3, 4, 5, 6, 8, 56, 57, and 58 and Interrogatories No. 15, 16, 19, 21, and 22).

Admittedly, Defendants have objected to some of the information and documents sought in Brooks' discovery requests. As set forth more fully below, however, their refusal to produce such information and documents is well-taken. Initially, Brooks is not entitled to the documents and information that she has sought in Requests No. 3, 4, 5, 6, 8, 56, 57, and 58 and Interrogatories No. 15, 16, 19, 21, and 22 regarding the claims, complaints, and lawsuits of other insureds. To be entitled to these items, Brooks should be required to make a preliminary showing that they somehow relate to the handling of her claim. As the Eighth Circuit has observed:

> While the standard of relevance in the context of discovery is broader than in the context of admissibility (Rule 26(b) clearly states that inadmissibility is no grounds for objection to discovery), this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case.

Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992) (citations omitted).

Numerous courts have recognized, however, that claims, complaints, and lawsuits of other insureds are neither relevant nor reasonably calculated to lead to the discovery of

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2) PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 13**

admissible evidence. See North River Ins. Co. v. Greater N.Y. Mut. Ins. Co., 872 F. Supp.

1411, 1412 (E.D. Pa. 1995); Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 124-25

(M.D.N.C. 1989); Moses v. State Farm Mut. Auto. Ins. Co., 104 F.R.D. 55, 57-58 (N.D. Ga.

1984). This case is not one in which Unum Life accepted Brooks' premium payments for years

only to deny her claim without justification and without the payment of any benefits. To the

contrary, Unum Life paid benefits to Brooks for several months (after she had paid premiums

for less than a year) and only closed her claim following receipt of surgical logs indicating that

she was not disabled. Moreover, such claims and lawsuits involve the application of different

laws to different claimants, different policies, different disabilities, and different facts. If such

evidence were admitted, Defendants would have no choice but to seek to introduce evidence

to defend its other claims decisions. Accordingly, discovery of these claims and lawsuits (and

Brooks' requests for additional information that will no doubt ensue from their disclosure)

should not be permitted. As one court observed:

> North River has moved under Rule 37 of the Federal Rules of Civil
> Procedure to compel GNY to identify, in answer to interrogatories, whether it
> has ever been a party to other bad faith actions in the last seven years and, if so,
> to set forth specifics. GNY has objected on the ground of relevancy. We agree
> with GNY's objection. These prior bad faith cases, if any, will necessarily
> involve totally different facts and circumstances from those present here. Such
> information not only is highly unlikely to have any relevance to whether or not
> GNY acted in bad faith in the *McIlhenny* lawsuit but does not even "appear
> reasonably calculated to lead to the discovery of admissible evidence." *See* Rule
> 26 of the Federal Rules of Civil Procedure. Any discovery of this material would
> properly be characterized as a fishing expedition, causing needless expense and
> burden to all concerned. Allowing such discovery would also run counter to the
> important but often neglected Rule 1 of the Federal Rules of Civil Procedure
> which requires that all rules "shall be construed and administered to secure the
> just, speedy and inexpensive determination of every action."

North River Ins. Co., 872 F. Supp. at 1412; see also Baker v. CNA Ins. Co., 123 F.R.D. 322, 328-329 (D. Mont. 1988) (sustaining an insurer's objections to the identification of all bad faith lawsuits in previous five years); Moses, 104 F.R.D. at 57-58 (stating that the insurer's conduct regarding the claims of others "is of no consequence to this case"). Here, Brooks may obtain information regarding the handling of her claim through the depositions of the individuals primarily responsible for the denial of her claim.[4] See Marker, 125 F.R.D. at 125 ("Deposition of defendant's decision makers would provide the most direct source of the reasons plaintiff's claim was denied."); Moses, 104 F.R.D. at 57-58 (observing that the plaintiff "can determine the reasons for Defendant's conduct regarding her claim by deposition of Defendant's employees and others who were involved in the decision not to pay the amounts in question").

Brooks's allegations that Defendants acted in bad faith do not change this result:

> This lawsuit is not a complicated one. It involves a request for money allegedly due under an indemnity insurance policy. It is a simple contract case involving a small amount of money. It does not involve great issues of philosophic, social or institutional importance. Information about other lawsuits or claims cannot be deemed crucial to such a case.
>
> Mere incantations that an opponent has acted in bad faith will not convert a simple contract lawsuit into a license to burden or harass one's adversary. Conclusory claims of bad faith may not be the bases for conducting marginally relevant discovery which is by its nature burdensome. Such discovery requests amount to nothing more than an out of season fishing expedition. Plaintiff has not made a *prima facie* or any other preliminary showing that defendant acted in bad faith, as a matter of policy, in order to discourage small claims or for some other reason.

---

[4] Defendants have provided Brooks with available dates for the three depositions that she has requested.

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2) PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 15**

Marker, 125 F.R.D. at 125. This is especially true here, as Unum Life based its decision to close Brooks' claim in large part on surgical logs confirming that she was, notwithstanding her denials to the contrary, continuing to perform her occupational duties.

The same result is true with respect to Brooks' statutory claims to the extent that they are predicated on Defendants' alleged bad faith. These claims turn on whether Defendants knew or should have known that it was reasonably clear that Brooks' claim was covered. See Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 55-56 (Tex. 1997). The bad-faith inquiry thus focuses on the insurer's conduct with respect to the specific claim at issue. See, e.g., id.; Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 17-18 (Tex. 1994); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Dominguez, 873 S.W.2d 373, 376-77 (Tex. 1994); Lyons v. Millers Cas. Ins. Co. of Tex., 866 S.W.2d 597, 600-01 (Tex. 1993); see also Moses, 104 F.R.D. at 57 (observing that the "issues in this case are limited to Defendant's conduct regarding Plaintiff's claim for insurance benefits and to the adequacy of Defendant's reasons for that conduct"). In none of these cases was the insurer's handling of other claims considered in the bad-faith analysis. Moreover, the DTPA defines "false, misleading, or deceptive acts or practices" to include only the "laundry list" in Tex. Bus. & Com. Code § 17.46(b), none of which involve the handling of other claims. See Tex. Bus. & Com. Code § 17.46(d), 17.50(a)(1)(A). Similarly, none of the enumerated acts in the Texas Insurance Code constituting "unfair methods of competition and unfair and deceptive acts or practices" involve the handling of

other claims, and the Code limits the available relief to violations of these "laundry list" provisions.[5] See Tex. Ins. Code art. 21.21, §§ 4, 16(a).

In addition, the documents sought by Brooks do not shed any light on her unconscionability claim. The DTPA defines "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, or experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5). This inquiry is obviously specific to Brooks and Defendants' handling of her claim, not their handling of other claims.

Moreover, responding to some of these discovery requests would be unduly burdensome and expensive. To prepare the list requested in Interrogatory No. 15 of individuals who have sued or threatened to sue them for disability benefits, Defendants would incur over $250,000.00 in time in manually reviewing over 40,000 claim files. (Karkos Decl. ¶ 3.)[6] Moreover, it would cost Defendants over $250,000.00 in time to prepare the list sought in Interrogatory No. 22 regarding other insureds against whom allegations of criminal

---

[5]Importantly, the current enactments of the DTPA and the Texas Insurance Code (and the specific statutory violations alleged in the Complaint) do not incorporate the "pattern and practice" type of allegations that were previously cognizable in Texas. Admittedly, Texas courts have on occasion considered an insurer's handling of other claims as part of the bad-faith analysis. See, e.g., Underwriters Life Ins. Co. v. Cobb, 746 S.W.2d 810, 814-16 (Tex. App.--Corpus Christi 1988, no writ). At the time that Cobb was decided, however, the Texas Insurance Code granted a private right of action for, among other things, violations of rules adopted by the State Board of Insurance, which at the time made it actionable for an insurer to refuse to pay claims without conducting a reasonable investigation with such frequency to indicate a general business practice. See Cobb, 746 S.W.2d at 814-15 (citing the version of Tex. Ins. Code art. 21.21, § 16 that was in effect at the time). Since § 16 no longer incorporates the State Board's rules, information regarding other claims is irrelevant.

[6]The Declaration of Donna Karkos is attached hereto as Exhibit A.

wrongdoing have been made. (Id. at ¶ 4.) Finally, it would cost Defendants over $250,000.00 to produce the letters of appeal or protest sought in Request No. 58. (Id. at ¶ 5.)

This expense far exceeds any potential relevance of these documents. See Leksi, Inc. v. Federal Ins. Co., 129 F.R.D. 99, 106 (D.N.J. 1989). In Leksi, the plaintiff sought "information regarding the manner in which the insurer has applied the policy language to claims similar to [plaintiff's] made by other insureds," and the court found that the plaintiff was not entitled to this information:

> The information which [the plaintiff] seeks concerning the files of other insureds is disproportionate to the declaratory judgment action it has filed. To compel the production of the files of other insureds not only involves enormous inconvenience and management difficulties, but also entails a frightening potential for spawning unbearable side litigation which, in my view, defeats the purpose and spirit of the discovery rules themselves.... [The plaintiff] does not need to discover the information contained in the files of other insureds in order to develop and prepare its case. I hold, therefore, that the information sought by [the plaintiff] regarding the files of other insureds is not discoverable because although it may be considered remotely relevant, its production would be unduly burdensome and disproportionate to this litigation.

Id.; see also K Mart Corp. v. Sanderson, 937 S.W.2d 429, 431 (Tex. 1996) (holding that the likelihood that comparable conduct in other locations "will have even a minuscule bearing on this case is far too small to justify discovery"); Texaco, Inc. v. Sanderson, 898 S.W.2d 813, 815 (Tex. 1994) (observing that the request in question "is not merely an impermissible fishing expedition; it is an effort to dredge the lake in hopes of finding a fish").

Finally, the claim files pertaining to other insureds contain countless examples of confidential information regarding the insureds, their medical condition, and their health

history, at the very least.[7]  These other insureds are not parties to this action, and Defendants

acknowledge their obligation to keep this information confidential.  Brooks does not cite a

single case ordering an insurer to provide another party with unfettered access to confidential

information regarding other insureds.[8]    Moreover, the cost to redact the confidential

information from these files would be enormous.  Accordingly, the Court should sustain

Defendants' objections to these discovery requests.

**E.    Brooks Is Not Entitled to Information Regarding the TDI's Investigations**
**(Requests No. 7, 8, and 18 and Interrogatories No. 8, 20, and 22).**

Similarly, Defendants' objections to Requests No. 7, 8, and 18 and Interrogatories No.

8, 20, and 22 regarding the investigations of Brooks and other insureds by the Texas

Department of Insurance (the "TDI") and the applicable criminal authorities are well-taken.

Initially, Defendants' communications with the applicable authorities regarding Brooks and

other insureds are irrelevant because such communications are both compulsory and entitled

to immunity.  That is, Tex. Ins. Code art. 1.10D, § 4(a) affirmatively requires a person who

determines that a fraudulent insurance act has been committed or is about to be committed to

report such information to the TDI.  Here, Defendants determined that Brooks had, in failing

---

[7]Brooks' position with respect to the production of her own documents is telling.  In this regard, Brooks filed numerous motions to quash based on her alleged privacy interests, notwithstanding the fact that she squarely placed her medical condition and earnings in issue in filing this suit.  Similarly, Brooks repeatedly objected to the disclosure of her medical records and other personal information, ostensibly for privacy reasons, until Defendants had filed a motion to compel their production.  The very relief now sought by Brooks regarding other insureds, if granted in an action brought by another insured, would result in the production of information regarding Brooks that she has opposed producing to Defendants in this action.

[8]In the event the Court elects to require the production of these materials, Defendants request the Court to review all of the requested documents in camera, assess the costs of the in camera inspection against Brooks, and enter an appropriate protective order.

DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO
COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2)
PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 19

to disclose her continuing work activities, engaged in conduct that they had to report. Pursuant

to § 6 of this article, Defendants are entitled to immunity for such report, and the information

that they reported is exempted from public disclosure.

In addition, Defendants' communications regarding Brooks and others are exempt from

discovery pursuant to § 5(b) of this article:

> (b)    Any information or material acquired under this article by an
> authorized governmental agency is privileged and is not a part of any public
> record.  Except as otherwise provided by law, an authorized governmental
> agency or an insurer that possesses or receives any information or material under
> this article may not release it to the public.  The information or material is not
> subject to a subpoena, except a valid grand jury subpoena, unless, after
> reasonable notice to the insurer and authorized governmental agency and after
> a hearing, a district court determines that the public interest and any
> investigation by the authorized governmental agency will not be jeopardized by
> obeying the subpoena.

Tex. Ins. Code art. 1.10D, § 5(b).  Consequently, Defendants cannot produce their files

pertaining to the criminal investigations of Brooks and other insureds.

Finally, these discovery requests as written arguably call for the disclosure of

Defendants' communications with their outside counsel or such counsel's work product, which

are exempt from discovery by the attorney-client privilege and the attorney work product

exemption.[9]

---

[9]For the same reasons, information regarding Defendants' complaints with the appropriate authorities regarding other insureds (as sought in Request No. 8 and Interrogatory No. 22) are equally (if not more so) undiscoverable.

**F.    Brooks Is Not Entitled to Additional Information Regarding
       Sullivan's Activities (Request No. 38 and Interrogatory No. 21).**

Brooks is also not entitled to the information sought in Request No. 38 and

Interrogatory No. 21 regarding the activities of Sean Sullivan ("Sullivan").  Sullivan was the

field representative who learned of and investigated Brooks' continued performance of

surgeries at BMC.  As set forth in Defendants' response, Brooks' request for production is

improper to the extent it purports to require Defendants to prepare a list that is not already in

existence.  Moreover, Defendants have referred Brooks in their response to CL410-17, which

is a copy of Sullivan's report, identifies some (if not all) of the individuals with whom he

spoke, and sets forth what they told him.[10]  Defendants are not aware of any nonprivileged

documents that are responsive to this request that have not previously been produced.

Similarly, as set forth in Defendants' answer to this interrogatory, Sullivan's activities with

respect to other insureds have nothing whatsoever to do with this case, and the identification

of the individuals whom he investigated would unquestionably invade such individuals'

privacy.

**G.    Brooks Is Not Entitled to Any of the Other Documents
       that She Seeks (Requests No. 16, 19, 20, and 44).**

Brooks is not entitled to any of the remaining documents that she seeks.  For example,

in Request No. 16, Brooks seeks documents which discuss "the need for UNUM to deny more

claims" or that the payment of claims is affecting its profitability.  Although not reflected in

---

[10]A true and correct copy of this report is attached hereto as Exhibit B.

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO
COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2)
PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 21**

their response, Defendants have produced UnumProvident's Form 10-Ks for 1998 through 2001 (UNUM 0049-1482), which provide information regarding the claims paid by UnumProvident's subsidiaries (such as Unum Life) and the profitability of such entities. Otherwise, this request seeks documents that are not relevant, does not describe the requested documents with reasonable particularity, and seeks documents that are confidential.

In Request No. 19, Brooks seeks documents that "may indicate a conflict of interest between UnumProvident and its outside counsel in this case." Of course, Defendants' communications with its outside counsel are unquestionably privileged. Moreover, Brooks does not (and, indeed, cannot) cite any authority rendering discoverable the stock holdings of Defendants' outside counsel; however, suffice it to say that they do not own any stock in UnumProvident and have not received shares of stock for their work on UnumProvident's behalf. Moreover, the requested documents have nothing to do with this case and constitute pure harassment.

Similarly, Brooks' request in Request No. 20 for "all documentary evidence which indicates that UNUM is owned and/or controlled by an organized criminal group" is objectionable for several reasons. First, over the objections of Brooks and her prior counsel, the Court dismissed her RICO claim in the Original Action with prejudice. Brooks' efforts to compel the production of documents on a claim that this Court has dismissed with prejudice is sanctionable. Moreover, the requested documents have nothing to do with the matters in dispute in this case.

**DEFENDANTS' COMBINED RESPONSE TO (1) PLAINTIFF'S MOTION TO COMPEL RESPONSES TO REQUEST FOR PRODUCTION AND (2) PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES - Page 22**

Finally, the documents sought in Request No. 44 regarding the job descriptions of various positions are not relevant to the matters in dispute in this case.

**H.    Brooks Is Not Entitled to a Listing of All of Defendants' Employees (Interrogatory No. 5).**

In Interrogatory No. 5, Brooks requests Defendants to state the name, address, telephone number, and current employment status of all of the individuals that worked for or with them during the period from May 1997 until May 1998. Brooks offers no explanation for how this information is relevant, which comes as no surprise because it is not. Indeed, in their answer to Interrogatory No. 4, Defendants provided the requested information regarding the individuals who actually worked on Brooks' claim. Defendants' objections to Interrogatory No. 5 should be sustained.

**I.    Defendants Are Entitled to Recover Their Attorney's Fees from Brooks.**

As the foregoing demonstrates, Defendants have provided Brooks with a wealth of information in response to her legitimate discovery requests, and their refusal to answer her remaining requests are well-justified. At the motions hearing on May 28, 2002, the Court advised the parties that it was included to grant fees for having to respond to frivolous motions. Mindful of the Court's comments, by letter dated June 6, 2002, Defendants offered to not seek any fees from Brooks for responding to the Motions to Compel if she agreed to withdraw such motions.[11] Brooks declined to accept Defendants' offer. Accordingly, pursuant to Fed. R. Civ.

---

[11] A true and correct copy of this letter is attached hereto as Exhibit C.

P. 37(a)(4)(B), Defendants respectfully request that Brooks and her attorney, jointly and severally, be required to pay to Defendants the reasonable expenses incurred in opposing the Motions to Compel, including attorney's fees, in the amount of $2,730.00 (13 hours at $210.00 per hour).

## IV. CONCLUSION

All told, a review of Brooks' discovery requests makes it clear that they are not merely a fishing expedition; they are an effort to "drain the pond and collect the fish from the bottom." See Amcast Indus. Corp. v. Detrex Corp., 138 F.R.D. 115, 121 (N.D. Ind. 1991); see also In re IBM Peripheral EDP Devices Antitrust Litig., 77 F.R.D. 39, 41-42 (N.D. Cal. 1977). Defendants respectfully request that the Motions to Compel be denied in their entirety and that Defendants be awarded their attorney's fees of $2,730.00.

Respectfully submitted,

By: _____

Andrew C. Whitaker
State Bar No. 21274600
S.D. No. 14309
Attorney-In-Charge

OF COUNSEL:
Doug K. Butler
State Bar No. 03516050
S.D. No. 9271

FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (telecopy)

ATTORNEYS FOR DEFENDANTS
UNUMPROVIDENT CORPORATION
and UNUM LIFE INSURANCE
COMPANY OF AMERICA

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been sent by certified mail, return receipt requested, to Mr. Mark A. Di Carlo, La Solana Building, 722 Elizabeth Street, Corpus Christi, Texas 78704, on this 7th day of June, 2002.

_____
Andrew C. Whitaker

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KAREN BROOKS,                        ′
                                     ′
        Plaintiff,                   ′
                                     ′
v.                                   ′        C.A. No. B-01-052
                                     ′
UNUMPROVIDENT CORPORATION            ′
and UNUM LIFE INSURANCE              ′
COMPANY OF AMERICA,                  ′
                                     ′
        Defendants.                  ′

## DECLARATION OF DONNA KARKOS

1.      My name is Donna Karkos.  I am currently employed as a Senior Consultant,

Quality Performance & Support and am submitting this declaration on behalf of UnumProvident

Corporation ("UnumProvident") and Unum Life Insurance Company of America ("Unum Life")

(collectively, "Defendants"), the defendants in this action.  This declaration was prepared with

the assistance of individuals whose duties include the gathering of records, files, and information

for Defendants.  Based on the assistance of these individuals, as well as my own experience with

Defendants, I have personal knowledge of the facts stated below, and they are all true and

correct.

2.      I have reviewed and am familiar with Plaintiff's First Request for Interrogatories

to Defendant UnumProvident Corporation (the "Interrogatories") and Plaintiff's First Set of

Requests for Production to Defendant (the "Requests") (collectively, the "Discovery Requests"),

which I understand have been served by Plaintiff Karen Brooks ("Brooks") in this lawsuit.  In the

**DECLARATION OF DONNA KARKOS - Page 1**

EXHIBIT A

paragraphs below, I will discuss the burden and expense that Defendants would incur in responding to some of the Discovery Requests.

      3.      In Interrogatory No. 15, Brooks requests Defendants to:

> State the names and address of each person who has ever sued you or caused to be written any letter to you threatening to sue you including for disability benefits, long term disability benefits or short term whether under ERISA under contract, for fraud or otherwise. State the nature of the suit or threatened suit or conditions complained of, the date on which you were notified of same, the name of any attorney who represented you and any other party in the suit, and the final disposition of each. Also, state the style, cause number, and court of each such suit.

Initially, it should be noted that this interrogatory is unlimited with respect to time. Defendants do not maintain computer records that would enable them to readily obtain the information sought in this interrogatory. To fully respond to this interrogatory, Defendants would first have to manually review all of the currently existing Unum Life claim files to determine whether the insured in question ever wrote a letter threatening to sue Defendants under one of the listed theories. This initial task would require Defendants to manually review at least 40,000 claim files. I estimate that it would take on average at least 15 minutes per file to determine if the insured in question ever wrote a letter threatening to sue Defendants under one of the listed theories. At $ 25.00 per hour, it would cost Defendants at least $250,000.00 to simply identify the insureds that are responsive to this interrogatory. This estimate does not include the additional time that would be necessary to compile the other information sought in this interrogatory.

      4.      In Interrogatory No. 22, Brooks requests Defendants to:

> Please state the names, address and telephone numbers of all persons who you and/or your agent employees have alleged criminal actions and/or reported for any alleged criminal actions to any state or federal agency against the past 10

**DECLARATION OF DONNA KARKOS - Page 2**

years who attempted to obtain any insurance benefits from you or your corporate entities.

Defendants have not maintained computer records that would enable them to readily obtain the information sought in this interrogatory for the past 10 years. To fully respond to this interrogatory, Defendants would first have to manually review all of Unum Life's claim files from at least the start of 1995 to 1999 to determine whether Defendants have reported such insureds to the appropriate authorities for possible criminal actions. This initial task would require Defendants to manually review at least 40,000 claim files. I estimate that it would take on average at least 15 minutes per file to determine if Defendants have reported such insureds to the appropriate authorities for possible criminal actions. At $25.00 per hour, it would cost Defendants at least $250,000.00 to simply identify the insureds that are responsive to this interrogatory. This estimate does not include the additional time that would be necessary to compile the other information sought in this interrogatory.

5.    In Request for Production No. 58, Brooks requests Defendants to:

Please produce any letters received by those insured by UNUM from January 1, 1995 to the present who protested and/or appealed the denial of their disability benefits.

To fully respond to this request, Defendants would first have to manually review thousands of Unum Life's claim files from at least the start of 1995 to approximately mid-2000 to determine whether the insured in question had his or her claim for benefits denied and then protested and/or appealed such denial. This initial task would require Defendants to manually review at least 40,000 claim files. I estimate that it would take on average at least 15 minutes per file to determine if the insured in question had his or her claim for benefits denied and then protested and/or appealed such denial. At $25.00 per hour, it would cost Defendants at least

**DECLARATION OF DONNA KARKOS - Page 3**

$250,000.00 to simply identify the letters that are responsive to this request. Additionally, because Defendants treat an insured's personal and medical information as confidential and private, it would be necessary to redact information from each of these letters. Because the total universe of letters covered by this request has not even been identified, it is impossible to accurately estimate the burden that Defendants would incur in redacting all of the private and confidential information from these letters. I estimate that it would take at least 1 minute per letter to redact all of the private information included in these letters.

6.    In sum, to obtain the information and fully respond to the Discovery Requests listed above would be extremely time consuming, expensive, and burdensome for Defendants. Completing the tasks necessary to fully respond to these Discovery Requests would seriously disrupt the normal course and operation of Defendants' business. Many employees would be unable to perform their usual and customary job duties during the time that they were attempting to comply with these requests.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this ⎧6⎫ day of June, 2002.

Donna Karkos

**DECLARATION OF DONNA KARKOS - Page 4**

## MEMORANDUM
### (Dictated but not read)

**TO:**   Sheldon White       **FROM:**   Sean Sullivan

**RE:**   **Karen Brooks**       **DATE:**   March 25, 1999
       **Policy# LAARXN1022**
       **Claim# 982346**

## BACKGROUND

Sheldon White referred this file to me after surgical schedules had recently been received from Brownsville Medical Center. He indicated that these had been previously requested, but never received. He also indicated that it appeared from the records that the Claimant had continued to work as a surgeon after her date of loss in 5/98. The purpose of meeting with the Claimant was therefore to clarify this situation and confirm whether this information was accurate.

I met with the Claimant by appointment on 3/22/99 at her office located at 615 Villa Maria Boulevard, in Brownsville, Texas. See previous Field report of 10/98 for additional information.

## SURGICAL SCHEDULES

I indicated to Dr. Brooks that the purpose of my visit was to discuss the recently received surgical schedules from Brownsville Medical Center. I indicated that these schedules had only been recently received and that there was some concern regarding the information contained in these reports. I indicated that, based on a review of the information, it appeared that she performed approximately 26 surgical cases in 1997 and approximately 22 cases in 1998. Additionally, the average length of most procedures was in the range of one hour to one and a half hours per case or less. I indicated that, based on these reports, it would appear that the levels for surgical cases were approximately the same both pre- and post-disability.

I went on to indicate to the Claimant that it appeared, based on the above records, that she had performed up to 12 surgical cases after her date of loss in 5/98. I subsequently asked the Claimant if she felt the information contained in the surgical schedules was accurate or whether this information was mistaken. Dr. Brooks subsequently reviewed the surgical schedules in my possession, and indicated that this information may be accurate, however, she indicated that she was not certain.

I asked the Claimant whether she had, in fact, performed surgical procedures after her disability date in 5/98. Dr. Brooks indicated that she was always listed as the lead surgeon in these documents, despite the fact that she may or may not have been performing the surgical procedure in question. She stated that she believed after the disability date that the referenced cases were performed by interns or residents, and that

EXHIBIT B

CL-416

Karen Brooks
March 25, 1999
Page 2

as noted in our file, that the Claimant did have teaching duties. She also stated that the hospital was not going to disclose to UNUM that it was allowing residents or interns to perform surgical cases, due to reasons associated with liability. She also stated that usually the intern or resident is listed as an assistant, but that this is not always the case.

I subsequently indicated to the Claimant that many of the procedures performed after her date of loss in 5/98 list no assistant in the records, and asked whether this meant that she had performed the surgical procedure herself. She again offered the explanation previously provided that interns or residents performed many of the procedures. However, upon further questioning, the Claimant finally admitted that she might have performed at least one or two procedures for the period in question.

When asked why she had failed to disclose this, the Claimant indicated that she did not, in fact, fail to disclose anything and that she made no misstatements regarding her occupational duties. She stated that she had attempted to return to work after her disability date, and that she had informed Nancy Olds, the previous DBS, regarding this. I indicated to the Claimant that it was my understanding that this was a brief period, sometime in the months of May, June or July, and that it did not include periods in late 1998.

It should be noted that after additional discussion, the Claimant finally indicated that she believes that she had only done one procedure for the period in question, and that all other procedures were performed by residents or interns as previously described.

The Claimant also again stated that she had fully informed Nancy Olds regarding her daily activities concerning work, indicating that she had stated on several occasions that she was working one to two hours per week after her disability date in reference to working with interns and residents.

I subsequently reviewed my previous Field report, and indicated to the Claimant that she had reported during that interview that she was working up to one to two hours per week with the interns or residents. However, I indicated that there was no report regarding her attending surgical procedures in the operating room. I also indicated that at present I did not have copies of any conversations between Dr. Brooks and Nancy Olds regarding her previous work activities. However, I indicated that if she were working with interns or residents in the operating room that this would have been questioned at the time of my visit. I indicated that since this was not discussed in 10/98, at the time of my visit, that it was likely that it was not disclosed.

I also pointed out to the Claimant that not only was this information not contained in my Field report, but that she had completed several Progress Statements with the sections regarding work activities not completed. Additionally, she had checked the box "No" in terms of whether she had been performing any occupational duties since her disability date. Again, the Claimant indicated that she had made no misstatements regarding her

CL-417

Karen Brooks
March 25, 1999
Page 3

work activities and that she had provided all of the information ever requested by UNUM. She also again stated that she believed that she had disclosed everything to Nancy Olds and that UNUM had knowledge regarding her work activities.

I again indicated to Dr. Brooks that this did not appear to be the case, but that I would be following up on this. I also indicated that I would be following up with Brownsville Medical Center in order to determine if her explanation regarding the interns and residents, as previously noted, was accurate.

I also asked the Claimant several other questions regarding her pre-disability occupational duties. I confirmed with the Claimant that she continued to receive the $600 flat fee for the residency program that she had previously reported. She also stated that this amount was not dependent upon the number of hours she worked or the amount of time she spent in the operating room with the interns. I also discussed with the Claimant how she would be able to observe the interns in the operating room, given her reported restrictions and limitations. She stated that she was able to alternate sitting or standing and that she was able to do this because she did not have to assume certain positions, such as bending forward over the patient, indicating that this was something that she was unable to do.

I also asked the Claimant regarding the length of the surgical procedures in question, noting that the relative length of procedures appeared to be present in the surgical schedules previously discussed. She indicated that these figures were not accurate, indicated that these listed only the start and ending time, and that they included other time in the operating room that would not actually be considered part of the surgical procedure.

I also discussed with Dr. Brooks as to whether Dr. Middleton, her assistant she hired after her disability date, was a practicing surgeon, since she had previously indicated in 10/98 that he was not a surgeon. She indicated that he had been an intern, and that currently he was now certified as a surgeon. It should be noted that he is listed in several places throughout the surgical schedules the assistant.

I also confirmed with Dr. Brooks that she performed all of her surgical procedures at Brownsville Medical Center, and that there are no other facilities involved.

I also confirmed with the Claimant that she had recently returned to work on a more substantive basis, sometime in 2/99, working approximately four hours a day, up to three days a week, and that this included both performing surgical cases, as well as working in her office. When asked as to the number of cases, she indicated that she felt she had only performed one surgical case herself, but could not remember the date. She also stated, as previously, that she did attend with interns and residents in the operating room for the period in question.

Karen Brooks
March 25, 1999
Page 4

## SUMMARY

I subsequently discussed with Dr. Brooks as to the current status of her claim. I indicated that based on the surgical schedules previously discussed, it appeared that she continued to operate as a surgeon after her date of loss in 5/98. I indicated that based on this information, and without additional information to the contrary, her claim would subsequently be denied and that no further benefits would be payable.

I also indicated to the Claimant that it did not appear that she had ever been totally disabled, as previously reported. I also indicated that if the information contained in the surgical schedules was accurate, that she should be able to perform all of the material and substantial duties of her regular occupation, as they pertain to both her surgical and office practice. I also stated that, this being the case, it appeared that her claim had been overpaid since the date of loss.

I went on to explain that two options emerge in this situation. I indicated that she could return the benefits previously paid in a lump sum amount, or she could keep the benefits previously paid in exchange for surrender of her claim and policy. I indicated that I would give her one week to make a decision regarding these options. I also stated that she would receive a letter regarding the denial of her claim and the various options that are possible. I also stated that this would include referring this file to our legal department for appropriate action.

Dr. Brooks subsequently asked what type of information would be needed in order to change the decision regarding the denial of her claim for benefits. I indicated that she would have to provide independent documentation from Brownsville Medical Center that confirms her version of events, notably that although she is listed as the surgeon on many of the surgical cases in question, that interns, residents or other physicians actually performed the cases. She again indicated that she believed the hospital would not provide such information, again alluding to reasons associated with liability.

I also stated that I would be discussing the situation with Brownsville Medical Center to verify the information that they had provided previously was accurate in all its details.

## ADDITIONAL INFORMATION

Following my visit with Dr. Brooks, I met with several individuals at Brownsville Medical Center. I initially contacted Mike Marchand, who is in the surgical services unit for Brownsville Medical Center. He is also the individual who previously provided the surgical schedules previously discussed. He confirmed that the person who is listed as the surgeon in these records would be the actual operating surgeon. He also stated that any interns or other physicians present in the operating room would be listed under the assistant category. I also discussed at length with Mr. Marchand whether the hospital would fail to list an intern as the operating surgeon, as asserted by Dr. Brooks, for

CL-414

Karen Brooks
March 25, 1999
Page 5

liability reasons, and whether students or interns were ever listed in any of the records associated with a surgical procedure. Mr. Marchand stated that interns and residents were not allowed to perform surgery at the facility to his knowledge, and indicated his opinion that Dr. Brooks had been the operating surgeon for most if not all of the procedures listed in the records previously provided. He also stated that typically, students or interns who attend the surgical procedures are listed in the record, and may either be listed as an assistant or listed elsewhere in the hospital records, notably in the register of operations.

Mr. Marchand subsequently provided me with copies of computer documents labeled "register of operations" and stated that he had used these documents to produce the surgical schedules submitted to UNUM. He provided the printouts for 1997, 1998 and 1999. Patient names and code numbers have blocked out for patient confidentiality. In addition, it should be noted that an authorization was provided to Mr. Marchand in order to discuss the surgical schedules for Dr. Brooks.

I also confirmed with Mr. Marchand that whoever was listed as the lead surgeon would be receiving the income from the surgical procedure, whether they performed the procedure or not.

I also asked Mr. Marchand as to other individuals I could contact at the hospital who could again confirm that Dr. Brooks was the operating surgeon for the cases in question in our records.

He indicated that we should speak to Jan Behm, in the quality risk management department for the hospital. I provided an authorization to Ms. Behm and I again discussed the above situation with Mr. Marchand and Ms. Behm. Ms. Behm confirmed that residents and interns are not allowed to perform surgical procedures because they do not have privileges at the hospital. She also indicated that Brownsville Medical Center is not a teaching facility. Upon further clarification, she did indicate that an intern or resident can be designated as a qualified medical affiliate and that this would allow them to assist at a surgical procedure, but it would not allow them to ever participate as the lead surgeon.

She also stated unequivocally, that the previous situation described by Dr. Brooks was not possible, in other words that she would be supervising interns or residents while they were performing surgical procedures.

Mr. Marchand also provided me with access to the operating room charge nurse, who he described as the coordinator in the operating room, Maria Castellion. She indicated that a student, resident or intern may be present in the operating room and that they would be listed in the surgical records. She also stated unequivocally that they would not be performing the surgical procedure. She did indicate that they might assist, but qualified this statement by indicating that this would not involve actually assisting in surgery. She

Karen Brooks
March 25, 1999
Page 6

provided an example, indicating that an intern or student might wash an affected area for example, but would not be allowed to operate. She also stated that from her personal knowledge, she felt that Dr. Brooks had been the operating surgeon for the cases in question. It would also appear that she did not have any knowledge of a disability concerning Dr. Brooks.

Mr. Marchand also indicated that I could speak to the operating room coordinator, who was acting for the director of surgery, Juan Reyna; however, he indicated that Mr. Reyna was currently unavailable.

## ADDITIONAL CLAIMANT CONTACT

Following my discussions at Brownsville Medical Center, I subsequently contacted the Claimant once again and attempted to set up a meeting with her. I contacted her office and they indicated that she had already gone home for the day. I subsequently contacted the Claimant at home and indicated that I had just met with several individuals at Brownsville Medical Center. I subsequently indicated to the Claimant over the telephone that based on additional documentation provided by the hospital, as well as the three interviews with various individuals, that it appeared that she did, in fact, perform several surgical procedures after her date of loss. I indicated that based on this, it appeared that she had clearly misstated the nature of her disability claim.

She again stated her original opinion that the hospital is not going to disclose the fact that residents or interns were allowed to perform surgical procedures. I indicated that based on my conversations with the three individuals, as well as the additional documentation provided, that this appeared to be unlikely. I indicated that it appeared to be the case that she, in fact, did perform surgical procedures. I again indicated that the burden of proof had now shifted to her in terms of providing information to refute all of the information provided by Brownsville Medical Center.

I also indicate to the Claimant that I was now revoking the previously discussed offer involving a claim and policy settlement. I indicated that it was not in UNUM's best interest to maintain such a settlement given her continuing assertions regarding probable misstatements of fact. I indicated that I would be referring this file to our legal department and that I would be making the recommendation that all benefits previously paid be recovered, as well as additional action in terms of recovering the claim and policy.

This concluded the conversation.

## CONCLUSION/RECOMMENDATIONS

Following my visit with this Claimant, I contacted Sheldon White.

CL-412

Karen Brooks
March 25, 1999
Page 7

I indicated to Sheldon that based on the information provided by the hospital, both in terms of additional documentation, as well as interviews with various individuals, that it appeared that the Claimant had clearly misstated the nature of her restrictions and limitations. Furthermore, she had failed to disclose that she had continued to perform surgical procedures after her date of loss. This being the case, it does not appear that the Claimant has any restrictions and limitations regarding either her surgical or office practice and thus, would not be considered to be totally or residually disabled at this time. The above being true, it would also appear that the claim has been overpaid.

I would also recommend that since the Claimant has continued to provide misstatements regarding the nature of her surgical activities, that it is not in UNUM's best interest to offer a settlement as previously considered, notably allowing the Claimant to keep the benefits previously paid to date in exchange for her claim and policy.

I believe that appropriate legal action should be taken in order to recover both the benefits paid, as well as the surrender of the Claimant's policy.

It should also be noted that upon further review of the additional documentation provided by Brownsville Medical Center, it would appear in one case, notably for 11/13/98, the both a resident and another physician are listed as being in observation. This would appear to support the assertions made by Mr. Marchand and Ms. Castellion regarding the listing or such physicians on surgical cases. In contrast, for other cases listed after the date of loss in 5/98, Dr. Brooks is listed alone. So, it would appear that there is no possibility that a resident or other physician was actually performing those surgical procedures. See enclosed copies of these additional records from Brownsville Medical Center.

I have one additional recommendation, notably that we review any financial information provided by the Claimant. It would appear that she received income for the surgical procedures in question, and it is my understanding that profit and loss statements for various periods had been provided, although it is unclear whether they were provided for the same period of time. It is possible that the Claimant made additional misstatements regarding the reporting of income.

In addition, the above information regarding the Claimant would also impact the characterization of her occupational duties. If the Claimant's arguments regarding whom actually performed the surgical procedures in question is accurate, then this may change the nature of her occupational duties, as performed pre-disability. In other words, it is unclear as to how much surgery she may have performed pre- and post-disability. However, I do not believe this issue is relevant at this time, since the Claimant has failed to provide any documentation that refutes UNUM's assertion that she was continuing to operate after her date of loss.

Karen Brooks
March 25, 1999
Page 8

Lastly, it should be noted that a gentleman named Fred Myers contacted me on 3/23/99, the day after my visit with Dr. Brooks. He indicated in his message that he had been acting as an adviser to Dr. Brooks for the last eight or nine months, but it is unclear as to his exact role. For our records, his telephone number is (5120 457-8555. I subsequently did contact Mr. Myers and left a message indicated that he needed to send me a letter of representation and/or clarify his role in the claims process, if any. I also indicated that I would need an authorization from Dr. Brooks.

If any information is developed regarding this, I will relay the information to the home office.

I will be maintaining a copy of the file for additional investigation or activity if necessary.

If there are any questions regarding the handling of this file, please do not hesitate to contact me.

SS:aah

30153.doc

# FIGARI DAVENPORT & GRAVES

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202-3796
214-939-2000
Fax 214-939-2090

Writer's Direct Dial Number

(214) 939-2076

Writer's E-Mail Address

awhitake@figday.com

June 6, 2002

**VIA TELECOPY**
Mr. Mark A. Di Carlo
La Solana Building
722 Elizabeth Street
Corpus Christi, Texas  78704

Re:     C.A. No. B-01-052; *Karen Brooks v. UnumProvident Corporation and*
        *UNUM Life Insurance Company of America*

Dear Mr. Di Carlo:

We are in receipt of your letter dated June 4, 2002.

Please be advised that we are unwilling to withdraw our letter dated June 4, 2002 to Ms. Cavazos. We also oppose any efforts that you take to request the Court to rehear the matters that were addressed at last week's hearing and will seek to recover all of the attorney's fees that we incur in opposing your efforts.  Moreover, in light of Judge Tagle's involvement in this case to date, we believe that she (rather than the Magistrate Judge) should hear any future discovery disputes.

With respect to our notice for Dr. Brooks' deposition, please be advised that the documents requested in the notice are the same documents requested in Defendants' requests for production, which were the subject of the motion to compel granted by Judge Tagle.  Consequently, you have had our request for these documents in your possession since October 2001 (when we served you with our requests for production).  Moreover, you were aware at the hearing on May 28 that the Court had ordered Dr. Brooks to produce these documents.  We thus expect to receive copies of all of the requested documents in advance of Dr. Brooks' deposition.

Finally, at last week's hearing, Judge Tagle made it clear that she would award sanctions for having to respond to a frivolous motion.  We are now working on our response to Dr. Brooks' motions to compel and believe that we have, notwithstanding your assertions to the contrary, produced documents in response to the majority of her requests for production and answered the majority of her interrogatories.  In the event we are required to file our response to these motions, we will seek all of the attorneys' fees that we incur in such effort.  On the other hand, if you withdraw these motions, we will not seek such fees.  Please advise by noon tomorrow whether you are willing to withdraw both of these motions.



EXHIBIT  C

Mr. Mark A. Di Carlo
June 6, 2002
Page 2

Please advise if you have any questions.

Sincerely,

Andrew C. Whitaker

ACW/krp