42

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**JUL 0 1 2002**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| KAREN BROOKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. B-01-052 |
| | § | |
| UNUMPROVIDENT CORPORATION | § | |
| and UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' DESIGNATION OF EXPERT WITNESSES

Defendants UnumProvident Corporation ("UnumProvident") and Unum Life Insurance

Company of America ("Unum Life") (collectively, "Defendants"), pursuant to the Scheduling

Order entered January 10, 2002, state that they may call the following individuals as expert

witnesses at the trial of this case[1]:

    1.    Nancy Bogg
          UnumProvident Corporation
          2211 Congress Street
          Portland, Maine 04122
          (207) 575-2211

Although she has not been retained or specially employed to provide expert testimony
in this case, Bogg is expected to testify as to the reviews that she conducted in February 1999
and March 1999 of portions of Unum Life's claim file pertaining to Brooks. Bogg is expected
to testify as to the facts and opinions and the grounds for such facts and opinions set forth in

---

[1]In the Scheduling Order, the Court gave Plaintiff Karen Brooks ("Brooks") until June 7, 2002 to name her
experts and furnish the requisite reports and gave Defendants 30 days after the deposition of Brooks' experts to name
their experts and furnish the requisite reports. Brooks did not file any sort of expert designation or provide Defendants
with any expert reports by the deadline in the Scheduling Order. In the absence of such designation and reports,
Defendants believe that their obligation to designate their experts and provide reports has not yet begun to run; however,
out of an abundance of caution, Defendants are nonetheless filing this designation.

her reports dated February 9, 1999 and March 4, 1999, true and correct copies of which are attached hereto as Exhibit A and which are incorporated herein by reference. Exhibit A also includes a copy of Bogg's curriculum vitae. Bogg will not receive any amounts in connection with her work on this action other than her regular salary with UnumProvident.

2.    Richard G. Day, M.D.
      UnumProvident Corporation
      2211 Congress Street
      Portland, Maine 04122
      (207) 575-2211

Although he has not been retained or specially employed to provide expert testimony in this case, Dr. Day is expected to testify as to the reviews that he conducted in August 1998 and December 1998 of portions of Unum Life's claim file pertaining to Brooks. Dr. Day is expected to testify based on a reasonable medical probability as to the facts and opinions and the grounds for such facts and opinions set forth in his reports and letters dated August 31, 1998 and December 18, 1998, true and correct copies of which are attached hereto as Exhibit B and which are incorporated herein by reference. Exhibit B also includes a copy of Dr. Day's curriculum vitae. Dr. Day will not receive any amounts in connection with his work on this action other than his regular salary with UnumProvident.

3.    Doug K. Butler
      Figari Davenport & Graves, L.L.P.
      3400 Bank of America Plaza
      901 Main Street
      Dallas, Texas  75202
      (214) 939-2000

4.    Andrew C. Whitaker
      Figari Davenport & Graves, L.L.P.
      3400 Bank of America Plaza
      901 Main Street
      Dallas, Texas  75202
      (214) 939-2000

Butler and/or Whitaker may testify concerning the reasonableness of the attorneys' fees sought in this lawsuit, taking into account the relevant criteria for such charges. The bases for their opinions include their experience, skill, and training as attorneys practicing in state and federal courts throughout Texas, together with information specifically related to the prosecution and defense of this lawsuit. In rendering their opinions, it is anticipated that Butler and/or Whitaker will rely upon, among other things, the pleadings and discovery generated in this lawsuit and other evidence concerning the prosecution and defense of this suit. True and correct copies of the curricula vita of Butler and Whitaker are attached as Exhibit C.

Defendants reserve the right to designate additional expert witnesses (including, but not limited to, the experts (if any) subsequently designated by Brooks) as discovery and the circumstances of this case dictate.

Respectfully submitted,

By: _____
Andrew C. Whitaker
State Bar No. 21274600
S.D. No. 14309
Attorney-In-Charge

OF COUNSEL:
Doug K. Butler
State Bar No. 03516050
S.D. No. 9271

FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (telecopy)

ATTORNEYS FOR DEFENDANTS
UNUMPROVIDENT CORPORATION
and UNUM LIFE INSURANCE
COMPANY OF AMERICA

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been sent by certified mail, return receipt requested, to Mr. Mark A. Di Carlo, La Solana Building, 722 Elizabeth Street, Corpus Christi, Texas 78704, on this 28th day of June, 2002.

_____
Andrew C. Whitaker

## MEMORANDUM

**TO:** File/Sheldon White

**RE:** **Karen E. Brooks**
**Policy #LAARXN1022**
**Claim #CLA982346**

**FROM:** Nancy V. Bogg, VCM

**DATE:** February 9, 1999

## REFERRAL:

The request to review the file to determine whether this insured has reduced functional capacity to perform the duties of her occupation as a podiatrist has been completed. This 39 year-old insured reports a date of loss of 5/16/98 with an MRI of 5/29/98 showing lumbar spine injury at L5 with central disc herniation and impingement on thecal sac probably traversing the S1 root sleeve across L5-S1 level. Per the correspondence of 12/18/98 between Richard Day, M.D., Consultant and the AP, John Wells, M.D., capturing a phone call between the two, the AP noted that "she (insured) was not able to drive beyond 30 minutes without experiencing increased pain, that she should not be standing greater than 2 hours at a time and should not be sitting greater than 30 minutes". It is further noted per the HRT consult from Oscar Cartaya, M.D. per his telephone contact with the AP on 1/27/99 that she was able to stand for only 30-40 minutes and to sit for 30-40 minutes at a time. She was severely limited in her ability to lift, bend and carry.

I have reviewed the claim form, the PC report, the AP statements and the aforementioned information, the financial reports and the telephone memos discussing her work as a podiatrist. In addition, I have referred to a job analysis of a podiatrist completed by this case manager, a subsequent contact with the practitioner, and information researched from the American Podiatric Association.

## ANALYSIS:

*Insured's Practice:*

This insured has been at her present office since 5/95 in Brownsville, Texas. She is the 100% stockholder of a Sub S corporation and reports her income on a W2 form. She has one associate who was to join her as soon as he was getting his license. She has an office manager, a medical assistant, a bookkeeper, and two receptionists. She noted that her role in the practice was treating patients, supervising associates, administering the office and corporation and performing surgeries, both in the hospital and in the office. She noted that she used to work 55-60 hours per week. She is an instructor of residents in the Orthopedic Department of the University of San Antonio Health Science Center. She reported that she had privileges at Columbia Valley Regional, Brownsville Medical Center, Surgicare and South Texas. She reports that she is licensed to practice in the

EXHIBIT _A_

CL-473

Karen E. Brooks                                    2                                    February 9, 1999

State of Texas. She also noted that she had surgeries that she accomplished every week at about 3-4 hours, as well as hospital consults. She noted that she saw 20-25 patients daily and would see 15 patients when requested from nursing homes. She also reported that she had performed a range of surgeries, which she said included hammer toes, arthroplasties, ingrown toenails, amputations, neuromas of soft tissue mass. In addition, she did receive a salary of $666.67 per month from the University of Texas Health Science Center for administration of the residency program. She had residents from the San Antonio hospital to cover for her and reported that she tried to change her schedule to accommodate her disability. There were a number of requests from this insured to provide UNUM with her surgical schedules and procedures. This has not been done. No surgical schedules have been received.

The American Podiatric Medical Association in Bethesda, Maryland noted that a survey completed in 1996 discussed a median of 50 surgeries per year with 78.8 surgeries as an average. This number represented the surgeries that were accomplished in a surgical center or hospital. The range was actually 14 to 1000 per year. ·

### *Occupational Description:*

A job analysis was completed by this Vocational Case Manager in 1997 with the podiatric consultant, Danforth DeSena, DPM. It is noted that most podiatrists do their work in a seated position, however, sitting and standing for office procedures are intermittent. These visits/procedures may take from 5 to 30 minutes in a seated position with standing and walking for a few minutes in between patients. If, in the course of an 8-hour day, one sees 30 patients, this would average out to about 4 patients per hour. This fits with the time frame of some patients taking 5 minutes and some taking up to 30 minutes. Sometimes surgeries in the operating room require standing to work over the foot, but most require working in a seated position. Although many hospital procedures may be only 15 minutes in duration, if there are multiple or more complex surgeries, the duration may be continuous up to 1.5 hours. The lifting or carrying is a courtesy to assist nurses with patients in nursing home, but is not a part of the regular duties or a podiatrist in the office. Bending is occasional in the office and more frequent while performing hospital surgery. This involves waist and neck up to a 30-45 degree angle leaning over the table to look and perform surgery from above the foot. .

### *Income:*

The American Podiatric Medical Association in Bethesday, Maryland developed a survey in 1996 of their members indicating the overall average income from those podiatrists engaged in private practice was $108,156. The insured did provide a 1998 practice analysis (dated 10/15/98) indicating the procedure, codes, quantity completed and the amount with total charges of $254,314.99. It is noted, however, that with her date of loss of 5/16/98, the procedures were accomplished by others in her practice so her own clinical work and billable information was not established. She paid herself pre-disability

CL-472

Karen E. Brooks                                      3                                      February 9, 1999

of $4000 per month ($48,000 per year) according to information sent beginning January 1998.

## CONCLUSIONS:

Specific restrictions are considered as follows:

1. 10/17/98, the PC report noted that she could "typically sit for 45 minutes to 1 hour before having to shift position. In terms of standing, the claimant indicated that she could typically go 15-20 minutes only...she can walk around her house and for short distances, up to 10-15 minutes. She noted that she was not able to lift anything but that she would be able to lift up to 5-10 pounds. She further stated that standing and sitting and leaning forward were her primary restrictions and limitations.
2. 11/10/98 from the AP statement form: "no prolonged standing, walking or sitting".
3. 12/18/98 clarification (telephone and letter) with the AP from Richard Day, M.D. indicating that she should not be standing greater than 2 hours at a time and should not be sitting greater than 30 minutes.
4. 1/27/99 telephone contact between HRT and the AP indicating that she was able to stand for only 30-40 minutes, to sit for 30-40 minutes at a time. She was severely limited in her ability to lift, bend, and carry.

Seats and stools would depend on the preference of the practitioner, but there are those that are available that allow one to bend at the hip rather than at the waist or low back level that still offer a back support.

Considering the job analysis and the restrictions and limitations above, this insured's functional ability to continue in her office practice would not be affected. As noted, the work as a podiatrist is varied and can be scheduled to accommodate a less strenuous patient load of less than the typical of up to 30 per day. It would appear that this insured would be able to accomplish office practice procedures at a reduced level by pacing her patients each day in the office. As noted, it is not known the extent to which this insured did surgical procedures because there are no surgical records from the hospitals in which she noted she had privileges. The restrictions and limitations are within the functional analysis of a podiatrist working in an office as discussed above.

## RECOMMENDATIONS:

1. For further information regarding this insured's surgical practice, types of surgeries and lengths of time for hospital procedures, request again the procedures from the hospitals in which Ms. Brooks had privileges pre-disability.

Thank you very much for this referral. Please do not hesitate to contact me for further discussion or information.

NEB/mj

CL-471

## MEMORANDUM

**TO:**  File/Sheldon White          **FROM:**  Nancy E. Bogg, VCM

**RE:**  **Karen Brooks**            **DATE:**  March 4, 1999
      **Policy #LAARXN1022**
      **Claim #CLA982346**

## REFERRAL:

The request to review the surgical schedules from this podiatrist for both 1997 and 1998 and make comparisons regarding pre and post date of loss activities have been completed. This 39 year-old podiatrist reports a date of loss of 5/16/98 with an L5 disc herniation. Per my memorandum of 2/09/99 it is noted that her AP in correspondence of 12/98 noted that the insured was "not able to drive beyond 30 minutes without experiencing increased pain, that she should not be standing greater than two hours at a time, and should not be sitting greater than 30 minutes". I had noted that aside from specific surgeries, this insured would not be precluded from the material and substantial duties of an office practice given those limitations.

The surgical schedules have been submitted from PMSI for both 1997 and 1998 with the specific dates and the operating room start and end times. All noted that Dr. Brooks was the primary surgeon in these cases.

## ANALYSIS:

The analysis from 1997 and 1998 regarding the surgical procedures notes no specific procedures and procedure codes, however, the dates and the operating room start and end times were. Taking that into consideration, the following charts the surgeries for 1997 and 1998 with the date of 5/16/98 (the insured's claimed DOL) as the dividing point for both 1997 and 1998 for the purposes of my analysis.

1997

| J | F | M | A | M 1-15 | M 16-31 | J | J | A | S | O | N | D | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1:15 | - | :50 1:20 | 1:35 1:00 1:30 | 1:15 | - | 1:15 1:40 :35 | :55 1:50 :55 2:20 1:15 1:00 1:45 | 4:15 :50 1:10 | 1:30 1:45 1:10 | - | :55 :50 | 1:50 | |
| **1** | **-** | **2** | **3** | **1** | **-** | **3** | **7** | **3** | **3** | **-** | **2** | **1** | **26** |

1998

| J | F | M | A | M 1-15 | M 16-31 | J | J | A | S | O | N | D | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2:20 :35 1:04 | - | 1:55 1:05 | 1:15 1:25 2:35 | 1:40 1:05 | 1:35 | - | 1:05 | 1:40 1:45 | 1:35 1:20 :50 | 1:55 2:20 | 2:30 | 1:10 1:55 | 7 |
| **3** | **-** | **2** | **3** | **2** | **1** | **-** | **1** | **2** | **3** | **2** | **1** | **2** | **22** |

Karen Brooks                                    2                                    March 4, 1999

|                         | January - May 15, 1997 | May 16 – December 31, 1997 |
|-------------------------|-----------|-------|
| Total Procedures        | 7         | 19    |
| Average Time/Procedure  | 1:15      | 1:28  |
| Total Average/Procedure | 1:24      |       |

|                         | January 1 – May 15, 1998 | May 16 – December 31, 1998 |
|-------------------------|-----------|-------|
| Total Procedures        | 10        | 12    |
| Average Time/Procedure  | 1:30      | 1:38  |
| Total Average/Procedure | 1:30      |       |

As noted, the insured completed 26 procedures in 1997 performing 7 from January – May 15, and 19 from May 16 – December 31. In 1998 with her date of loss of 5/16/98, the insured performed a total of 22 surgeries with 10 from January – May 15, and 12 after her date of loss of 5/16. In fact, the insured performed a 1 hour and 35 minute surgery on May 22, 1998, one week following her DOL. It is noted, however, that she did not perform any surgeries in June of 1998 and only performed 1 in July, 1998. This is in contrast to having performed in 1997, 3 in June and 7 in July. It is noted that there were only 2 surgeries in 1997 that lasted over 2 hours that were performed in July and 1 again (a very lengthy procedure, 4 hours 15 minutes) in August. In 1998, however, there were 4 surgeries over 2 hours as follows: 1 in January, 1 in August, 1 in October and 1 in November.

The average times for the surgeries in 1997 was 84 minutes or 1 hour and 24 minutes with the breakdown of 1 hour 15 minutes from January through May 15th, and 1 hour 28 minutes from May 16th through December 31st. In 1998 the average time for a procedure was 90 minutes or 1 hour 30 minutes for the year and 1 hour 30 minutes for the average as well from January through May 15[th.] 1 hour and 38 minutes was the average time per procedure following her DOL in 1998 from May 16th through December 31st.

## CONCLUSION:

Based on the fact that the insured had been performing surgical procedures one week following her date of loss and surgeries that were on the whole longer as an average for the remainder of 1998 than she had done in any other comparative information above would indicate that the insured was clearly able to work at all material and substantial duties of her occupation. The restrictions and limitations indicated that she could not stand longer than 2 hours. As noted only 2 surgeries in 1997 required the operating room at over 2 hours, and in 1998 with 4 surgeries over 2 hours. and 2 of these followed her date of loss. Since a number of surgeries are performed in the operating room in a seated position it is not known what types of surgeries the insured was performing as this information was not available. It is clear, however, that the insured was performing surgery and performing more surgeries after her date of loss than prior to her DOL in 1998.

CL-495

Karen Brooks                                  3                          March 4, 1999

As noted in my previous memo of 2/09/99, a podiatrist's office practice does not involve standing for any period and is intermittent with walking. The primary position for office procedures is sitting. The insured should have no reason not to do her office practice with the restrictions given by her attending physician, and would have been able to do all but 2 of the surgeries that she did perform if, in fact, she did have to stand for them. The insured's operating room procedures from 1998 to 1997 were at 85% and from the DOL comparing 1998 to 1997 were at a 63% loss. At the same time, the average length of surgeries performed was 1 hour 38 minutes from her DOL of 5/16/98 through 12/31/98 -- the longest average time per procedures for any of the comparative information noted above. For our purposes, however, and the fact the insured noted that she could do no surgeries or office work from her date of loss, this clearly indicates that this was not, in fact, the case.

Thank you for presenting this additional surgical information to me for analysis. Please let me know if I can assist in any further way or discuss the above in further detail.

NEB/mj

CL-494

C002

# NANCY E. BOGG

(207) 799-2103
5 Julie Ann Lane
Cape Elizabeth, Maine 04107

## EDUCATION

B.S. 1966    Lesley College, Cambridge, MA.
Major: Education

M.Ed. 1969    Boston University, Boston, MA.
Major: Voc. Guidance & Rehabilitation Counseling

1970-present    50 additional college graduate credits.
Professional workshops.
Maintenance of certifications.

## CERTIFICATIONS/LICENSES

| | |
|---|---|
| Certified Case Manager | C.C.M.  # 03221 |
| Certified Rehabilitation Counselor | C.R.C.  # 12110 |
| Certified Disability Management Specialist | C.D.M.S. # 00607 |
| USDOL/Office of Workers' Compensation Programs | O.W.C.P. # 12-126 |
| Social Security: Vocational Expert | S.S.A. |
| MA: Certified Vocational Provider | OEVR |
| CA: Teaching, Pupil Personnel, Community College | Life |

## PROFESSIONAL EXPERIENCE

**December, 1997 - Current    UNUMProvident Insurance, Portland, ME.**
**11/99-Current:**    **Vocational Rehabilitation Coordinator/Long Term Disability.** Work with Impairment Unit (Orthopedic through 4/00 and Cardiac to current). Serve as a vocational resource to the claims team to clarify occupations and assist in the return to work process for the claimant. Coordinate services with outside vendors.
**11/97 - 10/99:**    **Vocational Case Manager/Individual Disability.** Worked with the Association, NY Association and First Unum block of business as a resource team member. Developed interview tools and educational trainings for occupations for the claims specialists. Research occupations for verification, complete transferrable skills analyses, provide accommodations and rehabilitation services for return to work.

**August, 1993 - 1998    NANCY BOGG ASSOCIATES, Portland, Maine**
**Vocational Rehabilitation Consultant:** Provided vocational rehabilitation services for Individual and Long Term Disability, Worker's Compensation (multi-state and Federal), Vocational Expert for Social Security Administration, Veteran's Administration, third party claimants and ADA Job Analyses. Consulting services include initial evaluations, job analyses, labor market surveys, job seeking skills, employment development/placement, vocational testing,

i

UNUM 0013

expert witness testimony, occupational research and related workshop presentations.

*August, 1994 - August, 1995 MAINE MEDICAL CENTER, Portland, Maine*
**Workers' Compensation Specialist (Part time):**  Provided services for injured employees to return to work in alternate duty or other permanent jobs at the hospital.  Services included vocational evaluations, interviewing and job seeking skills with employees, coordinating ergonomic evaluations and job analyses, developing alternate duty jobs with departments, coordinating with physicians and physical/occupational therapists.  Worked with MMC Ergonomic Committee, attorneys, claims examiners and rehabilitation counselors.

*1991 - July, 1994          NANCY BOGG ASSOCIATES, Wyoming and Maine*
**Consultant:**  Cyprus Minerals Corporate Office, Denver, Colorado and Mountain States Employers Council, Denver, Colorado.  Developed workshops and trained Human Resource and Safety Professionals within the mining community in conjunction with the Americans with Disability Act.  Developed Physical Demands Analyses forms for jobs.  Made on-site visits to twelve Cyprus Mineral mines nationwide to complete over 400 Physical Demands Analyses.

*1987 - July, 1993          NANCY BOGG ASSOCIATES, Casper, Wyoming*
**Vocational Rehabilitation Counselor:**  Provided vocational rehabilitation services for Long Term Disability, Worker's Compensation (multi-state and Federal), third party claimants and Social Security Evaluations.  Consulted with the Wyoming Medical Center Rehabilitation Unit to provide services to patients with strokes, head injuries or orthopedic injuries.  Supervised rehabilitation counselor/vocational evaluator at CARF facility.

*1983 - 1987                    NANCY BOGG ASSOCIATES, San Francisco/Oakland, CA*
**Vocational Rehabilitation Counselor:**  Provided rehabilitation services for Worker's Compensation (State and Federal), Long Term Disability and third party claimants.  Services included vocational evaluations, job analyses, labor market surveys, job seeking skills, employment development/placement, vocational testing, expert witness testimony and workshop presentations.  Coordinated services of employers, medical personnel, attorneys and agencies.

*1986 - 1987                    U.S. DEPARTMENT OF LABOR/OFFICE OF WORKERS'*
*                               COMPENSATION PROGRAMS, San Francisco, CA.*
**Vocational Rehabilitation Consultant:**  On this Federal Pilot Project reviewed claim files to determine rehabilitation eligibility for claimants.  Coordinated and supervised claimant referral to Rehabilitation Counselors in the field.

*1982 - 1987                    AMERICAN ARBITRATION ASSOC., San Francisco, CA.*
**Mediator/Arbitrator:**  Mediated and arbitrated community dispute issues toward resolution.  Worked with the police and courts.

2

NANCY E. BOGG

**1977 - 1982**          *INTERNATIONAL REHABILITATION ASSOCIATION,*
                         *San Francisco, CA.*
**Vocational counselor, supervisor and evaluator:** Provided all aspects of vocational
rehabilitation services to injured claimants. Supervised counselors, completed all vocational
testing and developed training and resources for the sixteen professional counselors in the office.

**1976 - 1977**          *ALAMEDA COUNTY SCHOOLS, Oakland, CA.*
**Counselor and Community College instructor:** Consulted with leaders of pre-school day care,
adolescent probation and senior citizens groups. Taught class in "Career Lifestyles".

**1974 - 1976**          *INSTITUTE FOR SCIENTIFIC ANALYSIS, Berkeley, CA.*
**Field Research Supervisor for Department of HEW Contract:** Researched curricula,
designed surveys, and coordinated entry to Berkeley Experimental Schools Program. One of
many authors of several volumes of published results for the Department of Health, Education and
Welfare.

**1969 - 1974**          *MANSFIELD PUBLIC SCHOOLS, Mansfield, MA.*
**School Adjustment Counselor:** Developed and implemented district referral system for
academic and emotional needs of students. Coordinated delinquency and early intervention
projects with mental health agencies.

**1966 - 1968**          *SPAULDING SCHOOL, NEWTON PUBLIC SCHOOLS,*
                         *Newton, MA.*
**Teacher, Grade 4:** Taught in self-contained and departmental grade in a creative and highly
academic public school.

**Jan. - Aug. 1966**     *EDUCATIONAL SERVICES INC. Cambridge, MA.*
                         *with NEWTON PUBLIC SCHOOLS, Newton, MA.*
**Curriculum Developer and Teacher:** One of ten college seniors selected to participate in a
Social Studies Curriculum, "Man a Course of Study", developed at Harvard College with Jerome
Bruner, author. Tested and developed teaching methods for specific curriculum in the classroom.


**ADMINISTRATIVE AND COMMUNITY INVOLVEMENT**_____

*Board of Directors:*
Cedars Nursing Home, Portland, Maine 1994-current.
        Chair:  Long Range Planning Committee
National Association for Rehabilitation Professionals in the  Private Sector (NARPPS),
        Regional Rep. 1990-92. State of Maine Representative, 1996-1999.
Cumberland County Extension, 1996-2000.
Natrona County and State Master Gardeners, Wyoming,1989-92

3

UNUM 0015

NANCY E. BOGG

California Association of Rehabilitation Professionals (CARP), Membership/Secretary, 1985-87
Rape Crisis Center, Central Contra Costa County, CA, 84-85

## ORGANIZATIONS

*Professional:*

    Rehabilitation Professionals of ME (Board Member, 94-95)
    National Association for Rehabilitation Professionals in the Private Sector (Now IARPPS)
    National/Maine Rehabilitation Counselors Association (NRCA)
    Brain Injury Association of Maine/National

## TEACHING/SPEAKING

Presentations to claims specialists, human resources and safety personnel, colleagues, business
women, and college students on Job Analyses, Career Planning, Vocational Rehabilitation field,
the Borderline Rehabilitation Client, Individual versus Group Disability Issues, Return to Work.

## PUBLICATIONS

Neway, B, Paasuke, L, **Bogg, NE. Vocational Strategies.** In: Halstead, L.S., Naierman, N. eds.
Managing Post-Polio, A Guide to Living Well with Post Polio Syndrome, National Rehabilitation
Hospital, Washington, D.C., 1998; 155-168. Paasuke.

## REFERENCES

Available upon request.

4

UNUM 0016

**MEMORANDUM**

TO:    File/Nancy Olds          FROM:    Richard G. Day, MD

RE:    **Karen Brooks**          DATE:    August 31, 1998
       **Policy# RXN1022**
       **Claim# A982346**

Questions:  1. doc to doc if this was felt to be beneficial
            2. a complete file review as requested.

The insured is a 38-year old woman who works as a podiatrist. She has a significant history of congenital hip dysplasia left, with recurrent hip dislocation on the right. In 7/98 it was noted she had herniated nucleus pulposa. She had not worked for two weeks. She resumed physical activity with aquatic therapy. It was also noted that she should be resting with regaining in her strength.

Limitations were listed as pain increase with sitting, standing, and prolonged sitting for greater than 15-20 minutes with right lower extremity radiculopathy after sitting for 45 minutes or riding in a car or for sitting. "Straight leg raise was positive at 7 degrees". Plan was for progressive rehabilitation program with an estimated return to work in 2-3 months.

In 6/98 she underwent epidural steroid injections with bilateral facet joint blocks. She had chronic headache as a result of the dural puncture requiring an epidural blood patch. She was gradually returned to ambulation. She also On 4/20/98 there was a physical exam notation of multiple myofascial trigger points in the posterior cervical medial scapula area and paravertebral area. There was concern that fibromyalgia with manifestation of emotional overlay was present.

MRI on 5/29/98 lists L5 disc with central herniation at L5, S1 and impingement on the thecal sac and probably both traversing the S1 nerve root sleeve and crossing the L5, S1 level. Mobility on 5/98 was noted to be a walker or wheel chair.

The woman has objective evidence for bilateral radiculopathy potentially at S1 nerve root level documented by MRI on 5/29/98. It is important that aggressive spine therapy is available once the acute episode has stabilized.

**Plan**:

1.  I have written a letter to the insured's physician because of my inability to contact him.
2.  The goal is to clarify and understand her current restrictions.
3.  In my experience a reasonable reasonable restriction would be to avoid heavy lifting with avoidance of repetitive bending. These restrictions may change if she

EXHIBIT ___

CL-192

participates in an aggressive spine program with good resolution of impairment with increasing function.

RGD:fem



UNUM.

August 31, 1998

John Wells, MD
844 Central Blvd., Suite 360
Brownsville, TX 78520-6338

RE:    **Karen Brooks**
       **Policy# RXN1022**
       **Claim# A982346**

Dear Dr. Wells:

I am taking the time to write to you as I have been unable to contact you by telephone. My name is Richard Day, MD. I am a Medical Director at UNUM Life Insurance Company of America, Disability Benefits Organization. Your patient Karen Brooks has applied for disability insurance benefits. I have reviewed medical records which documented a central disc herniation L5 and an impingement on the thecal sac, with S1 nerve root sleeve being crossed at the L5, S1 level.

Limitations from 7/6/98 noted your patient has continuous pain over the lumbar area with prolonged activities. At that time it was noted that she was encouraged to resume activities including aquatic therapy. The limitations noted that she had increased pain with standing and sitting for more than 15-20 minutes with complaints of radicular pain after 45 minutes of sitting while riding in a car.

Her physical exam showed that she had normal deep tendon reflexes with no weakness in the upper extremities. There was foot eversion weakness bilaterally at 4 over 5 felt to be secondary to pain rather than true weakness. She was not able to heel walk bilaterally, but was able to toe walk bilaterally. There was no sensory loss.

Restrictions were not identified (activities you do not want your patient to participate in because of risk to injury to herself or others). If you would please explain her restrictions, this would greatly increase our understanding of her status.

Would the participation in an aggressive functional restoration program of her spine be appropriate? Is there such a program in your area?

I noted at one point in her therapy she was at bedrest. Was this bedrest a prolonged program? Is the participation in pool therapy helping return her to a normal functional status?

UNUM LIFE INSURANCE COMPANY OF AMERICA
2211 Congress Street, Portland, ME 04122
207 770-2211
http://www.unum.com

Karen Brooks 2 9/1/98

Your cooperation in helping us further understand you patient's current status is greatly appreciated and important. I appreciate your willingness to communicate with us. I understand that you time is valuable and am willing to reimburse you a reasonable fee. Please forward your reply to me at:

> Richard Day, MD
> UNUM Life Insurance Company of America
> ID Benefits - T-291
> 2211 Congress Street
> Portland, Maine 04122
>
> or
>
> FAX 207/770-8374

If your reply is extensive, please feel free to use our Phone-In Dictation Service. Instructions for its use are enclosed. We would appreciate hearing from you within 7-10 days of receipt of this letter.

Sincerely,

Richard G. Day, M.D.
Diplomate, American Board of Physical Medicine and Rehabilitation

RGD:fem
cc: Nancy Olds, Disability Benefits Specialist

## MEMORANDUM

| | | | |
|---|---|---|---|
| **TO:** | File/Sheldon White | **FROM:** | Richard G. Day, M.D. |
| **RE:** | **Karen Brooks** | **DATE:** | December 18, 1998 |
| | **Policy #RXN1022** | | |
| | **Claim #CLA982346** | | |

The insured is a 39 year-old podiatrist who has complaint of back pain and is status post epidural injections. MRI on 5/29/98 showed lumbar spine injury at L5 with central disc herniation and impingement on thecal sac probably traversing the S1 route sleeves across L5-S1 level. Discogram on 10/02/98 showed normal L3-4, normal L4-5 with diffuse angular ?? fissuring of L5-S1. At the present time, the insured is not considering any surgical interventions. Dr. Wells noted that there are no progressive spine programs in that area of Brownsville, and there is no physiatry intervention. .

Please review the letter dictated to Dr. Wells regarding restrictions and limitations of no standing greater than two hours at a time, no prolonged sitting greater than 30 minutes, and no prolonged walking. Patient is participating in a rehabilitation program and aqua therapy.

**ASSESSMENT:**

At the present time it appears that this insured has a reduced functional capacity to work as a podiatrist.

1. I would have this verified by vocational case management.
2. There is no physiatry in the Brownsville area which may complicate the active recovery for this person. Currently, the recommendation from the pain management physician (Dr. Wells) is surgery. However, the insured will not participate in that at the present time.


RGD/jm



**UNUM.**

December 18, 1998

John A. Wells, M.D.
Pain Management
844 Central Blvd., Suite 360
Brownsville, TX  78520

**RE:    Karen Brooks**
**Policy #RXN1022**
**Claim #CLA982346**

Dear Dr. Wells:

Thank you very much for returning my call regarding your patient, Karen Brooks.  As we discussed, your patient is status post discogram which was positive for pain in the L5-S1 area.  She is treated by you for pain management and receives chiropractic therapy including modalities.  Currently, as she is not standing 5 hours continuously in the operating room, her functional status is improved, and her pain is relieved.  You state that currently she is working 2-4 hours a day within her office setting.  She is independent with her activities of daily living; however, she is not able to drive beyond 30 minutes without experiencing increased pain.  You stated that she should not be standing greater than 2 hours at a time, and  should not be sitting greater than 30 minutes.

Her file indicates that there was no pathology of her cervical or thoracic spine.

In discussing her current functional activities, you state that she is doing fairly well with reduced work load and will remain as such.  You also stated that there were no physiatrists in your area, and an aggressive spine program is non-existent.

Again, thank you for taking the time to speak with me today.  To insure that I have accurately captured the content of our conversation, I am enclosing two copies of this letter to you.  Please sign one and return it to:

Richard G. Day, M.D.
UNUM Life Insurance Company
2211 Congress Street
ID Benefits Department (T291)
Portland, Maine  04122

or to FAX# 207/770-8374.

UNUM LIFE INSURANCE COMPANY OF AMERICA
2211 Congress Street
Portland, Maine 04122
207-770-2211
http://www.unum.com

CL-387

If you wish to amend the contents, please do so. If your comments are more extensive, please feel free to use our electronic medical secretary. Instructions for its use are included separately. We appreciate hearing from you within 7 days of receipt of this letter. If we do not hear from you within that 7 day period, we will assume that you agree with the contents of this letter.

Respectfully yours,

Richard G. Day, M.D.
Diplomate, American Board of Physical Medicine and Rehabilitation

RGD/jm

Enc.

cc: Sheldon White, Disability Benefits Specialist

_____        _____
John A. Wells, M.D.                    DATE

## Richard G. Day, M.D.
## UNUM Life Insurance Company of America
## 2211 Congress Street
## Portland, Maine 04122
## Work (207) 770-3559

**EMPLOYMENT:**

Medical Director                                                3/96 - Present
    UNUM Life Insurance Company of America            Responsibilities Included:
    2211 Congress Street
    Portland, Maine 04122                             *Individual Disability
                                                             - Medical Disability Review

Staff Physiatrist                                               7/93 - 6/96
    New England Rehabilitation Hospital               Responsibilities Included:
    13 Charles Street
    Portland, Maine 04102                             *Member, Medical Staff Executive
                                                             Committee
                                                      *Director Spinal Cord Injury Program
                                                      *Director Inpatient & Outpatient
                                                             Prosthetic Program
                                                      *Outpatient Musculoskeletal Medicine
                                                      *Electrodiagnosis
                                                      *Inpatient Consultations
                                                      *General Physiatry Inpatient &
                                                             Outpatient

**MEDICAL EDUCATION:**

Residency                                          7/90 - 6/93
    Physical Medicine and Rehabilitation
    University of Medicine and Dentistry of New Jersey, Newark, NJ
    Kessler Institute for Rehabilitation, West Orange, NJ

Internship                                         6/89 - 6/90
    Internal Medicine
    Hahnemann University Hospital
    Broad and Vine Streets
    Philadelphia, Pennsylvania

Doctor of Medicine                                 9/84 - 5/89
    Faculte Libre de Medicine
    Universite Catholique
    rue du Port
    Lille, France

## UNDERGRADUATE EDUCATION:

| | |
|---|---|
| **Premedical Requirements** <br> Boston University <br> Commonwealth Avenue <br> Boston, Massachusetts | 1/81 - 12/83 |
| **Bachelor of Science** <br> Physical Education and Health Sciences <br> Northeastern University <br> Huntington Avenue <br> Boston, Massachusetts | 9/74 - 6/79 |

## CREDENTIALS:

*Diplomate American Board of Physical Medicine & Rehabilitation - 5/95;
    Certificate #4708
*FLEX (Federal Licensure Examination), passed 6/89
*ECFMG, Certificate #4080305, 8/89

## LICENSURE:

Maine Board of Registration in Medicine - License #013553

**HONORS:**     Medical Degree awarded, "Maxima cum laude"

## PROFESSIONAL AFFILIATION:

*American Medical Association
*Fellow of the American Academy of Physical Medicine and Rehabilitation
*American Spinal Injury Association

## PUBLICATIONS:

Day, R.G.; Cytryn, A.; Kirshblum, S.: "Bowel Evacuation in Chronic Spinal Cord Injury: Is it more than a neurogenic bowel? A Case Series", Archives of Physical Medicine and Rehabilitation, 10/92, (abstract).

Day, R.G.; Hendler, S.; Lomauro, T.; Gendron, B.: "Conversion Reaction Presenting as Late Neurological Deterioration in Spinal Cord Injury: The Journal of the American Paraplegia Society, Vol, 15, 2:115, 4/92 (abstract).

Day, R.G.; Cantu, R.C.: "Corporate Fitness Centers; a chapter in, The Exercising Adult; edited by, Cantu, R.C.; Macmillan Publishing Company, 1987.

## PRESENTATIONS:

"Bowel Evacuation in Chronic Spinal Cord Injury: Is it more than neurogenic bowel? A Case Series", American Academy of Physical Medicine and Rehabilitation,  annual meeting, November 14, 1992, San Francisco, CA.

"Conversion Reaction Presenting as Late Neurologic Deterioration after Spinal Cord Injury: A Case Report", American Spinal Injury Association (ASIA), annual meeting,  May 8-10, 1992,  Toronto, Canada.



Lawyer Locator | Services | Products | Contact Us | About Us | Site Info | Home    Go

Lawyer Locator
Search Lawyer Locator
◢ By Lawyer
  By Location/Area of Practice
  By Firm
  By Corporate Law Departments
  By US Government
  By US Law Faculty
About Lawyer Locator
Add Listing

**Dispute Resolution**

**Experts and Services**

**Legal Personnel**

**Legal Careers**

**Professional Resources**

**Customer Services**

Lexis Nexis
Martindale-Hubbell®

FEEDBACK :)

Visit our affiliates.
**lawyers.com**
**LexisNexis**™
**LawCommerce.com**ˢᴹ

# Search the Lawyer Locator

New Search

**Doug K. Butler**
Member
Figari Davenport & Graves, L.L.P.
3400 Bank of America Plaza, 901 Main Street, LB 125
Dallas, Texas 75202-3796
(Dallas Co.)
Telephone: 214-939-2000
Fax: 214-939-2090
Send Email

Rating Info

**Practice Areas:** Civil Litigation; Insurance Defense.

**Admitted:** 1984, Texas and U.S. District Court, Northern District of Texas; 1985, U.S. Court of Appeals, Fifth Circuit; 1988, U.S. District Court, Southern District of Texas; 1989, U.S. District Court, Western and Eastern Districts of Texas; 1992, U.S. Court of Appeals, Tenth Circuit; 1994, U.S. Supreme Court

**Law School:** Boston University, J.D., magna cum laude, 1984.

**College:** Idaho State University, B.S., with honors, 1981.

**Member:** State Bar of Texas; American Bar Association.

**Biography:** Associate Editor, American Journal of Law and Medicine, 1983-1984.

**Born:** Pocatello, Idaho, February 2, 1960.

**ISLN:** 908632563

**Web Site:** http://www.figdav.com

New Search

▲ top

Lawyer Locator | Dispute Resolution | Experts and Services | Legal Personnel
Legal Careers | Professional Resources | Customer Services


EXHIBIT C



**Lawyer Locator**
Search Lawyer Locator
➤ By Lawyer
  By Location/Area of Practice
  By Firm
  By Corporate Law Departments
  By US Government
  By US Law Faculty
About Lawyer Locator
Add Listing

**Dispute Resolution**

**Experts and Services**

**Legal Personnel**

**Legal Careers**

**Professional Resources**

**Customer Services**



Visit our affiliates...
**lawyers.com**
**LexisNexis**™
**LawCommerce.com**^SM

## Search the Lawyer Locator

New Search

**Andrew C. Whitaker**
Member
Figari Davenport & Graves, L.L.P.
3400 Bank of America Plaza, 901 Main Street, LB 125
Dallas, Texas 75202-3796
(Dallas Co.)
Telephone: 214-939-2000
Fax: 214-939-2090
Send Email

Rating Info

**Practice Areas:** Civil Litigation.

**Admitted:** 1991, Texas; U.S. District Court, Northern, Eastern, Southern and Western Districts of Texas; U.S. Court of Appeals, Fifth Circuit

**Law School:** University of Texas, J.D., with high honors, 1991.

**College:** Southern Methodist University, B.A., summa cum laude, 1988.

**Member:** Dallas and American Bar Associations; State Bar of Texas

**Biography:** Phi Beta Kappa; Chancellors; Order of the Coif. Associate Editor, Texas Law Review, 1990-1991. Life Fellow, Texas Bar Foundation.

**Born:** Dallas, Texas, February 11, 1966.

**ISLN:** 901473316

**Web Site:** http://www.figdav.com

New Search

▲ top

Lawyer Locator | Dispute Resolution | Experts and Services | Legal Personnel
Legal Careers | Professional Resources | Customer Services

Home | Contact Us | About Us | Site Info | Products | Services