46

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**AUG 0 7 2002**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| KAREN BROOKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. B-01-052 |
| | § | |
| UNUMPROVIDENT CORPORATION | § | |
| and UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' EMERGENCY MOTION FOR RETURN
## OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER

Defendants UnumProvident Corporation ("UnumProvident") and Unum Life Insurance Company of America ("Unum Life") (collectively, "Defendants") file this emergency motion for the return of a privileged document that was inadvertently sent to counsel for Plaintiff Karen Brooks ("Brooks") and for a protective order regarding the information contained in the letter and state:

## CERTIFICATE OF CONFERENCE

On August 5, 2002, counsel for Defendants realized for the first time that this privileged document had likely been inadvertently sent to Brooks' counsel, Mark Di Carlo ("Di Carlo"). That morning, Doug K. Butler ("Butler"), one of Defendants' outside counsel, called Di Carlo to confirm whether he had in fact received the letter and, if so, to demand its immediate return.

Di Carlo did not return Butler's call. Accordingly, by letter dated August 5, 2002, a true and correct copy of which is attached hereto as Exhibit 1, Defendants made these same requests to Di Carlo in writing. Di Carlo responded only with a letter dated August 6, 2002, a true and correct copy of which is attached hereto as Exhibit 2. As set forth in this letter, Di Carlo did not agree to any of the relief requested herein. Since agreement could not be reached, this motion is presented to the Court for determination.

### FACTUAL BACKGROUND

**Privileged Letter Accidentally Sent to Brooks' Counsel.** Defendants have recently tried to engage Brooks in settlement discussions and introduced to Brooks' counsel the possiblity of mediating the case. (Whitaker Decl. ¶ 4.)[1] In anticipation of these discussions, Andrew Whitaker ("Whitaker"), one of Defendants' outside counsel, prepared a letter to Matthew Monaghan ("Monaghan"), one of Defendants' inside counsel, updating Monaghan on the status of the case and setting forth Whitaker's factual and legal analysis of this case. (Whitaker Decl. ¶ 4; Piller Decl. ¶ 3.)[2] Contemporaneously herewith, Defendants have filed, under seal, a true and correct copy of this letter (the "Monaghan Letter"), which is referenced herein as Exhibit 5. On August 1, 2002, Whitaker finalized the Monaghan Letter and directed his secretary to telecopy it to Monaghan. (Whitaker Decl. ¶ 4; Piller Decl. ¶¶ 3-4.) The Court's

---

[1] A true and correct copy of the Declaration of Andrew C. Whitaker in Support of Defendants' Emergency Motion for Return of Privileged Document and Protective Order is attached hereto as Exhibit 3.

[2] A true and correct copy of the Declaration of Karen Piller in Support of Defendants' Emergency Motion for Return of Privileged Document and Protective Order is attached hereto as Exhibit 4.

**DEFENDANTS' EMERGENCY MOTION FOR RETURN**
**OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 2**

review of the Monaghan Letter will reveal that it is unquestionably exempted from discovery by both the attorney-client privilege and the attorney work product exemption. Although Whitaker intended that the Monaghan Letter be delivered to only Monaghan and Butler, this letter was accidentally telecopied to Di Carlo. (Whitaker Decl. ¶¶ 6-7; Piller Decl. ¶¶ 5-6.) A true and correct copy of the Fax Information Sheet for this erroneous transmission is attached hereto as Exhibit 6.

**Di Carlo Seeks to Gain a Tactical Advantage.** Although he apparently received the Monaghan Letter on the morning of August 1, 2002, Di Carlo did not advise Defendants that he had received the letter or offer to voluntarily return it to them. Indeed, despite his ethical obligation to do so, he did not even contact Defendants' counsel to determine whether the letter was inadvertently sent to him. Rather, by letter dated August 5, 2002, Di Carlo wrote:

> My office has received definitive evidence that you are aware of the theft of documents by Lucy Cascos an ex-employee of Karen Brooks.
>
> Please notify me if you and your firm intend to proceed on this case as counsel. Please notify me if you have contracted [sic] any federal or state officials regarding the theft of these documents. Please notify me whether you intend to testify at the prosecution of this case regarding the theft of these documents or to aid in the prosecution.
>
> Also, I am troubled that the affidavit you filed in this case infers that you were aware that Ms. Cascos was on parole during her employment with Ms. Brooks and you still filed the affidavit with the court. Please let me know if you were aware of this fact.

A true and correct copy of Di Carlo's letter is attached hereto as Exhibit 7.

**DEFENDANTS' EMERGENCY MOTION FOR RETURN**
**OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 3**

**Di Carlo Declines to Return the Monaghan Letter to Defendants.** Di Carlo's letter suggested to Whitaker that Di Carlo may have received the Monaghan Letter. Whitaker promptly reviewed the "to be filed" file behind his secretary's desk pertaining to this matter and, to his consternation, located the Fax Information Sheet indicating that the Monaghan Letter had not been sent to Monaghan as intended but may have been sent to Di Carlo instead. (Whitaker Decl. ¶ 7.) Upon realizing this error, Whitaker then conferred with Butler, who promptly contacted Di Carlo to request the return of the Monaghan Letter. (Id.) Di Carlo was not in to take Butler's call and did not return such call prior to the filing of this motion. Accordingly, on the afternoon of August 5, 2002, Whitaker sent Di Carlo a letter requesting the return of the Monaghan Letter. To date, however, Di Carlo has not agreed to return the Monaghan Letter to Defendants, thus necessitating this motion.

## SUMMARY OF THE ARGUMENT

The Monaghan Letter was specifically addressed to only Monaghan, and its text clearly reveals that Whitaker did not intend to send it to Di Carlo. It was telecopied to Di Carlo by accident. When he received the letter, Di Carlo was ethically obligated to notify Defendants, comply with their request to return the letter, and not use or rely upon the letter in any way. In violation of this duty, Di Carlo failed to contact Defendants about the letter, refused to return it when requested to do so, and (even worse) has now tried to gain a tactical advantage from it. Defendants are entitled to an order requiring Di Carlo to return the Monaghan Letter and

all copies thereof to Defendants and preventing Di Carlo and Brooks from using or relying on the contents of the Monaghan Letter in any way.

## ARGUMENT

**The Monaghan Letter Is Privileged.**   Initially, a review of the Monaghan Letter confirms that it is exempted from disclosure by both the attorney-client privilege and the attorney work product exemption.  The Monaghan Letter was to be sent by Whitaker (a lawyer) to his clients (Defendants) in his capacity as their lawyer for the purpose of providing them with confidential legal advice regarding this case.  Whitaker prepared the Monaghan Letter in anticipation of litigation for Defendants.  See Fed. R. Civ. P. 26(b)(3).  Morever, the Fax Information Sheet received by Di Carlo states that it contains **"PRIVILEGED AND CONFIDENTIAL MATERIAL"** and instructs any unauthorized recipient to notify the sender immediately and return the facsimile and all copies thereof to the sender by U.S. Mail. Brooks cannot seriously dispute that the Monaghan Letter is privileged.

**Di Carlo Was Ethically Obligated to Return the Letter.**  Upon receiving this facially privileged communication that was obviously not intended for him, Di Carlo was ethically obligated to notify Defendants that he received the Monaghan Letter and abide by Whitaker's instruction that it be returned.[3]  Indeed, the ABA Commission on Ethics and Professional Responsibility has squarely addressed the ethical obligations for an attorney who obtains an

---

[3]Even if there was any doubt about whether he was to have received the letter, Di Carlo should have called Defendants' counsel to inquire whether he was supposed to have received it.

**DEFENDANTS' EMERGENCY MOTION FOR RETURN**
**OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 5**

otherwise privileged document that was delivered to him inadvertently.  See ABA Comm. on

Ethics and Professional Responsibility, Formal Op. 92-368 (1992).  A true and correct copy

of this opinion is attached hereto as Exhibit 7.  In this opinion, the ABA Ethics Commission

observed:

> A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.

> ***

> Giving due weight to each of the foregoing considerations, it is the view of the Committee that the receiving lawyer, as a matter of ethical conduct contemplated by the precepts underlying the Model Rules, (a) should not examine the materials once the inadvertence is discovered, (b) should notify the sending lawyer of their receipt and (c) should abide by the sending lawyer's instructions as to their disposition.

Id.  Numerous courts have reached the same conclusion.  See, e.g., Transportation Equipment

Sales Corp. v. BMY Wheeled Vehicles, 930 F. Supp. 1187, 1188 (N.D. Ohio 1996) (quoting

Formal Opinion 92-368 and observing that "[c]ounsel for the plaintiff having chosen not to

take this better, and more ethical approach, I must fashion a remedy that avoids prejudice to

the defendant and deters others from following the ill-advised path pursued by plaintiff's

counsel after the document came into his hands"); Resolution Trust Corp. v. First of America

Bank, 868 F. Supp. 217, 220 (W.D. Mich. 1994) ("In this Court's judgment, common sense and

a high sensitivity toward ethics and the importance of attorney-client confidentiality and

privilege should have immediately caused the plaintiff's attorneys to notify defendant's counsel of his office's mistake.").[4]

**The Court Should Order Di Carlo to Return the Monaghan Letter.** In light of Di Carlo's refusal to comply with his ethical obligation to return the Monaghan Letter, Defendants are entitled to an order requiring him to do so. The Fifth Circuit has instructed district courts to apply a five-part test to address the issue of inadvertent disclosure of privileged materials,

> under which consideration is given to all of the circumstances surrounding the disclosure, including: (1) the reasonableness of precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness.

Alldread v. City of Grenada, 988 F.2d 1425, 1433 (5th Cir. 1993). Application of these factors confirms that this motion should be granted.

Here, the Monaghan Letter is obviously privileged, and Whitaker requested its return the same day that he learned of Di Carlo's receipt of it. The highly sensitive information contained in the Monaghan Letter would not have been discoverable absent this error, which was obviously inadvertent. Moreover, the record is bereft of evidence that Defendants (i.e., the client) intended to waive the privilege. Indeed, the Alldread panel upheld the district court's order requiring the return of the privileged materials where the producing party had promptly asserted the privilege upon learning of the disclosure and considerations of fairness

---

[4]Further support for this conclusion may be found in the Texas Rules of Civil Procedure. See Tex. R. Civ. P. 193.3(d) (providing that a privilege is not waived by inadvertent production and that, upon request, the receiving party must promptly return the specified material or information and any copies pending a ruling by the court denying the privilege).

warranted the return of the materials.  988 F.2d at 1433-35.  The same result is appropriate here.

**Di Carlo's Counter Accusations Are Meritless.**    Rather than simply concede and abide by his ethical obligation, Di Carlo chose to accuse Defendants' counsel of criminal misconduct.  Although not germane to the issue of whether Di Carlo must return the Monaghan Letter to Defendants, it is clear that the matters complained of by him are meritless.  It is, moreover, apparent that Di Carlo is trying to gain a tactical advantage in the case.[5]  To put the issue in context, the Court must understand the genesis of these disputes.

Since its filing in March 2001, this action has been hotly contested at every turn, and the parties have filed over time numerous discovery-related motions.  In early May 2002, the offices of Defendants' outside counsel received an unsolicited telephone call from Lucy Cascos ("Cascos").  (Whitaker Decl. ¶ 2.) Whitaker returned the call to Cascos, who identified herself as the former office manager of Karen E. Brooks, D.P.M., P.A. (the "PA"), the professional association through which Brooks conducted her medical practice.[6]  (Id.)  As set forth more fully in the Declaration of Lucille Cascos (the "Cascos Declaration"):

---

[5]Rule 4.04(b)(2) of the Texas Rules of Disciplinary Procedure prohibits a lawyer from threatening to present criminal or disciplinary charges solely to gain an advantage in a civil matter.

[6]There can be little dispute that Whitaker could ethically speak with Cascos, who identified herself from the outset as a former employee of the PA (which is not a party to this action). Cf. Tex. Disciplinary R. Prof'l Conduct 4.02 cmt. 4 ("Moreover, this Rule does not prohibit a lawyer from contacting a former employee of a represented organization ..., nor from contacting a person presently employed by such an organization ... whose conduct is not a matter at issue but who might possess knowledge concerning the matter at issue.").

**DEFENDANTS' EMERGENCY MOTION FOR RETURN**
**OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 8**

- •     Brooks, both individually and through her staff, contacted numerous individuals with records regarding her and instructed such individuals not to send out any records in response to any subpoena that they may receive;

- •     Brooks, both individually and through her staff, contacted an overnight delivery company, falsely stated that they were employed by one of Brooks' medical providers, requested that subpoenaed records that were to be sent to Defendants' counsel be returned to such doctor's office, obtained the return of such records, and sent cookies to such doctor's office staff for their help in obtaining the return of these records; and

- •     Brooks has taken numerous steps, such as beginning to use a cane and driving some distance to go out dancing, to continue to give the impression that she is disabled.

The Cascos Declaration constituted further evidence in support of the relief that Defendants were seeking in many of the then-pending discovery motions, and Defendants were not aware of such evidence prior to speaking with Cascos. (Id.) On May 23, 2002, Defendants filed the Cascos Declaration as an attachment to Defendants' Motion for Leave to File Supplemental Evidence (Docket No. 33), and Brooks has not yet taken any steps to challenge the contents of such declaration or Cascos' credibility.

During their conversations, Cascos also advised Whitaker that she had told Brooks, prior to joining the PA, that she had been incarcerated in the mid-1990s for embezzlement. (Whitaker Decl. ¶ 3.) Cascos also informed Whitaker that she possessed copies of certain documents that she had obtained from the PA. (Id.) Whitaker did not ask Cascos any questions about the circumstances under which she obtained these documents and neither requested the opportunity to review nor has reviewed any documents from her. (Id.)

On May 28, 2002, the Court held a hearing on the pending motions in this case, made its displeasure with Brooks' actions abundantly clear, and entered the Order (Docket No. 36), in which it denied most (if not all) of the relief that Brooks was seeking, granted Defendants' the majority of the relief that they were seeking, and awarded Defendants over $4,000.00 for the attorneys' fees that they had incurred as a result of Brooks' conduct. On June 6, 2002, the Court entered its Amended Order (Docket No. 38), which awarded Defendants an additional $1,470.00 in fees, required Brooks to provide the additional discovery to Defendants by July 15, 2002, and required Brooks to pay the fee award by July 15, 2002. Brooks has not complied with these orders, and Defendants have filed their Motion for Litigation-Ending Sanctions in light of Brooks' conduct.

Initially, the fact that Cascos was convicted of a crime does not disqualify her from providing evidence. Admittedly, at common law a person convicted of a felony was not competent to testify as a witness; over time, however, this absolute bar has been replaced by a rule allowing such witnesses to testify, subject to impeachment by evidence of such prior conviction. See Green v. Bock Laundry Mach. Co., 490 U.S. 504, 511-13 (1989). The enactment of the Federal Rules of Evidence in 1974 memorialized this change in the competency of such witnesses. See Fed. R. Evid. 601 advisory committee's note (1972) (observing that "[t]his general ground-clearing eliminates all grounds of incompetency [...], including] conviction of crime," that were not specifically recognized in such article). Further support for this conclusion may be found in the current text of Rules 601 and 609. Compare

**DEFENDANTS' EMERGENCY MOTION FOR RETURN**
**OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 10**

Fed. R. Evid. 601 (providing that, except as otherwise provided, "[e]very person is competent to be a witness") with Fed. R. Evid. 609 (allowing for the attacking of the credibility of a witness, subject to Rule 403, with evidence of prior criminal convictions).  As numerous courts have recognized, a person convicted of a crime can offer testimony.  See, e.g., U.S. v. Griffin, 818 F.2d 97, 101-02 (1st Cir.) (holding that the district court did not abuse its discretion in admitting the testimony of a self-confessed coconspirator who had entered into plea agreement, been indicted for and convicted of perjury, and later became the prosecutor's witness), cert. denied, 484 U.S. 844 (1987).

Whitaker was also not under any obligation to report, whether to Brooks or the criminal authorities, his limited knowledge of the documents possessed by Cascos.  Based on their conversations, all of which occurred after her employment with the PA ended, Whitaker lacks detailed knowledge of which documents are possessed by Cascos or how she obtained them. Whitaker did not request Cascos to take any documents, and he has neither requested nor obtained copies of any documents from her.  Even if Cascos were a client of his (which she is not), Whitaker would still not be under any obligation to report her possession of documents to anyone.  Cf. Tex. Disciplinary R. Prof'l Conduct 1.02(e) ("When a lawyer has confidential information clearly establishing that the lawyer's client has committed a criminal or fraudulent act in the commission of which the lawyer's services have been used, the lawyer shall make reasonable efforts under the circumstances to persuade the client to take corrective action."). Nor would Whitaker be subject to disqualification, even if he had received and reviewed

documents from Cascos.  See In re Meador, 968 S.W.2d 346, 354 (Tex. 1998) (orig. proceeding) (holding that the trial court did not abuse its discretion in refusing to disqualify an attorney who had used privileged documents that his client had (in another lawsuit) secretly removed from the defendants' offices).

Indeed, Di Carlo's position is somewhat disingenuous.  If Cascos possesses documents from the PA that are responsive to one or more of Defendants' discovery requests, the question remains why, in light of the Orders, Brooks has not produced such documents to Defendants.  Brooks' violation of the Orders would arguably provide Defendants with grounds to request and review documents from Cascos.  See ABA Comm. on Ethics and Professional Responsibility, Formal Op. 94-382 (1994) (noting that one circumstance in which a lawyer may use materials that the sender had no authority to transmit is where he has "a legitimate claim that the documents should have been, but were not, produced by the adverse party in response to discovery requests").[7]  Moreover, to the extent that Cascos possesses documents that may have been arguably privileged at one point in time, an argument can be made that (1) such documents lost their status as privileged to the extent that they were shared voluntarily with Cascos or (2) any privilege has been vitiated by the crime-fraud exception.  In any event, Di Carlo's complaints fail because Defendants' counsel have neither requested nor obtained from Cascos any documents allegedly belonging to the PA.

---

[7]A true and correct copy of this formal opinion is attached hereto as Exhibit 8.

**DEFENDANTS' EMERGENCY MOTION FOR RETURN**
**OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 12**

## **CONCLUSION**

Defendants thus request that the Court enter an order:

(1)     requiring Di Carlo and Brooks to return the Monaghan Letter and all copies

thereof to Defendants' counsel;

(2)     barring Di Carlo and Brooks from any further use of the Monaghan Letter or any

information gained as a result of its inadvertent disclosure;

(3)     requiring Di Carlo, within two weeks of the entry of such order, to certify that

(a) he has undertaken a diligent, good faith search to identify all persons to

whom the Monaghan Letter was made available, either in original, duplicate, or

summary form, or who otherwise had become aware of its contents, and (b) he

has given a copy of such order to all such persons and instructed them to deliver

all copies of the Monaghan Letter and any additional documents containing

direct or indirect reference to such letter to Di Carlo, who shall file all such

materials under seal with the Court;

(4)     requiring Di Carlo, within two weeks of the entry of such order, to file under

seal with the Court (a) a list of all persons whose identities were learned as a

result of the search to be undertaken in accordance with such order, with such

list to state the person's identity, relationship to Brooks or Di Carlo, and the

date(s) of and purpose(s) for disclosure of the Monaghan Letter to such person,

and (b) a description of the steps taken to ensure that no improper use of the

information learned as a result of the inadvertent disclosure of the Monaghan

Letter can or will be made during the course of this litigation;

(5)     requiring all persons to whom a copy of such order is delivered to refrain from

disclosure or use of the information that they have gained as a result of the

disclosure to them of the Monaghan Letter or the information contained therein;

and

(6)     awarding Defendants all such other relief to which they are entitled.

See Transportation Equipment Sales Corp. v. BMY Wheeled Vehicles, 930 F. Supp. 1187,

1188 (N.D. Ohio 1996) (awarding comparable relief).

Respectfully submitted,

By: _____

Andrew C. Whitaker
State Bar No. 21274600
S.D. No. 14309
Attorney-In-Charge

OF COUNSEL:
Doug K. Butler
State Bar No. 03516050
S.D. No. 9271

FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202
(214) 939-2000
(214) 939-2090 (telecopy)

ATTORNEYS FOR DEFENDANTS
UNUMPROVIDENT CORPORATION
and UNUM LIFE INSURANCE
COMPANY OF AMERICA

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been sent by Federal Express to Mr. Mark A. Di Carlo, La Solana Building, 722 Elizabeth Street, Corpus Christi, Texas 78704, on this 6th day of August, 2002.

_____
Andrew C. Whitaker

**DEFENDANTS' EMERGENCY MOTION FOR RETURN
OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 15**

# FIGARI DAVENPORT & GRAVES

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202-3796
214-939-2000
Fax 214-939-2090

Writer's Direct Dial Number

(214) 939-2076

Writer's E-Mail Address

awhitake@figdav.com

August 5, 2002

**VIA TELECOPY**
Mr. Mark A. Di Carlo
La Solana Building
722 Elizabeth Street
Corpus Christi, Texas  78404

Re:    C.A. No. B-01-052; *Karen Brooks v. UnumProvident Corporation and
       UNUM Life Insurance Company of America*

Dear Mr. Di Carlo:

We are in receipt of your letter dated August 5, 2002.  Please be advised that we will address the substantive matters that you have raised in the next few days.

In the meantime, following the receipt of your letter, we learned (for the first time) that a letter dated August 1, 2002 from me to Matthew J. Monaghan of UnumProvident Corporation may have been inadvertently telecopied to you.  Would you please advise me whether you in fact received such letter?  If you received it, please immediately return such letter and all copies thereof to us, at the address listed above, via the U.S. Postal Service.  We will pay all of the postal expenses associated with this request.  In addition, please refrain from using or relying on such letter in any way, including showing the letter to your client or any third party.

If you do not advise me that you never received the letter or that you have returned it and all copies thereof to us, we will have no choice but to serve a motion tomorrow to obtain the return of such letter and for a protective order.

Sincerely,

Andrew C. Whitaker

Andrew C. Whitaker

ACW/krp

EXHIBIT __I__

# Mark A. Di Carlo

## Attorney at Law
La Solana Building
722 Elizabeth St.
Corpus Christi, Texas 78404
(361) 888-6968
FAX (361) 888-6981

August 6, 2002

**VIA TELEFAX (214) 939-2090**
Mr. Andrew C. Whitaker
FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202-3796

> Re:   *C.A. No. B-01-052; Karen Brooks v. UnumProvident Corporation and UNUM Life Insurance Company of America*

Dear Mr. Whitaker:

I received your letter dated August 5, 2002 at about 4:13 p.m. and began to review is about 6:00 p.m.

Unfortunately, I cannot abide by your request not to show the letter to my client because the letter was faxed to my client late yesterday morning.

The letter at issue was faxed to me along with a fax cover sheet that the letter was faxed to Mark A. Di Carlo and which states I was the "intended recipient." Previously, I believed the letter was faxed to me purposefully as a litigation tactic regarding the discussed mediation.

Unfortunately, because of the letter, and your follow up letter, a number of issues have arisen regarding the theft of documents at Dr. Brooks office and I do not have a reasonable response to your request. Apparently, you now assert that the letter was not sent intentionally. Therefore, Doctor Brooks and I only discovered the theft or procurement of the documents and an apparent cover up by accident.

Texas Penal Code § 7.02 covers "Criminal Responsibility for conduct of another" and states that a person is criminally responsible if a person has the legal ability to

EXHIBIT 2

prevent a commission of an offense and acting with intent to promote its commission fails to make a reasonable effort to prevent commission of the offense.

Texas Penal Code § 7.22 states, "if conduct committing an offense is performed by an agent acting in behalf of a corporation or association . . .. The corporation or association is criminally responsible for an offense defined . . . ."

Texas Penal Code § 31.03 covers the definition of theft.

Ms. Brooks is a licensed podiatrist.  Although, because of your demands and threats I do not have much of an opportunity to research the law it appears to me that her records are "confidential and privileged."  Texas Occupations Code § 202.404.  Ms. Brooks, may have no chance but to notify her clients that her employee contacted UNUM in May 2002 and took a "trove" of documents which contained confidential records and that UNUM failed to notify Ms. Brooks, Ms. Brooks counsel, or the United States District Court that these documents were stolen.

I do not believe I can legally agree to a request to hide or a conspiracy to hide Ms. Cascos illegal conduct by not reporting it and providing evidence you provided to me under the present assertion that it was inadvertent without legal authority from you regarding my own ethical and legal duties or your own and my consideration of such legal authority.  Unfortunately, these issues are many and complex and involve criminal law, professional responsibility, the ethical codes  of two professions, and various regulations regarding the privacy of records.  For example, there are many new Federal regulations regarding confidentiality of records which I reviewed about a month ago and which I will need additional time to research before I can comply with any request.

I would appreciate your help in researching these issues instead of your threats without legal authority to file a protective order.

I would also like to query did Ms. Cascos identify what the "trove" of documents consist of?   Approximately, how many documents were taken?  What was the nature of these documents?

I also look forward to hearing from you regarding this original issues I raised in my August 5, 2002 letter as well as the new issues regarding your request that I not show a letter which I believe establishes or indicates criminal conduct to any third party, including apparently, appropriate criminal and/or regulatory agencies and/or licensing boards.

I will be contacting Mr. Butler this afternoon regarding these matters, given what I believe are the improper implications, in your letter to UNUM and your requests from me not to report these matters.

Case 1:01-cv-00052   Document 46   Filed in TXSD on 08/07/2002   Page 19 of 35

Sincerely,

Mark A. Di Carlo

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KAREN BROOKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. B-01-052 |
| | § | |
| UNUMPROVIDENT CORPORATION | § | |
| and UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF ANDREW C. WHITAKER IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION FOR RETURN OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER

1.      My name is Andrew C. Whitaker.  I am over the age of eighteen years and am competent and not otherwise disqualified to make this declaration.  I am a partner in the Dallas, Texas law firm of Figari Davenport & Graves, L.L.P. ("Figari & Davenport").  I am one of the attorneys representing Defendants Unum Life Insurance Company of America and UnumProvident Corporation (collectively, "Defendants") in this action.  As such, I have personal knowledge, during all of the times mentioned herein, of the facts and circumstances set forth below, and they are all true and correct.

2.      In May 2002, I received a telephone message slip from the secretary of another Figari & Davenport partner stating that he had received a telephone call regarding this case from a woman named Lucy Cascos.  Since this other partner was not working on this case, his

**DECLARATION OF ANDREW C. WHITAKER IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION FOR RETURN OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 1**

EXHIBIT ___3___

secretary gave the message slip to me.  On May 7, 2002, I returned the call and spoke with

Lucy Cascos ("Cascos"), who identified herself as the former office manager of Karen E.

Brooks, D.P.M., P.A. (the "PA"), which was purportedly the professional association through

which Brooks conducted her medical practice.  Over a series of conversations, Cascos told me

(among other things) that

- Brooks, both individually and through her staff, contacted numerous individuals with records regarding her and instructed such individuals not to send out any records in response to any subpoena that they may receive;

- Brooks, both individually and through her staff, contacted an overnight delivery company, falsely stated that they were employed by one of Brooks' medical providers, requested that subpoenaed records that were to be sent to Defendants' counsel be returned to such doctor's office, obtained the return of such records, and sent cookies to such doctor's office staff for their help in obtaining the return of these records; and

- Brooks has taken numerous steps, such as beginning to use a cane and driving some distance to go out dancing, to continue to give the impression that she is disabled.

I was not aware of any of this information prior to speaking with Cascos, and her statements

helped explain in my mind the difficulties that we had been encountering in obtaining records

from third parties in this case.  I thus began working with Cascos on the preparation of the

**DECLARATION OF ANDREW C. WHITAKER IN SUPPORT OF
DEFENDANTS' EMERGENCY MOTION FOR RETURN OF
PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 2**

Declaration of Lucille Cascos (the "Cascos Declaration"), which was eventually finalized and filed of record on May 23, 2002.

3.    During our conversations, Cascos also told me that she had told Brooks, prior to joining the PA, that she had been incarcerated in the mid-1990s for embezzlement. Cascos also told me that she possessed copies of certain documents that she had obtained during her affiliation with the PA. I did not ask Cascos any questions about the circumstances under which she obtained these documents, and I have never requested the opportunity to review any of her documents, received any documents (other than the Cascos Declaration) from her, or reviewed any documents (other than the Cascos Declaration) from her.

4.    On May 28, 2002, I personally attended a hearing on the pending motions in this case. Following this hearing, the Court entered the Order (Docket No. 36) and the Amended Order (Docket No. 38) (collectively, the "Orders"). After the entry of the Orders, the parties began discussing the possibility of using mediation to resolve their disputes. In connection with those discussions, I began dictating a letter to Matthew Monaghan ("Monaghan"), who is an inside counsel with Defendants and has served as my primary client contact on this case, providing him with an updated analysis of this case and discussing Defendants' settlement strategy. Karen Piller ("Piller"), my secretary since April 2001, typed this letter for me. After several revisions, on the morning of August 1, 2002, Piller finalized this letter by making my last set of corrections. A true and correct copy of this letter, in its final form (the "Monaghan

**DECLARATION OF ANDREW C. WHITAKER IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION FOR RETURN OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 3**

Letter"), has been filed under seal as Exhibit 5 to Defendants' Emergency Motion for Return of Privileged Document and Protective Order (the "Emergency Motion").

5.      The Monaghan Letter was to be sent by me to Defendants in my capacity as their lawyer for the purpose of providing them with confidential legal advice regarding this case. In addition, I prepared the Monaghan Letter in anticipation of litigation for Defendants.

6.      It was my intention at the time that I signed the Monaghan Letter that it be sent by telecopy to Monaghan and by intra-office mail to Doug Butler ("Butler"), who was the other Figari & Davenport attorney working on this case.  It was my further intention that this letter not be sent, under any set of circumstances, to Di Carlo.

7.      On the morning of August 5, 2002, I received a copy of a letter dated August 5, 2002 from Di Carlo.  A true and correct copy of this letter is attached as Exhibit 7 to the Emergency Motion.  In his letter, Di Carlo stated that his office "has received definitive evidence that you are aware of the theft of documents by Lucy Cascos an ex-employee of Karen Brooks."  Upon receipt of this letter, I realized that the alleged "definitive evidence" alluded to by Di Carlo could be contained in the Monaghan Letter.  I promptly reviewed the "to be filed" file pertaining to this matter and, to my consternation, located the Fax Information Sheet indicating that the Monaghan Letter had not been sent to Monaghan as I intended but may have been sent to Di Carlo instead.  Upon realizing this error, I then conferred with Butler, who (in my presence) called Di Carlo's office to request the return of the Monaghan Letter. Butler left a message with Di Carlo's office requesting a return call.  In light of our inability

**DECLARATION OF ANDREW C. WHITAKER IN SUPPORT OF
DEFENDANTS' EMERGENCY MOTION FOR RETURN OF
PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 4**

to speak with Di Carlo, on the afternoon of August 5, 2002, I sent a letter to Di Carlo requesting the return of the Monaghan Letter. A true and correct copy of this letter is attached as Exhibit 1 to the Emergency Motion.

      I declare under penalty of perjury that the foregoing is true and correct.

      EXECUTED on this 6th day of August, 2002.

                    Andrew C. Whitaker

**DECLARATION OF ANDREW C. WHITAKER IN SUPPORT OF
DEFENDANTS' EMERGENCY MOTION FOR RETURN OF
PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KAREN BROOKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. B-01-052 |
| | § | |
| UNUMPROVIDENT CORPORATION | § | |
| and UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendants. | § | |

### DECLARATION OF KAREN PILLER IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION FOR RETURN OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER

1.      My name is Karen Piller. I am over the age of eighteen years and am competent and not otherwise disqualified to make this declaration. I am a secretary in the Dallas, Texas law firm of Figari Davenport & Graves, L.L.P. ("Figari & Davenport"). Since April 2001, I have worked for Andrew C. Whitaker ("Whitaker"), who is one of the attorneys representing Defendants UnumProvident Corporation and Unum Life Insurance Company of America (collectively, "Defendants") in this action. As such, I have personal knowledge, during all of the times mentioned herein, of the facts and circumstances set forth below, and they are all true and correct.

2.      During the course of this action, I have personally prepared, at Whitaker's request, over fifty letters to Mark Di Carlo ("Di Carlo"), who is counsel for Plaintiff Karen

EXHIBIT 4

Brooks, and over forty letters to Matthew Monaghan ("Monaghan"), who is Figari & Davenport's primary client contact on this case.

3.      In late July 2002, I began typing a letter to Monaghan for Whitaker's signature providing an updated analysis of this case and discussing Defendants' settlement strategy. After several revisions, on the morning of August 1, 2002, I finalized this letter at Whitaker's request.  A true and correct copy of this letter, in its final form (the "Monaghan Letter"), has been filed under seal as Exhibit 5 to Defendants' Emergency Motion for Return of Privileged Document and Protective Order.

4.      From my review of the text of the Monaghan Letter and my experience with this case, it was my understanding that the Monaghan Letter was to be sent by telecopy to Monaghan and by intra-office mail to Doug Butler ("Butler"), who was the other Figari & Davenport attorney working on this case.  It was my further understanding that this letter was not to be sent, under any set of circumstances, to Di Carlo.

5.      In connection with finalizing the Monaghan Letter, I entered the subdirectory on the Figari & Davenport computer system for this case to print out a telecopy transmittal sheet for Monaghan.  Even though I understood that the Monaghan Letter was to be sent to Monaghan (and not to Di Carlo), I nonetheless erroneously printed out a telecopy transmittal sheet for Di Carlo, placed it on top of the Monaghan Letter, and placed such documents in our intra-office mail for transmission.

**DECLARATION OF KAREN PILLER IN SUPPORT OF
DEFENDANTS' EMERGENCY MOTION FOR RETURN OF
PRIVILEGED DOCUMENT AND PROTECTIVE ORDER - Page 2**

6.    I did not intend to send the Monaghan Letter to Di Carlo, and I was not instructed, whether by Whitaker, Butler, or another Figari & Davenport attorney, to send such letter to him.

7.    I did not realize that the Monaghan Letter had erroneously been sent to Di Carlo until the morning of August 5, 2002, when Whitaker and I examined the file copy of the Monaghan Letter.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 6th day of August, 2002.

Karen Piller

# EXHIBIT 5 HAS BEEN FILED UNDER SEAL

EXHIBIT___5___

## Confirmation Report — Memory Send

Page      : 001
Date & Time: Aug-01-02  09:19am
Line 1    : 214 939 2090
Line 2    : 214 939 2090
Machine ID : Figari Davenport & Graves,L.L.P.

| | | |
|---|---|---|
| Job number | : | 121 |
| Date | : | Aug-01 09:17am |
| To | : | ☎15760755502580913618886981 |
| Number of pages | : | 005 |
| Start time | : | Aug-01 09:17am |
| End time | : | Aug-01 09:19am |
| Pages sent | | 005 |
| Status | | OK |
| Job number | : 121 | |

**FAXED**

AUG - 1 2002

By_____



*** SEND SUCCESSFUL ***

## FIGARI DAVENPORT & GRAVES
A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

3400 Bank of America Plaza
901 Main Street, LB 123
Dallas, Texas 75202-3796
214-939-2000

Writer's Direct Dial Number
214-939-2076

Telecopiers: 214-939-2090
214-939-2091

### FAX INFORMATION SHEET

August 1, 2002

TO:          Mr. Mark A. Di Carlo
COMPANY:
FAX NUMBER:      (361) 888-6981
PHONE NUMBER:    (361) 888-6968

FROM:    Andrew C. Whitaker

NUMBER OF PAGES: ___5___ (including transmittal page)

CLIENT/MATTER NO: 76/07555/0258

#### WARNING: PRIVILEGED AND CONFIDENTIAL MATERIAL

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS CONFIDENTIAL, PRIVILEGED, AND EXEMPT FROM DISCLOSURE TO THIRD PERSONS AND IS INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE RECIPIENT OR READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY RETENTION, DISSEMINATION, DISTRIBUTION, COPYING, OR UNAUTHORIZED USE OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY TELEPHONE (214-939-2000), AND ALSO RETURN THE FACSIMILE AND ANY COPIES THEREOF TO THE SENDER AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. ALL POSTAL EXPENSES WILL BE PAID BY SENDER. THANK YOU.

EXHIBIT 6

# MARK A. DI CARLO
## ATTORNEY AT LAW

La Solana Building
722 Elizabeth Street
Corpus Christi, Texas 78404
(361)888-6968
Fax (361)888-6981

August 5, 2002

**VIA TELEFAX (214) 939-2090**
Mr. Andrew Whitaker
FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202-3796

       Re:    *C.A. No. B-01-052; Karen Brooks v. UnumProvident Corporation and*
             *UNUM Life Insurance Company of America*

Dear Mr. Whitaker:

    My office has received definitive evidence that you are aware of the theft of documents by Lucy Cascos an ex-employee of Karen Brooks.

    Please notify me if you and your firm intend to proceed on this case as counsel. Please notify me if you have contracted any federal or state officials regarding the theft of these documents. Please notify me whether you intend to testify at the prosecution of this case regarding the theft of these documents or to aid in the prosecution.

    Also, I am troubled that the affidavit you filed in this case infers that you were aware that Ms. Cascos was on parole during her employment with Ms. Brooks and you still filed the affidavit with the court. Please let me know if you were aware of this fact.

Sincerely,

Mark A. Di Carlo

EXHIBIT __7__

ABA Formal Op. 92-368                                                                    **Page 1**
ABA Comm. on Ethics and Professional Responsibility, Formal Op. 92-368

American Bar Association

INADVERTENT DISCLOSURE OF CONFIDENTIAL MATERIALS

November 10, 1992.

Copyright (c) 1992 by the American Bar Association

A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.

The Committee has been asked to opine on the obligations under the Model Rules of Professional Conduct of a lawyer who comes into possession of materials that appear on their face to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear that the materials were not intended for the receiving lawyer. The question posed includes situations in which the sending lawyer has notified the receiving lawyer of the erroneous transmission and has requested return of the materials sent as well as those situations in which the inadvertent sending lawyer and his client remain ignorant that the materials were missent. It also extends to situations in which the receiving lawyer has already reviewed the materials as well as those in which the sending lawyer intercedes before the receiving lawyer has had such an opportunity. This opinion is intended to answer a question which has become increasingly important as the burgeoning of multi- party cases, the availability of xerography and the proliferation of facsimile machines and electronic mail make it technologically ever more likely that through inadvertence, privileged or confidential materials will be produced to opposing counsel by no more than the pushing of the wrong speed dial number on a facsimile machine.

A satisfactory answer to the question posed cannot be drawn from a narrow, literalistic reading of the black letter of the Model Rules. But it is useful, and necessary, to bear in mind the thoughts in the Preamble to the Model Rules that "many difficult issues of professional discretion ... must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules," and that "the Rules do not exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules." In that larger, and more fundamental, framework, the Committee's views, expressed in this opinion, have been informed by (i) the importance the Model Rules give to maintaining client confidentiality, (ii) the law governing waiver of the attorney-client privilege, (iii) the law governing missent property, (iv) the similarity between the circumstances here addressed and other conduct the profession universally condemns, and (v) the receiving lawyer's obligations to his client.

Giving due weight to each of the foregoing considerations, it is the view of the Committee that the receiving lawyer, as a matter of ethical conduct contemplated by the precepts underlying the Model Rules, (a) should not examine the materials once the inadvertence is discovered, (b) should notify the sending lawyer of their receipt and (c) should abide by the sending lawyer's instructions as to their disposition.

## I. Confidentiality

The concept of confidentiality is a fundamental aspect of the right to the effective assistance of counsel. As reflected in each iteration of the rules of professional responsibility, the obligation of the lawyer to maintain and to refuse to divulge client confidences is virtually absolute.

The confidentiality principle rests on the vital importance society places upon the "full, free and frank" exchange between lawyer and client, shielded from the intrusive eyes and ears of adverse parties, the government, the media and the public. The principle's primary basis is that, absent the guarantee of confidentiality, critical discussions will be either proscribed, circumscribed or intruded upon in a way that will impact directly on the ability of the lawyer to serve his or her client. If the lawyer cannot gather all the necessary information and is not free to explore with the client the client's options, free from the threat that these confidential communications will be shared with those whose interests may be adverse to the client, the chilling effect on the lawyer-client relationship becomes plain. The benefits of

EXHIBIT  8

Finally, it might be urged that a receiving lawyer has an obligation to maximize the advantage his client will gain from careful scrutiny of the missent materials. While the "zealous" representation of Canon 7 of the Model Code of Professional Responsibility does not appear in haec verba in the Model Rules, it could be argued that a lawyer's "commitment and dedication to the interests of the client," referred to in the Comment to Model Rule 1.3, (calling on a lawyer to act with "reasonable promptness and diligence") includes an obligation to capitalize on an error of this sort on the part of opposing counsel.

However, there are many limitations on the extent to which a lawyer may go "all out" for the client. The examples cited in Part IV of this opinion are all "opportunities" the lawyer may not seize. Similarly, the Model Rules carefully circumscribe factual and legal representations a lawyer may make, people counsel may contact and clients counsel can represent. The limitation contemplated by this opinion is entirely consistent with these ethical restraints on uncontrolled advocacy.

### B. The Analogy to Inadvertent Waiver of the Attorney-Client Privilege

In concluding that inadvertent disclosure of confidential materials should not result in the loss of their confidential character we find persuasive the manner in which courts have treated the inadvertent disclosure of materials subject to the attorney-client privilege. While the privilege is a rule of evidence which addresses when an attorney can be compelled to disclose otherwise protected material, whereas confidentiality is a principle designed to govern the lawyer's voluntary conduct, both concepts are designed to further the attorney-client relationship in a similar manner and for the same reasons.

A review of the relevant cases demonstrates, with few exceptions, an unwillingness to permit mere inadvertence to constitute a waiver. [FN2] Something more, like a failure of counsel to spend any time reviewing the documents to be produced in discovery, is required before a waiver is found. An example of this approach is the decision by the New Mexico Supreme Court in Hartman v. El Paso Natural Gas Co., 107 N.M. 679, 763 P.2d 1144, 1152 (1988) in which the Court explained how it would examine counsel's conduct in determining if there is a waiver:

> [There are] five factors which should assist a court in determining whether a document has lost its privilege: (1) The reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; (5) whether the overriding interests of justice would be served by relieving a party of its error.

The Committee recognizes that the view that inadvertence should not necessarily give rise to a waiver of the attorney-client is not universally accepted. [FN3] Some cases and commentators endorse Wigmore's view that "the privilege stands in derogation of the public's right to everyman's evidence," that the privilege results in the suppression of evidence, that the cost of the privilege is clear: evidence which would have been used in the search for truth is excluded. This contrary view finds its philosophical expression in the writings of Judge Marvin E. Frankel who observed:

> The effect of every evidentiary privilege, every grant in the law of a right to withhold information, is an added barrier to the search for truth. The lawyer is authorized and required by the privilege to cover up what may be evil and needed facts. The interests injured by the cover-up may be precious ones.

M. Frankel, Partisan Justice 64 (1980).

The cases reflecting what appears to be the minority view conclude that any unforced disclosure of attorney-client privileged communications destroys confidentiality and terminates the privilege, not only for the communications disclosed but also for all related communications.

> [I]f a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels--if not crown jewels. Short of court compelled disclosure, [citation omitted] or equally extraordinary circumstances, we will not distinguish between various degrees of "voluntariness" in waivers of the attorney-client privilege. In re Sealed Case, 877 F.2d 976, 980 (D.C.Cir.1989).

The fact that this result is reached is not surprising if one starts with hostility to the privilege. However, the Model Rules certainly reflect a far more positive view toward the importance of maintaining the confidentiality of attorney-client communications, one that this Committee must reflect as it interprets and explicates the Model Rules.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

## II. Law Governing Missent Property

While the Committee does not answer questions of law, this principle does not preclude consideration, for present purposes, of the black letter of the law of bailment as it applies to missent property. Indeed, examination of the law of bailment proves instructive in suggesting how, as a matter of ethics, the receiving lawyer should conduct himself when he receives materials clearly not intended for him. That law defines the relationship between sending and receiving lawyer, the rights of the receiving lawyer with respect to the missent property and the obligations receiving lawyer has with respect to its use.

In the question presented to the Standing Committee, the receiving lawyer lawfully possesses the missent materials, but the sending lawyer clearly did not intend to relinquish title to them, either the physical objects or the ideas reflected on each page, such that they would become the "property" of the receiving attorney. The common law of bailments characterizes such mistaken possession as a bailment implied by law, or a constructive bailment.

When possession of personal property of another is acquired and held under circumstances where the recipient, on principles of justice, ought to keep it safely and restore or deliver it to the owner, as, for example where possession has been acquired accidentally, gratuitously, through mistake, or by agreement since terminated for some other purpose than bailment, the law, irrespective of any actual meeting of the minds, any voluntary undertaking, or any reasonable basis for implying mutual benefit, imposes on the recipient the duties and obligations of a bailee. Such bailments are known as constructive and involuntary bailments, and ordinarily the party in possession of the property is regarded as a gratuitous bailee....

8 Am.Jur.2d Bailments § 64 (1980) (emphasis added).

An essential element of the bailment relationship is the absolute obligation of the bailee to return the subject matter of the bailment upon termination of the bailment. Id. § 178 (1980). This obligation to return the property is necessarily implied from the mere fact of lawful possession of personal property of another. Id. § 178. Where the bailment is not for any particular time, the bailor may terminate it at will. Id. § 292. Indeed, the bailment terminates when an unauthorized use is made of the property. Id. § 295. If the bailee refuses to return the property, makes an unauthorized disposition of it, or uses it for purposes other than those agreed on, he may be liable for its conversion. Id. § 178.

The right of a bailee to use the bailed property and the extent to which it may be used is governed by the intention of the parties to the bailment. Id. § 207. In the absence of any express agreement between the parties, as is the case in the question presented the Committee, no rule of universal application can be laid down:

Each case must be governed by its own circumstances, such as the character and purpose of the bailment and the nature of the property, in connection with other attending incidents. One test or principle applicable to the subject is whether, from the circumstances, the consent of the owner to the use may be fairly presumed.

Id. § 207 (emphasis added).

The sending lawyer here, of course, cannot begin to be presumed to have consented to any use of the missent materials by the receiving lawyer. Indeed, the only "use" to which the sending lawyer could be presumed to have consented is the immediate return of the missent property. Any attempt by the receiving lawyer to use the missent letter for his own purposes would thus constitute an "unauthorized use."

## III. Analogous Cases

The present issue is not unlike that presented to the Standing Committee in Informal Opinion 86-1518, Notice to Opposing Counsel of Inadvertent Omission of Contract Provision (February 9, 1986). In that case a contract was negotiated including one hotly disputed provision insisted upon by B. When B's lawyer forwarded a draft of the agreement to A's lawyer, the key provision, though agreed to, was missing. The Committee was asked what duty, if any, A's lawyer had in the circumstances.

The opinion concluded that A's lawyer had no duty to notify A of the error under Model Rule 1.4 because the client has no decision to make. Nor was the lawyer barred by the confidentiality provisions of Model Rule 1.6 from informing the other side because this disclosure was "impliedly authorized" by the representation. Because under Model Rule 1.2 the lawyer has the authority to decide the technical means to carry out the representation and because the client's right under the same Model Rule to committed and dedicated representation is not unlimited, the opinion concluded that the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

ABA Formal Op. 94-382                                                                    **Page 7**
 ABA Comm. on Ethics and Professional Responsibility, Formal Op. 94-382

American Bar Association

UNSOLICITED RECEIPT OF PRIVILEGED OR CONFIDENTIAL MATERIALS

July 5, 1994

Copyright (c) 1994 by the American Bar Association

A lawyer who receives on an unauthorized basis materials of an adverse party that she knows to be privileged or confidential should, upon recognizing the privileged or confidential nature of the materials, either refrain from reviewing such materials or review them only to the extent required to determine how appropriately to proceed; she should notify her adversary's lawyer that she has such materials and should either follow instructions of the adversary's lawyer with respect to the disposition of the materials, or refrain from using the materials until a definitive resolution of the proper disposition of the materials is obtained from a court.

The Committee has been asked to consider the obligations of a lawyer under the Model Rules of Professional Conduct (1983, as amended) when the lawyer is offered or sent, by a person not authorized to offer them, materials of an adverse party that the lawyer knows to be, or that appear on their face to be, subject to the attorney-client privilege of an adverse party or otherwise confidential within the meaning of Model Rule 1.6. [FN1] The question posed addresses situations in which the lawyer has not solicited the production of such material and its production was not authorized by the owner of the materials. It includes situations in which the lawyer is offered such materials and has an opportunity to decline them, as well as situations in which, without notice, the materials are simply sent to, and received by, the lawyer. The question embraces both situations in which the lawyer has knowledge of the privileged and/or confidential nature of the materials before receiving them and situations in which the lawyer does not recognize the confidential nature of the materials until receipt. [FN2]

Although the Model Rules do not offer explicit guidance on the present issue, we are persuaded by relevant public policy considerations and case law that a lawyer who, without solicitation, receives materials which are obviously privileged and/or confidential has a professional obligation to notify the adverse party's lawyer that she possesses such materials and either follow the instructions of the adversary's lawyer with respect to the materials, or refrain from using the materials until a definitive resolution of the proper disposition of the materials is obtained from the court.

I. Analogous Cases

The present issue is similar to that considered by the Standing Committee in Formal Opinion 92-368, Inadvertent Disclosure of Confidential Materials (November 10, 1992). In that case, a lawyer received materials that appeared on their face to be subject to the attorney-client privilege or otherwise confidential and it was clear that the materials were not intended to be sent to the receiving lawyer. We recognized that, in this advanced technological age with its frequent use of facsimile machines and electronic mail, such inadvertent disclosures frequently occur, and that today's beneficiary of such disclosures may likely become tomorrow's victim. We concluded that a lawyer receiving such materials had a professional responsibility, upon realizing the error, to avoid reviewing such materials further, to notify sending counsel if he is unaware of the error, and to follow sending counsel's directions as to the handling and disposition of such confidential materials.

Our decision was influenced by the values served by principles of confidentiality and the attorney-client privilege; analogous principles governing the inadvertent waiver of the attorney-client privilege; the law governing bailments and missent property; and general considerations of common sense, reciprocity and professional courtesy. Although we considered other competing principles--including the possible deterrent effect that allowing use of such materials might have on similar future errors, and the receiving lawyer's obligation zealously to represent the interests of her client--we concluded that these considerations were not dispositive and did not justify a rule that would allow the receiving lawyer to take advantage of such inadvertent disclosures of privileged and/or confidential materials.

The instant case is analogous. An unauthorized disclosure of privileged and/or confidential materials by anyone is, from the adverse party's perspective, no more intended and no more consensual than when disclosure occurs because of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT ___9___

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KAREN BROOKS,                          §
                                       §
        Plaintiff,                     §
                                       §
v.                                     §        C.A. No. B-01-052
                                       §
UNUMPROVIDENT CORPORATION              §
and UNUM LIFE INSURANCE                §
COMPANY OF AMERICA,                    §
                                       §
        Defendants.                    §


**EXHIBIT 5 TO DEFENDANTS' EMERGENCY MOTION FOR
RETURN OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER**


**THIS DOCUMENT IS BEING FILED UNDER SEAL**

**THIS ENVELOPE IS NOT TO BE OPENED BY, NOR ARE THE
CONTENTS THEREOF TO BE DISPLAYED OR REVEALED TO, ANY
PERSON OTHER THAN THE COURT AND ITS STAFF**