IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 1 9 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| KAREN BROOKS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-052 |
| | § | |
| UNUM PROVIDENT CORPORATION | § | |
| AND UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA | § | |

**PLAINTIFF'S MOTION TO RECUSE HONORABLE JUDGE HILDA TAGLE
PURSUANT TO 28 U.S.C. § 455 AND/OR 28 AND/OR U.S.C. § 144;**

**PLAINTIFF'S RESPONSE AND OBJECTIONS TO DEFENDANT'S
MOTION FOR LITIGATION-ENDING SANCTIONS;**

**PLAINTIFF'S MOTION TO REHEAR ALL DISCOVERY MATTERS DUE TO
THE INCOMPETENT AFFIDAVIT AND/OR FRADULENT/CRIMINAL ACTS
OF CASCOS AND THE DEFENDANT THROUGH DEFENSE COUNSEL
AND/OR THE BIAS OR PREJUDICE OF THE JUDGE;**

**PLAINTIFF'S MOTION TO RECUSE MR. ANDREW WHITAKER AND/OR
DOUG BUTLER AND/OR FIGARI DAVENPORT AND GRAVES;**

**PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSE TO
DEFENDANT'S MOTION FOR PROTECTIVE ORDER;**

**PLAINTIFF'S MOTION FOR PROTECTIVE ORDER AGAINST UNUM.**

**PLAINTIFF'S NOTICE TO DEFENDANTS OF MOTION SANCTIONS UNLESS
DEFENSES ARE WITHDRAWN OR CORRECTED**

The Plaintiff names to qualify the Honorable Hilda Tagle on the basis of the

following:

1.     The defendant filed a "Defendant's Emergency Motion for Return of Privileged

Document and Protective Order."

2.      The motion and letter which the defendant filed with the court gave the court

knowledge of disputed evidentiary facts and contained statements with a false indicia of

truth which would bias or prejudice the Honorable Judge Hilda Tagle because the letter

contained statements from the defense attorney to the insurance company regarding the

case and statements from plaintiff's counsel.


3.      Evidentiary facts "are facts which are necessary for determination of ultimate facts;

they are the premises upon which conclusions of ultimate facts are based."  Black's Law

Dictionary, Fifth Ed. (1979).


4.      The motion and letter by Mr. Andrew Whitaker revealed the following evidentiary

facts, contained the following unsupported statements and contained matters which trial

judges do not traditionally consider, which would bias or prejudice a judge in the handling

of this case against the defendant:


        1)      Documents allegedly support that Karen Brooks was "performing her

occupational duties, and efforts to appear more disabled then she actually is."    This

allegation cannot be controvented by the plaintiff because we do not have the documents.

The defendant has forwarded virtually no discovery documents.

        2)      Unchallenged statements outside of the discovery process that Karen

Brooks embellished her physical condition.  The plaintiff has not had an opportunity to

depose Cascos and cannot address these untrue statements.

        3)      That establishes a value of the case.  The defendant's value of the case

asserted is now before this court through a <u>filed</u> sealed letter with false indicia of reliability. The letter is on file with the court as a result of the alleged mistake of the defendant and the defendant filing the letter with the court.

4)    That Brooks settlement demands are allegedly high and that her own counsel considers them high. Undersigned counsel has no opportunity to rebut such contention within his role as counsel.

5.    The plaintiff, Dr. Karen Brooks, believes and asserts the Honorable District Judge Hilda Tagle is biased or prejudiced against her for the reasons asserted in her attached affidavit see attached **Exhibit H**. The plaintiff requests the court take judicial notice of the entire file including the transcript of the May 28, 2002 hearing and the additional granting of attorneys fees following the hearing.

6.    Federal Rule of Evidence states 601 that a person is competent to testify "except" as otherwise provided in these rules. Federal Rule of Evidence 608(b) allows specific instances of conduct to be considered by the court concerning the character for trustfulness or untruthfulness or concerning the truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. Federal Rule of Evidence 609(a)(2) states that a credibility of the witness may be attacked by evidence that any witness has been convicted of a crime if it involves dishonesty or false statements.

7.    Ms. Cascos affidavit was used to support sanctions against Dr. Brooks and attorney fees of over $4,000.00. Ms. Cascos affidavit was supplied to the plaintiff on May

23, 2002 court just one business day before the court hearing on May 28, 2002 regarding the plaintiff's discovery without the plaintiff having the ability to controvent the affidavit. Therefore, the court's granting of the Plaintiff's Motion for Attorney Fees was based on an incompetent affidavit by a convicted embezzler who stole/converted Dr. Brooks documents with the acquiescence of the defendant through counsel of record and the plaintiff should be entitled to a new hearing and/or the court should reconsider all discovery orders in light of Ms. regarding her failing to abide by any discovery matters.

8.     Ms. Cascos affidavit is not competent because, according to Mr. Whitaker's Motion for Protective Order, she was convicted of embezzlement and served time in prison in the middle 1990's and because she stole or converted a "trove" of documents from Ms. Brooks office; Mr. Whitaker the defense counsel of UNUM was aware of the facts of the theft/conversion of privileged documents from Dr. Brooks at the time he filed the affidavit with the court; Mr. Whitaker did not tell the court and did not tell Dr. Brooks, did not tell Dr. Brooks attorney. Ms. Cascos who served time according to Mr. Whitaker for embezzling in the middle 1990's is, in all probability a twice convicted felon. It is common knowledge in the legal community that one virtually never is imprisoned for her first felony.   In addition, she is either using a criminal "alias" or a different name because a search was done on the State Board of Pardons & Paroles and a telephone call to their office did not reveal a criminal record for Ms. Cascos. This argument and these facts are documented in full in The Defendant's Motion for Protective Order and the Defendant's Response.

9.      The only reason the plaintiff found out about the theft/conversion of Dr. Brooks

medical and/or business records is because the defendant counsel's office faxed the

attached letter to plaintiff's counsel. The matter is particularity troubling because Mr.

Andrew Whitaker now asserts that the letter was faxed inadvertedly. Therefore, Mr.

Whitaker has based his motion to comply with discovery and his motion for litigation

ending sanction on an affidavit he knows was by a convicted embezzler who went to

prison and has stole/converted records from Dr. Brooks office.


10.     The facts averred; herein, establish Figari Davenport & Graves and/or Mr. Andrew

Whitaker and/or Mr. Doug Butler should recuse themselves from this case because:  1)

Mr. Whitaker is a fact witness to documents converted  or stolen from Dr. Brooks office;

2) Mr. Whitaker is employed by Figari Davenport & Graves; 3)  Doug Butler appears to

have received a copy of the letter putting him a notice of stolen/converted documents from

Dr. Brooks; 4) Mr. Whitaker did not notify the Federal Court, nor Dr. Brooks that

documents were stolen/converted from her office; 5) Mr. Whitaker filed an affidavit with

this court of a convicted embezzler who stole/converted a trove of documents from Dr.

Brooks office;  6)  The plaintiff should have the right to take Mr. Whitakers deposition.


11.     There is a plethora of information on the internet regarding UNUM's Deceptive

Trade Practices and fraud in denying disability claims.


12.     See **Exhibit A**, the partial deposition testimony of a Dr. William Feist. Ex-

Provident Vice President and Medical Director of Provident documenting that Provident

has "roundtable meeting" to terminate benefits. (see p. 4 of 12).    This is analogous to Karen Brooks termination of benefits after she began receiving them and due to the pretextual excuse by UNUM that she was still performing operations.  Mr. Sean Sullivan investigator for UNUM stated at his deposition on July 12, 2002 that he never spoke to any of the operative assistants to determine if Dr. Brooks merely supervised the operations.

13.    **Exhibit B** is a letter from Judy Morris, M.D. attesting to routine problems with those persons alleging disability from UNUM insurance and contains allegations that discovery, in her litigation against UNUM discovered 1044 lawsuits in 2 ½ years.

14.    UNUM has successfully prevented the court from ordering  from providing discovery on the issue that the defendant does not grant disability benefits.  The court did not hear the Plaintiff's Motion to Compel discovery at the discovery hearing.

15.    The plaintiff was forced to pay approximately $4,773.19 in attorney's fees to file this suit because the attorney who filed the first suit made some sort of technically deficient RICO violation allegation.  See, attached **Exhibit C**, page 3 of "Defendants Motion to Collect Costs and for Stay."  Brook's had to pay $4,773.19 because the RICO allegation of the plaintiff's counsel in the first case was dismissed in a "Defendant's Motion to Alter or Amend Judgment."  The granting of these attorney's fees because of a technically deficient RICO violation after an agreement was reached with former defense counsel to nonsuit the former lawsuit  without prejudice for a RICO cause of action

(which may now be warranted) should be factually considered by this court in deciding the motion to recuse Judge Tagle due to her being biased against the plaintiff.

16.    The defendants filed the attached sealed document with plaintiff's counsel on August 7, 2002. See **Exhibit D**, which is apparently a copy of the "confidential letter" they faxed to the plaintiff previously.

17.    The defendants waived any right they may have had to request back the confidential letter they request back by filing the new sealed document.  The plaintiff inquired by letter what they intend the plaintiff to do with the document which was tendered a second time to his office.  See **Exhibit E** which is a letter sent to Mr. Butler on August 9, 2002.   The defense has chosen not to withdraw their clearly frivolous motion for protective order which requests back a document they tendered to the plaintiff on two occasions and contains proof of theft/conversion and is corroborated by Mr. Whitaker's own attestation of facts in the motion for protective order.

18.    Mr. Whitaker is a witness to the theft/conversion of documents at Dr. Brooks office.  Mr. Whitaker did not notify the court or Mark Di Carlo of the conflict of interest. Mr. Whitaker tendered the confidential letter to Mr. Di Carlo's office on two occasions. Mr. Whitaker has tendered documents which establish, in part, the liability of the defendant by the defendant's failure to consider the residual disability of the client; has waived the attorney client privilege by filing a motion as an attorney and witness with attestations of fact; has waived any confidentiality privileges in this case by forwarding the

document which he objects to on two separate occasions and filing a motion for protective order referencing the document.

19.    The plaintiff received a copy of the Honorable Judge Hilda Tagle's Order on May 30, 2002 see **Exhibit F**. The plaintiff was not aware that a deadline to comply with discovery was attached to the order until July 29, 2002 when it was received from opposing counsel see **Exhibit G**. It would be logical that opposing counsel who requested the relief by the letter would be examining the order for deadlines to comply. Deadlines to comply were not included in the original order and undersigned counsel believed the court would not set deadlines pending ruling on the plaintiff's discovery rulings. Therefore, the plaintiff is not in violation of the court order because the plaintiff obtained the court order on July 29, 2002. In addition any court order was based on untrue allegations made by Ms. Cascos, a convicted embezzler who now has stolen/converted documents to reveal to the defendant who did not notify the defendant or the court.

20.    Plaintiff's requests protective relief against UNUM who by their size and resources is attempting to intimidate and outspend the plaintiff by time and costs in this case. See attached **Exhibit H**, Dr. Brooks' affidavit. The defendant has succeeded in near entirety based upon the rulings of the court and Brooks paying numerous attorneys fees including for her unwarranted indictment instituted by the defendant. See Federal Rule of Evidence 11. The plaintiff asks the court to take judicial notice of the pleadings and motions filed to date by the defendant.

21.  **PLAINTIFF'S MOTION TO RECUSE HONORABLE JUDGE HILDA TAGLE PURSUANT TO 28 U.S.C. § 455 AND/OR 28 AND/OR U.S.C. § 144.** The plaintiff asserts that Judge Hilda Tagle be recused pursuant to 28 U.S.C. § 453 and/or 28 U.S.C. § 144 because of her factual knowledge of evidentiary facts of this case as supplied to her by opposing counsel in a confidential letter and because she has exhibited bias and prejudice in this case as are documented by the orders of the court and the attachments.

22.  **PLAINTIFF'S RESPONSE AND OBJECTIONS TO DEFENDANT'S MOTION FOR LITIGATION-ENDING SANCTIONS.** The plaintiff asserts that the Defendant's Motion for Litigation-Ending Sanctions be denied because the sanctions are predicated on: (1) An affidavit of the embezzler Cascos who stole/controverted Dr. Brooks medical records; (2) The court or clerk not faxing the complete order and therefore the Plaintiff did not comply with the order and the Plaintiff did not receive the court order until July 29, 2002 from defense counsel; (3) The Judge is shown to be biased or prejudiced against the plaintiff by: 1) Not providing her with a full and fair hearing; 2) Not forwarding the order with appropriate discovery deadlines; 3) Ordering approximately $9000.00 in attorneys fess for a case which is being defended in federal court in bad faith; 4) The court has evidentiary knowledge of the case due to defense counsel tendering the confidential letter to her.

23.  **PLAINTIFF'S MOTION TO REHEAR ALL DISCOVERY MATTERS DUE TO THE INCOMPETENT AFFIDAVIT AND/OR FRADULENT/CRIMINAL**

**ACTS OF CASCOS AND THE DEFENDANT THROUGH DEFENSE COUNSEL AND/OR THE BIAS OR PREJUDICE OF THE JUDGE.** The plaintiff asserts that any discovery orders be reconsidered and/or reheard because: 1) The order were based on an untrue incompetent affidavit by a convicted embezzler who stole or converted documents from the plaintiff with the knowledge of defense counsel and the knowledge of the defendant; 2) Judge Hilda Tagle is and was biased against the plaintiff and/or has knowledge of evidentiary facts due to the actions of the defendant; 3) The defendant has not forwarded virtually any discovery to the plaintiff and it is inequitable to order the plaintiff to provide discovery and pay fees in this situation.

24.    **PLAINTIFF'S MOTION TO RECUSE MR. ANDREW WHITAKER AND/OR DOUG BUTLER, AND/OR FIGARI DAVENPORT AND GRAVES.** The plaintiff moves that Mr. Andrew Whitaker and/or Mr. Doug Butler and/or Figari Davenport & Graves be recused and/or withdraw because:

a)    Mr. Whitaker is a fact witness regarding the theft/conversion of a trove of documents by a convicted embezzler from Dr. Brooks office;

b)    Mr. Andrew Whitaker committed ethical violations in: i) Filing Cascos affidavit; ii) Not informing the court or defendant of Cascos actions; iii) Mr. Whitaker is a fact witness to the case; iv) For the reasons fully asserted in Plaintiff's Response to Defendant's Motion for Protective Order;

c)    Mr. Doug Butler received a copy of the "confidential letter" to UNUM documenting fraud and/or criminal actions.

d)    Mr. Whitaker and/or Mr. Butler are attorney's for Figari Davenport &

Graves. Mr. Whitaker and/or Mr. Butler did not notify the plaintiff or the tribual and acted as agent employees of Figari Davenport & Graves.

25.    **PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSE TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER.** The plaintiff requests the Defendant's Motion for Protective Order regarding the "confidential letter" be denied because the confidential letter was faxed to plaintiff's counsel and was mailed to plaintiff's counsel again as a sealed document; because Mr. Whitaker made attestations of fact in the motion for protective which corroborate the facts of the letter; because the letter contains crimes by Cascos and/or defense counsel and/or the defendant. See the "confidential letter," "Defendant's Motion for Protective Order," and "Plaintiff's Response to Defendant's Motion for Protective Order."

26    **PLAINTIFF'S MOTION FOR PROTECTIVE ORDER AGAINST UNUM.** The plaintiff requests she be protected from UNUM. The plaintiff asserts that the defendant is utilizing unfair legal tactics, unfair ethical tactics; engaging in crime and fraud against the plaintiff; has engaged in the malicious prosecution of the defendant through her indictment; Is devoting the resources of the defendant in an unfair manner against a much poorer plaintiff; Has filed defenses with improper purposes to harass the plaintiff and to needlessly increase costs of litigation. The plaintiff requests the protection of the United States District Court in order to be guaranteed her right to a Jury Trial under the Seventh Amendment to the United States Constitution. The plaintiff asserts she has been denied her due process rights to date.

27. **PLAINTIFF'S NOTICE TO DEFENDANTS OF MOTION FOR SANCTIONS UNLESS DEFENSES ARE WITHDRAWN OR CORRECTED.** The plaintiff notifies the court and asserts that this case based on the foregoing is and was defended on fraudulent grounds through frivolous pleadings and responses to discovery and the filing of frivolous discovery requests and stonewalling the plaintiff's discovery requests. The plaintiff asserts the various pleadings filed by the defendant were for an improper purpose to harass the plaintiff and to cause unnecessary and/or needless costs and to increase the costs of litigation and that the defenses are not warranted by existing laws in violation of Federal Rule of Civil Procedure 11. The only reason given as to the denial of benefits by UNUM was the fact that the plaintiff was performing the same or more operations before her accident and disability. Mr. Sean Sullivan, the investigator for UNUM, stated at his deposition on July 12, 2002 that he did not ask those persons allegedly assisting Ms. Brooks at the operations their role in these surgeries or her role at the surgeries. In that the stated reason for denying benefits to the defendant was because she was performing surgeries the defendant has presented no meritorious nor good faith defense for denial of the disability benefits and the defense of this case is not warranted and does not have sufficient evidentiary support. In addition, the failure of the defendant to make a determination of the partial disability of the defendant or her residual capacity is of record and establishes the case is being defended in violation of Federal Rule of Civil Procedure 11(b). This is established through the confidential letter of the defendant which the defendant has tendered to the court and the little discovery received by the defendant prior to the date of this motion. The defendant has not admitted this fact in their answer and

therefore the answer is in bad faith and should be struck.  The plaintiff asserts that the assertion that the defendant performed surgeries is frivolous and should be removed from the answer by the defendant because the defendant's investigator Sean Sullivan did not query the various assistants to determine who was performing the sugeries.

The plaintiff asserts that the failure of the defendant to make an e valuation of the Plaintiff's residual disability benefits, that is the degree of her partial disability establish that this case is being defended fraudulently.  The court may, on its own motion, strike the answer pursuant to Federal Rule of Civil Procedure 12(f).

The plaintiff prays for attorneys fees; The plaintiff prays for all other fair, reasonable and just relief which may be granted.

## CERTIFICATE OF SERVICE AND
## CERTIFICATE OF CONSULTATION

Plaintiff's counsel served this motion on Andrew Whitaker, Figari Davenport &

Graves, 3400 Bank of America Plaza, 901 Main Street, LB 125, and Dallas, Texas 75202-

3796 on August 8, 2002 by via telefax and certified mail.  Plaintiff's counsel conferred

with opposing counsel on August 14, 2002 by notifying them of intention to file these

motions, objections and requests unless an agreement was reached and no agreement was

reached.

Respectfully submitted,

Mark A. Di Carlo
722 Elizabeth St.
Corpus Christi, Texas 78404
(361) 888-6968
(361) 888-6981 Fax
State Bar No.: 05812510
Southern District I.D. No. 6839

# EXHIBIT "A"

Main Page

See testimony in the deposition of Dr. William Feist, Ex-Provident vice-president and Medical Director taken on March 8,1999 in the Case of Stephen O. Laucks, M.D. vs. Provident, in the United States District Court in the Middle District of Pennsylvania, # 1:CV-1507

The following are quotes from the above transcripts. The transcripts may be bought from Foshee & Turner Court Reporters 220 Park Place Towers Birmingham, AL 35203 Phone: 205-251-4200 or 1-800-888-DEPO

* ( Items in paranthesis are my personal comments. or my 2 cents.)

The questions are the lawyers the answers are Dr.Feist's.

Page 18:

Q. 1 would like to focus now, Doctor, on your employment with Provident. You had mentioned previously that , I believe sometime in the spring of 1995, you became more involved in the claims review process; is that correct?

A. That's correct, yes, sir.

Q. Can you describe for me how you came to be more involved in claims reviews?

A. Well, in the spring of 1995, Ralph Mohney asked ma to assist the claims operation of the Accident Department by basically spending fifteen to twenty hours a week on sort ff a consulting basis, sort of a walk-around basis to look a cases and advise the claims adjusters. At that time, there were like, they hadn't consolidated their claims operation from across the country into Chattanooga. and there were literally five different sections of building complex when, then, were there were claims adjusters located. I went on a rotating basis. Monday through friday. go to each of those five sections and be available for any review of cases or consultations that the adjusters had. In addition. I was asked to be a part of the evening round-table discussions on a once weekly basis.

Page 19:

Q. Who was Ralph Mohney, Specifically what was his title in spring of 1995.

A. My recollection was that he was the vice president in charge of the Accident Department claims operation.

Q. Did Mr. Mohney explain to you why he was requesting that you become involved in those claims reviews?

Page 20:

A. Well, the discussion we had at that point, as I recall, was that he felt that the claims operation needed more medical expertise: and he wanted me to help out in that area. He mentioned something to the effect that he felt the new application count was going to be down in the next six months; .so, therefore. [quote ][unquote]. " I would have more time to spend with claims," and beef up that section. Dr. Fred O'Connell was the medical director dedicated to the claims process, and I think Ralph Mohney felt that he needed help, so I was asked to do that. So I was spending fifteen to twenty hours a week in claims adjudication from the spring of '95 forward than, I had been prior to that point.

Q. You had mentioned that Mr. Mohney made reference to applications being down. What does that refer to?

Page 21:

A. Well. I mean. the whole idea of insurance is to sell policies. He didn't explain why he thought the new application count was going to be down in the next six months I suppose he had some projections that I wasn't privy to. I think the indication was that I would have a little extra time I could dedicate to the claims process. I think he was realizing that he needed more medical expertise in the operation. and probably didn't feel like he cold hire a second position doctor full-time., So he asked me to do it part-time.

Page 22:

Q. Did the physicians or physician within the disability unit report to you as medical director?

A. NO. He reported to the vice president of claims.

Q .Was there a time prior to 1995 when the Physicians reported to the medical director, as opposed to the vice president of claims.

A. Well, in the late 1980's and going into 1990. All the physicians in the whole company reported to the medical director. After my predecessor retired, the positions were split out, if you will, to the Group Department. Accident Department, and to the Underwriting Department. if you will.

Page 23 :

Q. You had mentioned that besides the one on one meetings with claims representatives. there were also what you termed round table meetings or discussions.

Page 24:

A. Yes.

Q What are they?

A. Well, the round-tables. as they were sort of known in the company, were twice weekly evening meetings. Usually, they would start at like 6:00 in the evening after normal working hours and maybe go two to three hours: and the participants were generally Ralph Mohney or one of his reports who had run the meeting, usually had some attorneys there , who usually- well, they were company attorneys, usually two, sometimes three of them, would be there, a medical director, either myself a Dr. O'Connell an a Thursday meeting. Then you would have the claims adjusters, who were actually working the case to be presented, and they would present. Then generally they would have the supervisors and the administrative personnel of the Group Department. I mean the Accident Department there in the meeting as well.

Page 25:

Q. Were the round-table meetings held twice every week?

A. Very regularly, yes. sir.

Page 26:

Q. Do you know how if was that these meetings came about ?

A. Well. my recollection was that there was a memo from Ralph Mohney that said - I can't say the exact words, but there is a concern about claims. "We need to have these meetings to try to adjudicate some of the claims."He list·ed on his memo who the participants were going to be. That's how they got started.

Page 27:

Q. How long did these, meetings typically last?

A. Generally about three hours, maybe sometimes a little longer. On average about three hours.

Page 29:

Q. Do you know, Dr. Feist, how the claims representatives would select which cases to present ar the round-table meetings ?

A. Well,my impression was, is that they were looking for cases that had high dollar reserves and also. perhaps. those that might be gray areas. There might be some dispute or a difference of opinion how it was or should be handled.



Page 30 :

Q. When you state that it was your impression. and then you continued to give an answer, what was your impression based upon ?

A. Well, my impression of high dollar amounts was that when the case was presented, they would

have a presentation, if you will, of what the company liability was for that applicant or that claimant; I'm sorry. Generally, you had reserves, you know, in the millions. And also, generally, the cases were, those where there might have been some legal problem or licensing problem or drug and alcohol abuse problem or psychiatric problem or chronic fatigue problem. some concern that the attending physician was falsifying the record. Just almost anything that might be latched onto, if you will, in determining the claim.

Page 31:

Q. When you say that was your impression, again, what was your impression based upon?

A. Well, it seemed like the youngsters, I call them youngsters. these were usually young people who were on their first job or the best job they had ever had at that point, and they were eager to please. It seemed like the same front line claim adjusters were at each of the weekly meetings presenting cases; i.e.. the ones that wanted to get ahead presented cases,and the ones that were not that interested didn't present cases. That was the impression I got.

Q. When you say that was your impression, again, what was your impression based upon?

Page 33:

Q. Files that were presented at the round-table meetings , were they cases where Provident was paying benefits or, as opposed to that, were there cases presented that Provident had not made a decision yet as to whether to honor or pay the claim?

Page 34:

A.My recollection was that all the cases that were presented were established cases that were, at the time that the case was presented. the individual was being paid disability. I don't recall any de novo cases coming to the round-table. It would not seem to be appropriate, probably, to bring a case that was in the process of being adjudicated from the beginning.

Page 35:

Q. Dr. Feist, what was the purpose of the round-table meetings, as you understood them? 

A. My impression was that there was an attempt to look at established claim files to see if there was any way to terminate those files, to basically enhance the bottom line apropos to the tremendous  claims losses that Provident had in the eighteen months prior to that point.

Page 36:

A. Well, my impression was that they had to take a 275 to 300million dollar write off in the fall of 1993 for the claims liability. I think there was a corporate decision made to try to look at all of me established claims, at much as possible, to see if they could stop paying some of these cases.

Page 38 :

Q. When you say "write off a million dollar claim," what do you mean by the term

"write off"?

A. Terminate the claim and quit paying the-- if Provident could terminate a claim and eliminate a liability for that claim, then they could drop the reserve by whatever was reserved for that claim.

Page 40:

Q. Procedurally, at the meetings, what happened after the claims adjuster would present the case?

A. Procedurally, normally after, the claims adjuster presented the case, there would be discussion on whatever avenue they felt could be used to determine the claim. You know, if the person wasn't making enough income to justify having that much monthly income, or maybe he had gotten in trouble with the bureau or maybe the attending physician that was sending in the disability reports was falsifying them. Any number of ways to try to terminate the claim.

Page 44:

Q. Once the investigation has been completed and Provident waives its reservation of rights - well, let me ask you, what does it mean if Provident has waived irs reservation of rights? What does that mean?

A. If I understand your question, it would seem to me that if Provident has waived its right to pay the claim. that they are obligated to pay the claim. They have decided it is a valid claim; we're going to pay it. I'm not sure that's what you asked, but I think that's what you asked.



It would seem to me that if a claimant who was judged to be disabled and there was no change in his or her medical condition or impairment there would be no reason to investigate a claim. I mean, it seems to me that philosophically, a company should decide within that three to six month window if a person is or is not disabled, and then barring any dramatic improvement or new technology or new treatment, there would be no reason to investigate the claim. There would be no reason to consider it.

Page:

Q. Were psychiatric claims presented at the round-table meetings ?

A. Quite common, yes, sir.

Q. Were round-table meetings specific to the disability unit?

A. To my knowledge, yes.

Page 50:

Q. Can you tell us when, to the best of your knowledge, Provident began offering own-occupation policies?

A. Well. it was certainly a large tradition at Provident. When I came there in '82, Provident was one of the leaders in the industry of own occupational disability policies. My sense would be that they were started in the 1970's, maybe sixties: but I'm not real sure on that.



Q. Generally what does the term "own occupation policy" mean?



A. It generally means that one is disabled if one cannot perform the substantial and material duties of your occupation.

Q. Were claims under own occupation policies ever presented at the round-table meetings?

Page 51:

A. Well, I would say probably a hundred percent of the time. ·. Simply because of the fact that so many of them were sold and so many of them on claims. I would have to say that maybe not a hundred percent ; but I would probably say pretty close to a hundred percent would.be own-occ/. Many times that was the bone of Contention whether a person was disabled for his or her own occupation, as opposed to any occupation.

Page 64:

Q. Dr. Feist, what does the term "claim resolution" mean to you?

A. Well, I think "claim resolution" means that some final decision has been made. I think, generally, in the context of what we're speaking of, it would mean that the claim has been terminated or a decision was made to terminate the file; or I suppose it could be there has been an out of court settlement. I suppose you could, in sort of a tertiary way, say it was decided he was disabled and continue paying indefinitely- I think in the context we are speaking of, it was some sort of resolution to get off the risk, so to speak.

Page 68 :

Q. Were you aware of any directives from Provident management that existing claims under the own-occupation policies needed to be closed or resolved ?

A. Well. the memo that Ralph Mohney put out in the spring of '95 didn't specifically state that, but that was the implication because of claims liability to enhance the personnel in the Claims Department and enhance the effort to put into that claims adjudication process.

Page 70:

Q. Dr. Feist, what were the circumstances of your departure from Provident?

A. I retired from Provident in February '96, after being there for almost fourteen years. It was a multi-factorial reason for leaving. One, I was 55 and able to take retirement. Two. I felt like Ralph Mohney was dumping on me, for asking me to do the claims work with all my other duties; and three, I didn't like the way Harold Chandler was running the company.

Q. When you say you " didn't like the way Harold Chandler was running the company", what do you mean?

A. Basically, he had taken a company that had tradition for treating the customer fairly, paying the claims when appropriate, a company that had executives that did not take salaries during the depression years so they wouldn't have to layoff employees, totally bottom line.
whatever it took to make a buck, not the least of which is seeing a number of top level executives been RIF'd out in the '93-'94 time frame; and with family support; I felt like I needed to make a move.

Page 99:

Would you describe yourself as something of a crusader on behalf of doctors who go into litigation against Provident?

A. I suppose it depends upon your definition of "crusader": but my motivation is to help health care,  professionals in general, and folks in particular, . Who perhaps have not had a fair not shake from Provident.

Page 104:
Q. Is it your view that after three to six months, the policy is no longer a monthly type of policy?

A. No. I didn't say that, I think the proof of disability needs to be a ongoing thing. Whether it's thirty days or sixty days or six months is not that important. But as long as the disability remains permanent unchanged. There should be no change in the decision on that disability.
In other words, if an individual is adjudicated as disabled after that initial time frame, an d there is no demonstrable change in that persons medical disability he or she should be disabled indefinitely 

Page 150:

Q. And that's how you believe the Provident policy should be applied; is that correct?
A. Yes, sir, I do, very strongly.

Q. And that is not something that you have arrived at since you have left Provident. but this is something you felt at that time: correct?

A. That's me way the policies were sold. Back in the 1980's, that's the policies were sold to professional people, physicians, lawyers, executive business persons. This is a policy that will pay for your disability if you become disabled. Your own occ. If you can't do the material and substantial duties of your occupation, Provident will pay you.
That's the way they were sold all over the country.

Page 107:

Q. Respectfully, Doctor, you did say it was three to six months, so are you saying it's not three to six months?

A. Well, I'm just saying three to six I months is a reasonable average. My point is, whether it's three to six months or nine months or twelve months, whatever it I takes to make that initial determination, once that determination is made of disability or not disability, to me, there should be no going back and looking at it, unless there has been - granted, there are people who have new operations: they get well from conditions that they previously didn't get well. Unless something like that happens, to me, once that decision has been made, it should be made and fixed.

Page 127:

Q. And it's fair to say that you can 't recall a single instance where a claims representative rejected or disregarded your recommendation; true?

A. Well. I would have to say that in my role, I gave my medical opinion. The claim decision was up to the administrative people and Ralph Mohney made that very clear: that it wasn't just the medical part; it was the whole kit and kaboodle, if you will. All he wanted was the medical part from me.

Q. Because you are a doctor?

A. Absolutely.

Q. He didn't want you making the claim decision?

Page 128:

A. That's exactly right.

Q. But as a medical doctor, you would make a medical recommendation; is that correct?
A. I would make a medical recommendation; and unless I saw the same case later, I wouldn't have any idea what they did.

Page 136:

Q. You mentioned doing surveillance and getting an IME; is that right?

A. Yes.

Page 137 :

Q. Both of those can be appropriate tools in investigating insurance claims; isn't that right?

A. That's correct. It can also be misused, as well.

Page 139:

A. Well, I think that's correct. But, again, I was just there for the medical input, Mr. Mohney made

Q. Would it be fair to say that you, Dr. Feist do not think that there was something inherently wrong with the round-table process?

A. I think the form of it was okay, but the basic underlying reason for it is what I object to.

Page 140:

Q. And is it fair to say that nobody ever articulated that rational to you?

A. Not in so many words, but the memo in the spring of 95 from Ralph Mohney to those persons involved in the round table basically said, you know, "We've got to beef up out claims processes, because of these great losses we are having,."So I don't think you can specifically say that. To me, that was the implication. "We've got to do everything we can to try to look a some of these cases, and see if we can't terminate them."

Page 143:
Q. Is it your testimony that there were no cases ever brought to the round-table that had a small monthly benefit amount ar a small reserve. Is that what you are saying?
A. Well. my recollection is that the majority of the cases were high reserves. Not to say that there weren't some lower reserves. I think me great majority of them were higher reserves.

Page 149:
Q. And would you agree with, me that these type of difficult to handle claims are the kind of claims that cry out for the multi-disciplinary approach, such as that designed by Mr. Mohney and the round-

# EXHIBIT "B"





# A warning about UNUM

*By Judy Morris, M.D.*

- React to this article in the Discussion Forum.

This letter is meant as a warning to employers that have contracts for insurance with UNUM Insurance Company. If you do not have a contract with UNUM Insurance Company, I would suggest that you please read this letter anyway. UNUM is one of the leading providers of group disability insurance in this country and would like to get new accounts. My goal is not to cause UNUM financial harm but to urge them to honor the contracts they wrote, and to warn people about the dangers of UNUM insurance to your health, finances, and reputation if you ever have to file a claim.

In my opinion , and based on my own experiences and what I have heard from other people, it appears that UNUM Insurance company is selling insurance contracts that they have no intention of honoring. Legal remedies for claimants are fraught with legal stumbling blocks and delays and frustrations. Claimants may be forced to sue their employers so their employers will sue UNUM on the employee's behalf. Claimants may be forced to sue the insurance agents who sold these policies to their employers.

I am a doctor with a claim against UNUM for disability benefits. I am also in contact with several dozen claimants and have heard stories attesting to the fact that what I am experiencing with UNUM is ROUTINE. UNUM has admitted that they have been sued over 1044 times in the last 2 ½ years. This undoubtedly represents only a small fraction of the people that UNUM is abusing or has abused. The UNUM 1996 Annual Report states:

"In the normal course of its business operations, UNUM is involved in litigation from time to time with claimants, beneficiaries and others, and a number of lawsuits were pending at December 31, 1996. In some instances, these proceedings include claims for punitive damages and similar types of relief in unspecified or substantial amounts, in addition to amounts for alleged contractual liability or other compensatory damages. In the opinion of management, the ultimate liability, if any, arising from this litigation is not expected to have a material adverse effect on the consolidated financial position or the consolidated operating results of UNUM."

There are a variety of reasons for UNUM's optimism. Thanks to the ERISA laws, claimants with group policies are not entitled to ask for punitive damages, no matter how egregious UNUM and its employees have been during the claims process. This in itself makes it difficult for many claimants to find lawyers to even file the lawsuits and therefore weeds out many claimants with legitimate disability claims but no legal redress when unconscionably denied by UNUM.

Other legal loopholes ensure that even those who can sue for punitive damages will be financially and emotionally drained prior to the time of a trial and more likely to accept settlement offers no where near what they should have been paid. UNUM also avoids the negative publicity of a trial.

Group contracts are actually between UNUM and the employers and lawyers are realizing this and soon the employers will be sued. UNUM carefully avoids giving insurance agents follow-up on the claims they are denying and the tactics used to do this and then refuses to discuss it with the agents once the claimant has a lawyer (even thought the only one they are not supposed to speak to is the claimant).

UNUM is using similar tactics across the spectrum of claimants. It doesn't matter how well connected a person is either. Doctors, lawyers, and executives as well as general employees are subjected to the same methods. Although my diagnosis is Chronic Fatigue and Immune Dysfunction Syndrome, there are also claimants with other disabling diseases or injuries that have had similar experiences. I will use my

case as an example:

I am an Emergency Doctor diagnosed by a reputable internist with Chronic Fatigue and Immune Dysfunction Syndrome. This is a legitimate condition caused by abnormalities in the immune system.

not a psychological problem. Tl  CDC has it listed
as a potential infectious disease and a top priority for
study. Many other reputable medical investigators
have also attested to the fact that it is a "real" disease.
Treatment is largely symptomatic and usually
involves lifestyle changes. In my case I can no longer
function reliably as an ER  doctor due to exhaustion,
headaches, and cognitive deficits
(concentration, memory, speech and thinking) which
are worsened by stress and exposure to germs and
viruses. I have policies with UNUM, both
individually and  through my employer that are
"Specialty Specific." UNUM is still
deducting premiums from my bank account while
they stonewall and force me to file a  lawsuit.

No attempt was made by UNUM to negotiate with
me or to try to work with my employer in any way. I
was subjected to surveillance and videotaping by
Private Investigators for at least 3 weeks that I know
of (UNUM sent me the tapes). UNUM's doctors, who
are also executives at UNUM, concluded that since I
can drive my car I am not disabled by CFIDS.  They
also did background checks on some of my friends
and family members and my psychologist.

UNUM's doctors spoke with my doctors by phone
and then wrote up a version of the conversation
claiming my doctors told them I had
psychiatric problems besides the reactive depression
that goes along with having a chronic illness. My
doctors have written in objections to these claims and
reiterated  that my problem is physical AND
disabling on multiple occasions. UNUM  either
ignores these letters or issues long-winded responses
trying to "educate" my doctors that it's all in my
head. No one at UNUM ever told me what kind of
test or evaluation it would take to prove my claim.
There is a reason for that as well. Once the case gets
to court, some laws give them the right to
exclude any additional information submitted after
the claim was denied, so it is to their benefit to have

very little documentation in the record up until the time they deny the claim. On my own, I have obtained two second opinions and some confirmatory laboratory evaluations proving that my immune system is substandard. Others before me have submitted far more objective evidence than this and still been denied or had their benefits unceremoniously cut off. UNUM's doctors are claiming they have no doctor/patient relationship with me as a means to shield then from a malpractice suit. One of them does not even have a medical license in Maine (UNUM's corporate headquarters where he is stationed).

I have written numerous letters to the Massachusetts Insurance Commission. They send my complaints to UNUM who responds with a letter that basically states they have "investigated my claim" and come to a "reasonable conclusion" and they are "sorry" that I am unhappy with their decision. The insurance commission accepts these letters and closes their "investigation."

I have also written to the Attorney Generals in two states, the Maine Board of Medicine, the Governors in two states, the Department of Justice, numerous elected officials, countless newspapers and television stations, and on and on. If anyone is seriously investigating than I am not aware of it. The reasons for this are, of course, numerous, including political cronyism and the fact that the media depends on the insurance industry for much of its advertising revenues, and the lack of sensationalism in the story. Newspaper reporters have indicated to me that they will be interested in lawsuits filed and courtroom verdicts, but as I have stated above, many claimants cannot get this far.

UNUM has armies of lawyers to keep claimants and their lawyers harassed and intimidated for years. Despite the fact that this story reeks of extortion, conspiracy and racketeering, corporations that operate like UNUM have managed to make the legal definitions of these infractions so narrow that it is difficult to charge them with a crime. UNUM refuses to recognize standard medical definitions of disability and would have us believe that people with chronic illnesses can never be happy, enjoy themselves, participate in leisure activities, or even drive (even if their contracts are occupation specific -

in fact the more the claim value, the worse the
stonewalling and harassment). They eventually pay
some claims for smaller amounts so they can say they
are paying some claims and won't have an
abnormally high denial rate, but refuse to do an
analysis of the lawsuits filed because they said it
would  cost them too much. They have refused to pay
people who were approved  by the more stringent
government regulations for Social Security Disability
 that require a person to be unable to reliably perform
any gainful employment (i.e. completely disabled).
Then this fact is not allowed to be used by
the claimant in their lawsuits against UNUM.

People who thought they were well protected in the
event of disability are having to file for bankruptcy,
lose their homes, and their health is most definitely
suffering adversely from dealing with UNUM.

A representative example of a UNUM claimant
whose case recently did get to court is John Dishman
v. UNUM CV 96-0015 in Los Angeles       .
Federal Court. Mr. Dishman was a disabled executive
in a law firm that had UNUM for a client and still
had his benefits terminated without cause. UNUM
maneuvers  all cases to Federal Courts, another very
intimidating factor that encourages  claimants to
settle before trial, and avoids jury involvement.
Because UNUM  delays, stonewalls, and intimidates
its claimants, few of these cases become public
record. Many people give up or settle for a pittance
out of financial  desperation and are forced to sign
gag orders.

UNUM paid its employees $18 million dollars in
bonuses in 1996 as part of  its "results sharing"
program. UNUM now has an ad campaign aimed
at selling disability insurance to housewives. Based
on what I've said, do you think they have any
intention of honoring these contracts?

I will be relentless in exposing UNUM's corruption
to honest people and  businesses whose money is
lining the pockets of corporate
executives, stockholders, and mean-spirited
employees who receive bonuses for denying claims.

I might also mention there have been claimants with
similar problems  with ITT Hartford, Mass Mutual,
Provident , Cigna, Paul Revere, and Standard

Insurance. The few companies that I had heard good things about I think have been incorporated into the above companies. No one is safe.

You and your company are paying a lot of money for insurance coverage that very well may not be there at exactly the time you need it. We need some serious reform in the insurance industry, but meanwhile, I would encourage you to avoid dealing with UNUM.

Thank you for reading this letter. I truly hope you can avoid the years of legal battles that lie ahead for me, if you are ever disabled. It is my intent to share my own experiences in the hopes to prevent this type if gross negligence of contractual fulfillment being perpetrated on others. I will be happy to discuss this situation with anyone.

Judy Morris, MD

261 Bumstead Rd.
Monson, MA 01057

September 28, 1997

Margaret Fast
Counsel Unum Company
2211 Congress St.
Portland, ME 04122

Dear Ms. Fast,

As far as I can tell I have been telling the truth in the letters I have been writing to your employees and on the Internet. I have documents and court proceedings and precidents to back up my allegations. If you or anyone from UNUM has information that anything I've said is false, please inform me, in writing, with validation and proof of falsity, that this relating of my experiences and that of others us substantively untrue and I will issue a retraction for any unintentional falsity. However, I will expect this information to be "compelling."

If you cannot provide evidence that what I am saying is false then I will continue to spread the truth.

If you try to prevent me from telling the truth, you will be violating my rights to free speech.

Judy Morris, MD

261 Bumstead Rd.
Monson, MA 01057

November 10, 1997

Margaret Fast
UNUM Corporation Legal Department
2211 Congress St.
Portland, ME 04122

Dear Ms. Fast and all UNUM employees,

I wrote you on September 28, October 7, and again
on October 26 asking you to respond to charges of
extortion, blackmail, fraud, and racketeering. You
have not responded in any way, by phone or letter or
otherwise. Since you typically give claimants'
doctors 2 weeks to respond when you imply that they
are frauds, malingering, or mentally ill, I think you
have had more than enough time to respond to these
charges. Therefore, I can assume, by your total lack
of response, TOTAL admission to charges of
extortion, racketeering, fraud and blackmail
by UNUM Corporation and its employees.

Now I understand that you are under no LEGAL
obligation to respond to an unofficial charge, but in
your letters various employees have stated "If
you have any questions regarding your claim, please
contact me," "we do remain willing to consider any
additional information you can provide which
substan- tiates that our decision should be changed.
Additionally, I would be willing to consider means to
amicably resolve a dispute. Feel free to contact me if
you have any questions," and in a letter from you to
my former lawyer dated August 26, 1997 "To avoid
the necessity of our filing a cease and desist type of
action against Dr. Morris's pattern of harassment and
defamation, would  you kindly advise her to refrain
from contacting employees at UNUM,
except through you, and from using the wire services
for defamation? If we learn of her continued actions
along these lines, we will avail ourselves of
whatever legal and equitable remedies we deem
appropriate."

By your own words you want to clear up any
misunderstandings, but by your actions you have

proven not only that my statements are true but that you  never had any intention of paying my claim. The intent all along was to force me, as you have forced many others into a protracted legal battle where you

can attack me some more with innuendoes and accusations. I asked you to inform me of any cases with similar circumstances to mind that had lost in court and you did not.

And yes, I know very well that I am accusing a corporation with a worth of $15 Billion dollars of some incredible charges. Am I scared? Let me ask you, should I be? I believe in being prepared though, and I can promise you I will defend myself and my home by whatever means I feel fit the circumstances at the time.

If that sounds paranoid to you, you can attribute it to the incredible stress I have been under since I started dealing with UNUM. Everyday I have to listen to stories people tell me of harassment, humiliation, intimidation, bankruptcy, worsening of their health, harassment of their doctors, and threats of lawsuits by UNUM. Yes, I'm angry and I have good reason to be paranoid.

Fortunately my medical problems are stable since it was the physical, mental and immunological stresses of being an ER doctor that were harming me, and I am no longer in that environment and can rest when I need to.

Since you have admitted guilt to the above charges I will spend my furthur time and energy pursuing legal action against UNUM and its employees. It is quite obvious that UNUM does not respond to medical evidence or care about it's customers. And I will gladly read aloud to the court, every single letter I have written to you.

## Free Offer! Get Daily News Briefs by Email

© 1997, Physician's News Digest, Inc. All rights reserved.

**Local Medical News**

Cover Story
Spotlight Interview
News Briefs
Editor's Notebook
Commentary
Medicine & Computers
Medicine & the Law
Medicine & Business
Personal Finance

Cover Story
Spotlight Interview
News Briefs
Medicine & Computers
Medicine & the Law
Medicine & Business
Personal Finance

Cover Story
Spotlight Interview
News Briefs
Editor's Notebook
Commentary
Medicine & Computers
Medicine & the Law
Medicine & Business
Personal Finance

CME
Discussion
Email
Search
Archives
About PND
Advertising
List Rentals
Subscriptions

# Unconscionable Behavior
## UNUM's response to CFIDS claim is appalling
### By Benjamin Havens, Jr.

Reprinted by permission from *The CFIDS Chronicle*
© Copyright 1996 The CFIDS Association of America

This is my chronicle of the unconscionable behavior I have witnessed by the largest LTD insurer in the United States, UNUM Corp. In sharing my story I can only hope that it is the beginning of the collapse of ERISA regulations which allow UNUM and other insurers to operate unjustly without fear of financial loss. While it is written under a pseudonym to protect my family from further harm, if anyone in the federal government sees fit to take on the current ERISA law, I am at your disposal. I can be contacted c/o The CFIDS Chronicle, PO Box 220398, Charlotte NC 28222-0398, or by sending an email to the Disinissues webmaster.

In October 1994, my daughter and I were diagnosed with chronic fatigue and immune dysfunction syndrome (CFIDS). Thanks to UNUM, my family did not celebrate birthdays or Christmas last year. Last November, my 19- year-old son was killed in an automobile accident and his ashes are still in a plastic bag at the funeral home because we have not had the funds to pay the funeral expense. Next month, my wife, my daughter and I will likely see our home sold on the courthouse steps. If I had received my LTD benefits, none of this would have happened. I worked too hard and too long to have this happen to my family. Yet, because I am dealing with a money-driven, arrogant, big business, my family and I lose.

My claim has been mishandled and appears to be intentionally delayed. The reason for denial of benefits has changed from "it is all depression" (revised after it was pointed out that my employer's contract did not include a mental health exclusion), to "there is no concrete evidence" of disease, and now to "while I may have CFIDS, I am not disabled." Never mind that my internist, neurologist and neuropsychologist all have submitted reports stating that I am disabled. UNUM's representatives read these reports, spoke with my doctors and issued their own version of my case, which was obviously incorrect. According to UNUM, their experts halfway across the country know best without even having talked to me.

## Slipping Through the Cracks

Mine is not an isolated story. I personally know of over 125 individuals who are actively pursuing litigation against my insurer for the same reasons: delays, denials and obstructive and bad faith behavior. The pattern is quite clear. The insurer takes the full 180 days they are permitted to deny the initial claim. Then they instruct the insured that he or she can



appeal the decision, but the appeal can take another 120 days. So, 10 months after applying for benefits, you may have an answer.

Don't forget the increased cost of medical insurance when you're not employed. Sure, COBRA is available, but my monthly payments went from about $135 to $555. What does this mean? Simply put, the insurer can count on emptying your bank account which means you can no longer afford medical insurance, nor can you afford an attorney to represent you. With no medical insurance you have no doctors to support your claim and, with no attorney to represent you, you simply slip silently through the cracks of society. The insurer "wins" another one for their investors and their employees. One more productive life becomes a living death. No future, no past, no hope. Worse, if you give in to the desperation and depression which this situation is bound to create, the insurer says they were right: you were only depressed.

---

## Delaying Tactics

My situation was tailor-made for the LTD insurer to delay. When I first applied in August 1995, they asked my doctor to send my former physician's records to them. The doctor never sent all of the requested records, but nearly eight weeks went by before I was informed. Once I knew, it took less than two weeks for my doctor to send them. These were promptly lost ("not received") by the insurer. So a second set was sent. It then took five weeks for the insurance company's doctor to contact my doctor.

In November I asked the insurer to expedite the decision because, in order to support my family I had to withdraw my 401k funds and hoped to replace the funds by December 9 so I could avoid paying tax on the withdrawal. I was assured that "everything is being done that can be done." I later learned that this wasn't true.

The insurer didn't request my job description from my former employer until January 16, 1996. I was also told that my case was "so difficult" that a committee would have to review my records to see if they needed to be referred to the home office, yet my records have no evidence of any committee review or recommendation. Even so, my case was transferred to the home office.

When the insurer's doctor talked with my doctors, he created a report which was to be sent to each doctor to review, approve with a signature and return. At least two of the doctors' reports in my file are not signed. Yet selected passages from these unsigned reports were taken out of context and used to deny my claim. As of nearly a year later, UNUM has not supplied copies of signed doctors' reports, even though they were requested by my attorney.

I was first denied benefits on February 12. On February 15 my attorneys mailed a certified letter stating that we would be appealing and forwarding additional information. According to the contract UNUM has with my employer, they have between 60 and 120 days to respond to my appeal. In just 45 days, UNUM sent a second denial and closed my file before we were able to send additional information, primarily because I was waiting for a neuropsychological evaluation which documented my disability. UNUM could take six months to deny but couldn't wait to close my appeal.



I have written to my State Insurance Commission. They did a cursory investigation and accepted a letter of explanation from UNUM which did not even address my concerns. I asked the Commissioner to contact others who have been denied/delayed by UNUM. Nothing was done. I have called and written both of my Senators, and neither has seen fit to do more than reply with a form letter.

My employer has chosen to ignore UNUM's obvious misstatements and fabrications. Their attitude has been "we pay UNUM to make the decision and they have done that."

---

## The Damage Has Been Done

Nowhere in the LTD contract does it require that the insurer "approve of" my diagnosis, it only requires that I prove I am disabled. Three doctors have documented this. I have accepted my disease and want more than anything to get on with my life.

Sometimes I wish I had gotten a fatal illness, rather than a chronic one. At times it seems that my death would have made it financially so much easier for my family. They could have collected Social Security benefits. My nearly $300,000 in life insurance would have paid off all the debts and allowed my wife and daughter time to get their lives together. I have spent all my retirement income in order to live and still am no closer to a settlement with the LTD carrier. Despite this, I am committed to living and fighting their unconscionable behavior against me and others like me.

UNUM's actions will have a deleterious effect on my daughter. She is just now aware of the situation and is losing her fight with the disease. She was doing much better and had hopes of returning to school full time. The stress has negatively affected my marriage. Now the stress of the continual calls from bill collectors is even more of a stressor. My wife was diagnosed five months ago with clinical depression (I wonder why?) and my daughter is in bed at noon too ill to get up. I have no family life.

Most frustrating of all, if my attorneys are eventually successful (as I fully expect they will be), the damage will already have been done. If I had the income as I expected, I could have used the 401k funds to pay off everything except the house and my wife could have supplemented our income enough to save our home. We will never be able to qualify for a similar home unless I am awarded damages for bad faith, which is unlikely because of ERISA (see sidebar below). Rather than protect the individual, it protects the insurance industry.

So even in victory, my family will have lost it all. Bitter? Hell, yes. Depressed? Only because I have to use the legal system to fight my fight. Angry? Vindictive? You bet. Fortunately, my attorney is paid on a contingency basis and is familiar with the insurer. I can only hope to put UNUM in the same condition they have put me and so many others.

This is not the end. This is my war. UNUM and others like them are the enemy. Unfortunately the battleground is the American court system where what is "legal" is more important than what is just.

---

## References

1. UNUM 1995 Annual Report.
2. Johnson H: Osler's Web. New York: Crown Publishers; 1996.

---

## UNUM's Profits Continue to Grow

UNUM, the nation's largest private disability insurer, reported record earnings in 1995 and, just this year, announced initiatives to further increase profits. In its 1995 Annual Report,[1] UNUM proposed bolstering returns to its investors through "more stringent underwriting

# EXHIBIT "C"

C.   **The Court Awards Costs to Defendants.**

On October 3, 2000, after hearing argument from the parties' counsel, the Court entered the Order (the "Judgment"), in which the Court dismissed Brooks' RICO claim with prejudice, denied her motion for leave to amend, and granted her motion to dismiss her remaining claims without prejudice.  On October 16, 2000, Defendants filed Defendants' Motion to Alter or Amend Judgment and Supporting Brief (the "Motion to Amend"), in which they requested the Court to amend the Judgment to tax the costs of $4,773.19 that they had incurred.  Brooks never filed any sort of response to the Motion to Amend, and by Order entered March 26, 2001, the Court granted the Motion to Amend, amended the Judgment to tax the costs incurred by Defendants, ordered the Clerk to enter the Bill of Costs, and ordered Brooks to pay the amounts sought by Defendants.

## III.  THE SECOND ACTION

Brooks has not to date paid Defendants any of the costs that the Court ordered her to pay.  To the contrary, a mere three days after the Court granted the Motion to Amend, Brooks instituted this action (the "Second Action") with the filing of Plaintiff's Complaint, in which she asserts claims against Defendants for breach of contract, violations of the Texas Insurance Code and the DTPA, bad faith, and fraud.  Plaintiff's Complaint makes no mention whatsoever of the previous dismissal of the Original Action (which involved the same parties and factual allegations and many of the same claims) or the Order requiring her to pay the costs incurred by Defendants in the Original Action.  For the reasons set forth below, the Court should require Brooks to pay the costs, including attorneys' fees, incurred by Defendants in the

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KAREN BROOKS,                          §
                                       §
    Plaintiff,                         §
                                       §
v.                                     §          C.A. No. B-01-052
                                       §
UNUMPROVIDENT CORPORATION              §
and UNUM LIFE INSURANCE                §
COMPANY OF AMERICA,                    §
                                       §
    Defendants.                        §


**EXHIBIT 5 TO DEFENDANTS' EMERGENCY MOTION FOR
RETURN OF PRIVILEGED DOCUMENT AND PROTECTIVE ORDER**


**THIS DOCUMENT IS BEING FILED UNDER SEAL**

**THIS ENVELOPE IS NOT TO BE OPENED BY, NOR ARE THE
CONTENTS THEREOF TO BE DISPLAYED OR REVEALED TO, ANY
PERSON OTHER THAN THE COURT AND ITS STAFF**

# EXHIBIT "E"

# MARK A. DI CARLO
ATTORNEY AT LAW

La Solana Building
722 Elizabeth Street
Corpus Christi, Texas 78404
(361)888-6968
Fax (361)888-6981

August 9, 2002

<u>VIA FAX:(214)939-2090</u>
Mr. Doug Butler
FIGARI DAVENPORT & GRAVES, L.L.P.
3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202

Re:    *C.A. No. B-01-052; Karen Brooks v. UnumProvident Corporation*
*and UNUM Life Insurance Company of America*    .

Dear Mr. Butler:

I reviewed your August 8, 2002 letter last evening and your defense of Mr. Whitaker.

As I discuss in my rather quickly drafted responsive motion, Mr. Whitaker has now filed and signed a motion for protective order in the United States District Court with supporting documentation that he filed an affidavit of an "embezzler" who worked for Dr. Brooks and that he was aware that she took and/or copied a "trove" of documents from    Dr. Brooks office and that Mr. Whitaker neither notified Dr. Brooks, nor the court, nor me regarding this matter. Moreover, these matters are of record now, and documented, without the need for the confidential letter in support of these issues.

Obviously, Mr. Whitaker has the right to speak to Cascos; although it would have been wiser to have Cascos speak to an investigator. Mr. Whitaker did not however, have the right to discover the inappropriate theft/conversion/burglary of in all likelihood confidential records and not notify the court, or me, and then file an affidavit with the court casting false aspersions against my client.

Mr. Whitaker also had  the right to file what I believe was the most foolish motion I have ever seen filed in any court. Mr. Whitaker's Motion for Protective Order contains various admissions and supporting documents which establish the

very issues which he should not wish to be in the record. Mr. Whitaker's Motion for Protective Order also placed me in the precarious legal and ethical position of not being able to tender the letter he desires for me to tender to him.

I would recommend you withdraw the Motion for Protective Order. In the event the judge rules upon the motion it will become a permanent part of the record in this case. Even if you withdraw the Motion for Protective Order I still have a copy of the motion. Although, Mr. Whitaker's motion is a pleading it is the pleading of an attorney in Federal Court who is now a witness and has made attestations and admissions in the motion he signed. See Federal Rule of Civil Procedure 11(b). Perhaps Mr. Whitaker will now file a motion with the court requesting the sealing of his motion and its return to him and requesting I return my copy of his motion.

While drafting this letter I discovered that I have also received a sealed document, Exhibit 5, late on August 7, 2002 by mail which was apparently included with the Motion for Protective Order and contains instructions not to open. Apparently, your firm has mailed me yet another copy of the letter you assert I am not supposed to have. I have not heard of filing a sealed document or disputed document with the court and tendering to opposing counsel. The proper and traditional manner of handling an item like this would be to request an in camera inspection of the letter by the court. Do you contend that I was not supposed to receive this envelope which contains the letter at issue? Do you have any precedent that I cannot open the envelope? Are you asserting I cannot maintain it for my file records nor use it in any manner in the event my client desires to sue the persons responsible for the breach of her confidential records?

I expect some sort of precedent or rule that you can tender a letter to my office in a motion and that I do not have the right to keep the letter. Your firm has now tendered the same letter to me on two separate occasions, basically paraphrased most of it in a Protective Motion signed by the subject attorney who wrote the letter, and still asserts I am not supposed to have the letter. It appears that I am going to have to amend my response to your motion for protective order. As stated previously it would appear that once I tendered Ms. Brooks the letter, as part of full disclosure to her in this case, it is her proprietary property.

It appears now, as it has in the past, that it would be in the best all parties interest to agree to the abatement of all new motions for relief, the abatement of decisions on pending motions, orders, rulings, and filings of new motions for a period of twenty days following the mediation.

I will agree not to share the twice received "confidential" letter with anyone nor discuss the letter with anyone except for my own counsel, including organizations such as ATLA, pending the mediation. In addition, I will agree not

to share Mr. Whitaker's Motion for Protective Order pending the mediation.

I am nearly certain I can be available for mediation on the August 20th. I would like to know by the end of the day so that I can file an early motion for continuance.

Sincerely,

Mark A. Di Carlo

# Fax Cover Sheet

**Mark A. Di Carlo**
**Attorney At Law**
**722 Elizabeth St.**
Corpus Christi, TX. 78404
(361) 888-6968
(361) 888-6981 (Fax)

| | |
|---|---|
| Send to: Doug Butler | From: Mark A. Di Carlo |
| Fax Number: (214)939-2090 | Date: August 9, 2002 |
| Subject: Karen Brooks v. UNUMProvident | Cause No.: B-01-052 |
| | |

Original will follow VIA:

☐  Regular Mail
☐  Overnight Delivery
☐  Hand Delivery
☐  CMRRR

Total pages, including cover: 4
Comments:

**CONFIDENTIALITY NOTE**the documents accompanying this transmission contain information from the Law Office of Mark A. Di Carlo which is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are not the intended recipient, you are hereby notified that nay disclosure, copying or distribution of this document, or the taking of any action in reliance on the contents of this telecopied information, is strictly prohibited and the documents should be returned to this office immediately. In regard, if you have received this telecopy in error please notify us by telephone immediately so that we can arrange for the return of the documents to us at no cost to you.

HP OfficeJet
Personal Printer/Fax/Copier/Scanner

Fax History Report for
Mark A. Di Carlo
512-888-6981
Aug-9-02 3:08pm

Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Aug 9 | 3:05pm | Sent | 12149392090 | 2:46 | 4 | OK |

# EXHIBIT "F"

38

United States District Court
Southern District of Texas
ENTERED

JUN 0 5 2002

Michael N. Milby, Clerk of Court
By Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

KAREN BROOKS,                     §
                  Plaintiff,      §
                                  §           Civil Action B-01-052
v.                                §
                                  §
UNUMPROVIDENT CORPORATION and     §
UNUM LIFE INSURANCE COMPANY       §
OF AMERICA                        §
                  Defendants.     §

## AMENDED ORDER

BE IT REMEMBERED that on June ____5____,2002, the Court **AMENDED** its Order of May 28, 2002 [Dkt. No. 36] awarding attorneys' fees and compelling discovery in order to clarify the amounts awarded and to set deadlines by which attorneys' fees must be paid and the compelled discovery must be provided.

In its earlier order, the Court denied Plaintiff's Motions to Quash [Dkt. Nos. 22, 23, 27, 28 & 29]; granted Defendants' Motion to Compel [Dkt. No. 21]; denied Defendants' Motion for Attorneys' Fees [Dkt. No. 19]; denied Plaintiff's Motion for Attorneys' Fees [Dkt. No. 20]; granted Defendants' Motion to Compel [Dkt. No. 16]; and granted Defendants' Motions for Attorneys Fees relating to the Motions to Quash [Dkt. Nos. 25, 26 & 31] in the amount of $4137.00 based on 19.7 hours worked at a rate of $210 per hour. At the hearing, the Court also granted attorneys' fees associated with the Motion to Compel [Dkt. No. 21] in the amount of $1,470.00 based on 7 hours worked at a rate of $210 per hour. **SO ORDERED.**

# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

**MICHAEL N. MILBY**
CLERK OF COURT
P.O. BOX 61010
HOUSTON, TEXAS 77208

www.txs.uscourts.gov

06/06/02

To:     Mark Anthony Di Carlo (aty)

Re:     Notice of Entry of Order or Judgment

---

Enclosed Order or Judgment entered in:

case number:     1:01-cv-00052

instrument number:     38

If after three attempts this fax fails, then we will print this notice and mail it to you. For questions, please call (713) 250-5768.

Number of pages including cover sheet:     2

HP OfficeJet
Personal Printer/Fax/Copier/Scanner

Fax History Report for
Mark A. Di Carlo
512-888-6981
Jun-6-02 11:43am

Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Jun 6 | 11:42am | Received | 713-250-5434 USDC | 1:28 | 2 | OK |

# EXHIBIT "G"

38

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

JUN 0 5 2002

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | |
|---|---|
| KAREN BROOKS, | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| UNUMPROVIDENT CORPORATION and | § |
| UNUM LIFE INSURANCE COMPANY | § |
| OF AMERICA | § |
| Defendants. | § |

Civil Action B-01-052

## AMENDED ORDER

BE IT REMEMBERED that on June ___5___,2002, the Court **AMENDED** its Order of May 28, 2002 [Dkt. No. 36] awarding attorneys' fees and compelling discovery in order to clarify the amounts awarded and to set deadlines by which attorneys' fees must be paid and the compelled discovery must be provided.

In its earlier order, the Court denied Plaintiff's Motions to Quash [Dkt. Nos. 22, 23, 27, 28 & 29]; granted Defendants' Motion to Compel [Dkt. No. 21]; denied Defendants' Motion for Attorneys' Fees [Dkt. No. 19]; denied Plaintiff's Motion for Attorneys' Fees [Dkt. No. 20]; granted Defendants' Motion to Compel [Dkt. No. 16]; and granted Defendants' Motions for Attorneys Fees relating to the Motions to Quash [Dkt. Nos. 25, 26 & 31] in the amount of $4137.00 based on 19.7 hours worked at a rate of $210 per hour. At the hearing, the Court also granted attorneys' fees associated with the Motion to Compel [Dkt. No. 21] in the amount of $1,470.00 based on 7 hours worked at a rate of $210 per hour. **SO ORDERED.**

Plaintiff is **ORDERED** to pay the attorneys' fees no later than

_____, 2002.

Plaintiff is **ORDERED** to provide the compelled discovery no later than

_____, 2002.

DONE this _____ day of June, 2002, at Brownsville, Texas.

_____
Hilda G. Tagle
United States District Judge

# FAX INFORMATION SHEET

July 26, 2002

|  |  |
|---|---|
| **TO:** | Mr. Mark A. Di Carlo |
| **COMPANY:** |  |
| **FAX NUMBER:** | (361) 888-6981 |
| **PHONE NUMBER:** | (361) 888-6968 |

FROM:    Andrew C. Whitaker

NUMBER OF PAGES: ⟋ (including transmittal page)

CLIENT/MATTER NO: 76/07555/0258

## WARNING: PRIVILEGED AND CONFIDENTIAL MATERIAL

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS CONFIDENTIAL, PRIVILEGED, AND EXEMPT FROM DISCLOSURE TO THIRD PERSONS AND IS INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE RECIPIENT OR READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY RETENTION, DISSEMINATION, DISTRIBUTION, COPYING, OR UNAUTHORIZED USE OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY TELEPHONE (214-939-2000), AND ALSO RETURN THE FACSIMILE AND ANY COPIES THEREOF TO THE SENDER AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. ALL POSTAL EXPENSES WILL BE PAID BY SENDER. THANK YOU.

# EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KAREN BROOKS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-052 |
| | § | |
| UNUM PROVIDENT CORPORATION | § | |
| AND UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA | § | |

## AFFIDAVIT OF KAREN BROOKS IN SUPPORT OF MOTION TO RECUSE HONORABLE JUDGE HILDA TAGLE PURSUANT TO 28 U.S.C. § 144

My name is Karen Brooks. I am over 18 years of age and I am of sound mind and capable of making this affidavit. I have personal knowledge of the facts stated below and they are true and correct.

1.    The Affidavit of Ms. Cascos my former employee filed in this case is not true in the following respects: Paragraph 7 is untrue. Paragraph 8 is untrue. Paragraph 9 is untrue regarding the fact that I ever stated I would "move to full time" once my disability lawsuit was settled.

2.    My lawyer and I were not allowed in the courtroom at the hearing on May 28, 2002.  Then it was averred by Judge Tagle that we were late.  See attached, **Exhibit A ,** the affidavit I already filed in this court.

3.    My lawyer faxed me the  letter Mr. Whitaker had faxed  to him on August 2, 2002 and which Mr. Whitaker now states is "confidential".  Mr. Di Carlo has copied or faxed me important motions and documents throughout this case unlike my former attorney Mr. Cowen in the previous lawsuit.   A copy of this "confidential" letter is attached hereto as **Exhibit B**

4.    My lawyer said that he was faxed this  letter one time purposefully with a fax cover sheet addressed to him  and another time it was forwarded to him in a sealed envelope by mail.  I understand by my attorney that Mr. Whitaker now says he wants the letter back.  I am asserting that  letter faxed and mailed to my attorney is privileged.  I need the document to pursue appropriate ethical and/or criminal  complaints  against  Cascos  and  other  parties  and  to  protect  the confidentiality  of my patients.

5.    I have been forced to pay numerous attorneys fees in this case for a lawsuit which I believe has been defended by UNUM without a legal basis.

6.    I have been criminally indicted by UNUM for what I believe were false

reasons. The indictment was dismissed. My lawyer has been unsuccessful in obtaining the documents from the defendants regarding what I believe was my malicious prosecution by them. I had to pay $15,000.00 to Mr. Edmund Cyganiewicz to defend the criminal action.

7.    This company has practically ruined me. I have also been forced to pay $4,773.00 in order to file this lawsuit allegedly based on the allegedly inappropriate actions by my former attorney. I have an order which I am allegedly in noncompliance with for the payment of attorneys fees of $4137.00, and to supply discovery because my lawyer had not received the complete faxed order. Mr. Di Carlo told me that he was faxed the order from the court regarding discovery without the second page with compliance deadlines on May 30, 2002 regarding rulings against my case. Therefore, I have been ordered to pay $4,773.00 plus $4,137.00. In addition, due to UNUM's indicting me, I had to pay $15,000.00 to my lawyer. I attribute the exacerbation of my health problems, including emotional problems and severe clinical depression to UNUM's treatment of me beginning in the middle of the first lawsuit and during the proceedings of these suits. I used to be a high functional person prior to my accident. I purchased disability insurance in 1990 from New York Life just so I would not be in the position financially and emotionally that I am currently in.

8.    Mr. Di Carlo has notified me that he feels the letters to the court by Mr. Whitaker raising new matters not addressed at the hearing on May 28, 2002

deprived me of my rights to due process and that he filed objections.

9.    I do not believe my former employee Ms. Cascos would embezzle records without encouragement from UNUM and steal or copy "troves" of documents regarding my patients. My patients confidential records including billing records and/or names and /or medical records are now apparently out in the community. I have discovered several  documents missing from my office. I feel UNUM keeps pushing for discovery because I do not have all the documents requested. For example, the daily sheets are missing which is the listing of all the patients that were seen in the corporation and the amount they have paid.   I believe it is a reasonable assumption  that UNUM or Cascos has them because I practiced in a building by myself.   My lawyers told me that Whitaker admitted by motion that my employee Cascos was an embezzler and served time in prison in the mid 1990's. We have not deposed Ms. Cascos as of yet.

10.    I believe the court is biased or prejudiced for some unknown reason either against my   case or me. The Affidavit by Cascos' is basically false and I have a witness that places Ms. Cascos in my office after she quit working for the corporation. I believe it was then that the documents were stolen and/or taken in some manner.   I have a legitimate case which I believe is and was being handled competently and yet I have been assessed $8,970.00 in attorneys fees; had to pay $15,000.00 for a criminal defense; and had to pay Mark Di Carlo an additional retainer. My entire inheritance has been spent.

11.    I believe this big and powerful company is taking advantage of me and my limited financial resources and I need the help and protection of the United States District Court.  It appears UNUM and their attorneys knows that Judge Tagle will not look favorably upon any of my motions or requests no matter what their merit.

12.    I would not know about documents being stolen or copied from my office by Ms. Cascos  unless the allegedly inadvertent fax was not faxed to my lawyer Di Carlo.  I am very concerned about my patients personal information being divulged.  I doubt that any motion my attorney files with Judge Hilda Tagle would be granted because of her attitude with me and my case both in court and out of court.

13.    The Honorable Judge Tagle may be biased against me due to the false affidavit filed by Cascos against me before the first hearing or her dealings with my previous attorney, Mr. Michael Cowen.   I was not kept informed about  what was done in the first case.

14.    Mark A. Di Carlo has told me that he has never had to pay attorneys fees for any lawsuit he filed in a United States District Court Civil or Criminal Case.

15.    I hired Mark A. Di Carlo because he was successful at a trial against

UNUM in a suit in a prior United States District Court.

16.    I've had disability insurance for years, since 1990. My injuries to my back by X-Ray are established. My attorney told me that Sean Sullivan admitted at the deposition that Mr. Sullivan did not speak to the persons who were allegedly in the operating room on the date of the operations and, therefore, I do not believe their decision to terminate my disability benefits based on the number of operations I performed following the accident was in good faith. In addition Mr. Whitaker admits in the  letter he now refers to as "confidential" that UNUM never even attempted to see if  I was entitled to residual disability benefits. In other words UNUM never even attempted to see if I were 50% to 60% disabled and I could obtain partial benefits.

17.    Mr. Di Carlo and I discussed filing a motion to recuse Judge Tagle when we were barred from the courtroom on May 28, 2002. Mr. Di Carlo did not know the orders of the motions and Mr. Whitaker did and Mr. Whitaker was permitted in the courtroom and we were not. Mr. Di Carlo instead filed a motion for rehearing and objected to the letters filed by opposing counsel, after the hearing. Mark Di Carlo's motion was denied  without a hearing. Then Judge Tagle ordered that I pay additional attorneys fees which I understood had already been ruled out at the hearing on May 28, 2002.

18.    I believe the actions of the judge have affectively prevented me from

pursuing this case. I thought in the United States a person who was a United States Citizen was entitled to a trial and to access of the court. I do not feel that I have been treated fairly by the Honorable Judge Tagle and I do not believe I will be treated fairly in the future. My lawyer and I attempted to do everything we could to prevent from filing this affidavit and moving for Judge Tagle's recusal.

19.    I feel that because I have been indicted and because in all likelihood confidential patient records were stolen from my office either at the urging of Mr. Whitaker and/or to provide alleged evidence against me to the firm, Figari Davenport & Graves that my career in Brownsville as a podiatrist is ruined.

20.    Regarding the other paragraphs in the Cascos affidavit regarding my contacting my medical providers. Many of these medical providers contacted me and told me that they had been contacted prior to the subpoena of my medical records to get the medical records ready and to send them to Figari Davenport and Graves. I do not know if this is proper or not. I had discussed this with my attorney Mark A. Di Carlo and he discussed that these requests were an attempt to embarrass me and to find an excuse not to pay insurance benefits after they had been denied specifically because I was allegedly performing operations. Mr. Mark Di Carlo was of the opinion that attempting to obtain all my medical records for an unlimited period of time regarding all health

matters, of every nature, was not something that the other side should legitimately obtain.  However,   I attempted to prevent these records from being prematurely being sent out  so my counsel would have an opportunity to attempt to object to UNUM obtaining my private and irrelevant medical records prior to the court order.  I believe that under Federal Law my medical providers do not have to honor a subpoena duces tecum without a court order.   The medical providers have to honor a court order based upon  "the Health Information Patient Protection Act" passed in 1997.   I have some familiarity with the law in this area because I am a medical provider myself.  I was simply, attempting to withdraw my consent of the release of my medical records pending court order as I understood was my right under federal law.   I did nothing improper and anything I did was performed with the permission of my medical providers  and their staffs.   Ms. Cascos was not my personal friend and had not even been my employee very long, therefore, her comments are primarily  speculation.


I declare under penalty of perjury that the foregoing is true and correct.


Executed On _____          _____

                                                             Karen Brooks

# EXHIBIT "A"

## AFFIDAVIT AND DECLARATION OF KAREN BROOKS

BEFORE ME, the undersigned authority, personally appeared Karen Brooks, who, being my me duly sworn, deposed as follows:

My name is Karen Brooks. I am over 18 years of age, I am of sound mind and capable of making this affidavit.

I arrived at the district courtroom for a hearing in my case and was sitting outside the courtroom at about 2:00 p.m. when Mr. Di Carlo arrived and we spoke briefly. When Mr. Di Carlo and his secretary and I attempted to enter the court room at about 2:05 p.m. a man stopped us in uniform who stated that there was a hearing going on and that we could not enter the courtroom. Mr. Di Carlo stated that he had a hearing scheduled for 2:30 p.m. Mr. Di Carlo made a reference to me of the fact that it must be some sort of closed hearing or that it was an unusual procedure. I sat outside of the courtroom door on a bench with Mr. Di Carlo and his secretary until we were called into the courtroom at about 2:30 p.m.

I declare under penalty of perjury that the contents of this affidavit are true and correct.


6/5/02
_____
Date

_____
Affiant

# EXHIBIT "B"

# FIGARI DAVENPORT & GRAVES

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

3400 Bank of America Plaza
901 Main Street, LB 125
Dallas, Texas 75202-3796
214-939-2000
Fax 214-939-2090

Writer's Direct Dial Number
(214) 939-2076

Writer's E-Mail Address
awhitaker@figdav.com

August 1, 2002

**VIA TELECOPY**
Mr. Matthew J. Monaghan
UnumProvident Corporation
Legal Department - M194
2211 Congress Street
Portland, Maine  04122

Re:    C.A. No. B-01-052; *Karen Brooks v. UnumProvident Corporation and
       UNUM Life Insurance Company of America*

Dear Matt:

By letter dated May 3, 2000, we provided you with our initial analysis of Unum Life's handling of Brooks' claim.  In some respects, our analysis is unchanged.  First, our primary concern remains the fact that Brooks' diagnosis of degenerative disc disease is not in question.  Unum Life's outside consultant opined that Brooks would likely be disabled for a year, Dr. Day concluded that she had a reduced capacity to work as a podiatrist, and recently obtained medical records indicate that she has not undergone surgery and that conservative treatment (such as epidural steroid injections and physical therapy) has not resolved her problems.  Second, we continue to have concerns about the fact that Unum Life never addressed Brooks' entitlement to residual disability benefits.

Since our initial letter, another concern of sorts has arisen.  During the claim process, Sean Sullivan reported Brooks to the Texas Department of Insurance (the "TDI") for possible fraud.  After a lengthy delay, the TDI made a referral to the Cameron County District Attorney, which apparently thought enough of the allegations to obtain an indictment of Brooks.  Within a few months, however, the DA voluntarily dismissed the case due to concerns about his ability to prove her fraud.  Brooks will undoubtedly profess her innocence and accuse Unum Life of conducting a witch hunt against her.

Moreover, the company has (admittedly and unfortunately) already incurred substantial attorneys' fees. In some respects, we have little to show for such expenses, as we have not yet deposed either Brooks or her primary treating physician, which are typically the first depositions that we take upon the completion of written discovery.

Mr. Matthew J. Monaghan
August 1, 2002
Page 2

On the other hand, the overwhelming majority of these fees have resulted from the misconduct of Brooks and her counsel, and we have met with a great deal of success before Judge Tagle. As you will recall, in the Original Action, the Court dismissed Brooks' RICO claim with prejudice, ordered briefing on the import of Brooks' post-fall performance of surgeries, and dismissed the Original Action, without prejudice, at Brooks' request due to her fear that she would be forced to invoke the Fifth Amendment. (Recently obtained records from Brooks' psychiatrist indicate that Brooks may well have filed a grievance against her lawyer in the Original Action.)

Brooks then retained her current counsel, Mark Di Carlo ("Di Carlo"), who filed this action on the day before the expiration of the two-year limitations period. At our request, Judge Tagle required Brooks, as a precondition to proceeding with this action, to pay Defendants almost $5,000 for their costs in the Original Action. Over the ensuing months, we have fought, for the most part successfully, numerous discovery battles with Di Carlo, and Brooks is currently in violation of an order requiring her to pay Defendants an additional $5,000 and provide numerous categories of information and documents. We have recently filed a second motion to compel as well as a motion for litigation-ending sanctions, and we have an outside chance that Judge Tagle will dismiss Brooks' claims with prejudice for her misconduct.

Moreover, in May 2002, we received an unsolicited telephone call from Lucy Cascos ("Cascos"), who formerly worked as the office manager for Brooks' professional association. Cascos provided us with a declaration detailing Brooks' misconduct during discovery, continued performance of her occupational duties, and efforts to appear more disabled than she actually is. In addition, Cascos purportedly has a treasure trove of documents that she took with her but which we have not (for obvious reasons) requested to review. Tellingly, Brooks has not to date challenged Cascos' credibility in any way.

In all, the claim decision still appears quite defensible. Brooks clearly misrepresented her inability to do surgeries, as she repeatedly told the claim people that she was not working at all when in fact she was performing surgeries. Her ability to operate would seem to evidence her ability to perform the tasks associated with the less-demanding office practice. To date, we have been precluded from obtaining Brooks' office records, which would presumably demonstrate the extent to which she saw patients in the office and the income that she generated from her office and surgical activities. This is particularly important given the likelihood that her back condition impaired her to some extent and likely affected her productivity. Measuring the extent of her residual disability will be extremely difficult. Normally, Brooks would simply demonstrate a loss of income through her financials, and we might challenge whether the loss was due to the injury. Here, however, her claim is

Mr Matthew J. Monaghan
August 1, 2002
Page 3

complicated by Cascos' testimony that Brooks intentionally embellished her condition to obtain benefits

Consequently, although we still feel very optimistic about the case, we find it difficult to get more particular in our assessment because of the lack of deposition testimony  Nonetheless, the case has inherent settlement value due to the risks of litigation for an insurer in Brownsville, Texas  Brooks claims that she was injured on May 16, 1998 and stopped working on June 1  Unum Life paid eight months of benefits (which, of course, we seek to recover)  She was born on October 5, 1959, meaning that she turns 65 in October 2024.  (The question remains whether she has a lifetime benefit rider )  Moreover, talking about a benefit valuation to age 65 seems absurd given her condition and probable recovery, and her claim is more likely residual than total

That being said, we note that total disability benefits (at $6,000 per month) from February 1999 through August 2002 would total $252,000  From that point to her 65th birthday (another 266 months), the present value of future total disability benefits, using a discount rate of 5%, would be $963,547  At least that gives us some idea of the numbers they will present in their repudiation claim

We strongly doubt Brooks will settle for less than $100,000, and it seems unlikely that she would do so for less than $200,000  As such, barring surprise, it will likely take more than $200,000 to settle this case  Settlement in that range would probably be reasonable and prudent  Valuing the case much above that at this juncture is difficult  Given the current posture of the case, however, Brooks may be willing (at her attorney's urging) to settle the case in that range

Over the past few weeks, Doug (in a rare appearance as the "good cop") has attempted to establish a rapport with Di Carlo  At Sullivan's recent deposition, in which Di Carlo scored few (if any) points, Doug began discussing the possibility of mediation, and Di Carlo has become increasingly receptive to that approach  Of course, Di Carlo is in many respects between the proverbial rock and a hard place, as the clock is now ticking on his deadline to respond to a motion seeking the dismissal of Brooks' claims with prejudice and which is based in large part on his own wrongdoing  Although Di Carlo has made it clear to Doug that he wants to avoid incurring the time and expense associated with further discovery battles if at all possible, he has stated that Brooks' expectations are pretty high  Moreover, Brooks told Cascos that she thought this was a "$1 million case "  We have thus asked Di Carlo to make an opening settlement demand to encourage us to mediate  If they are unwilling or the offer is

Mr. Matthew J. Monaghan
August 1, 2002
Page 4

extreme, we may want to re-think going to mediation.  We suggest awaiting Di Carlo's response before committing to mediation.

Please call Doug and me to discuss our next step.

With best regards, I am

Very truly yours,

Andrew C. Whitaker

ACW/krp

cc:    Mr. Doug K. Butler